# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AMGEN INC. and AMGEN MANUFACTURING LIMITED, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 20-201-CFC |
| HOSPIRA, INC. and PFIZER INC., | ) ) ) | |
| Defendants. | ) ) ) | |

## JOINT CLAIM CONSTRUCTION BRIEF

Robert W. Whetzel (#2288)
Katharine Lester Mowery (#5629)
Tyler E. Cragg (#6398)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
whetzel@rlf.com
mowery@rlf.com
cragg@rlf.com

Of Counsel:

Nicholas Groombridge
Jennifer H. Wu
Jennifer Gordon
Peter Sandel
Naz E. Wehrli
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

Dominick T. Gattuso (#3630)
HEYMAN ENERIO
GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300

Of Counsel:

Dimitrios Drivas
Alison Hanstead
John P. Scheibeler
Amit Thakore
Kevin J. Georgek
Brigid Bone
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200

1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000

Wendy A. Whiteford
Kimberlin L. Morley
Paula S. Fritsch
J Drew Diamond
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320-1799
(805) 447-1000

*Attorneys for Amgen Inc. and Amgen Manufacturing, Limited*

Dated: March 15, 2021

Elizabeth Chang
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071-2433
(213) 620-7700

*Attorneys for Hospira, Inc. and Pfizer Inc.*

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................1

    A. Plaintiffs' Introductory Remarks...........................................1

        1. Plaintiffs' Summary of Argument ..............................2

        2. Level of Ordinary Skill in the Art...............................5

    B. Defendants' Introductory Remarks .......................................5

        1. Technology Overview..................................................6

        2. The '707 Patent ..........................................................8

II. AGREED-UPON CONSTRUCTIONS.............................................9

    A. "dynamic capacity" ...............................................................9

III. DISPUTED CONSTRUCTIONS....................................................10

    A. "such that the dynamic capacity of the column is increased for the protein" (Claim 1) and "of increasing the dynamic capacity of a hydrophobic interaction chromatography column for a protein" (Claim 10) ............................................................10

        1. Plaintiffs' Opening Position......................................10

            a. Amgen's Construction is Consistent with the '707 Patent Invention .............................11

            b. Amgen's Construction is Supported by the Claim Language and the Specification.....................13

        2. Defendants' Answering Position ...............................16

            a. The specification does not sufficiently inform a POSA how to conduct the relevant dynamic-capacity comparison...................................................17

            b. Amgen's construction improperly imports a limitation into the claims and does not resolve indefiniteness. .................................24

        3. Plaintiffs' Reply Position..........................................27

            a. Amgen's Proposed Construction is Correct ...................27

            b. Hospira Fails to Prove Indefiniteness of This Term.......29

**TABLE OF CONTENTS (CONTINUED)**

Page

          (1)    The Claims Apprise a POSITA of the Scope of the Invention With Reasonable Certainty ...........29

          (2)    Hospira's Indefiniteness Arguments Fail.............33

    4.    Defendants' Sur-Reply Position ................................36

        a.    The specification does not inform a POSA whether the dynamic-capacity comparison is against one salt or both salts.......................................................37

        b.    The specification does not inform a POSA what salt concentrations should be used for the single-salt comparisons. ..................................................39

B.    "mixing a preparation containing the protein with a combination of a first salt and a second salt" (Claims 1 & 10) ..........41

    1.    Plaintiffs' Opening Position....................................41

    2.    Defendants' Answering Position ..............................42

        a.    This limitation requires a protein-salt mixture with two salts only. ..................................................43

        b.    Amgen's construction allowing more than two salts would render the asserted claims indefinite. .................45

    3.    Plaintiffs' Reply Position.........................................48

        a.    The "Preparation Containing the Protein" Is Not Limited to Only  the Combination of a First Salt and a Second Salt.....................................................48

        b.    Hospira Fails to Prove Indefiniteness of This Term.......51

    4.    Defendants' Sur-Reply Position ...............................54

C.    "loading the mixture onto a hydrophobic interaction chromatography column" (Claims 1 & 10)...........................57

    1.    Plaintiffs' Opening Position....................................58

    2.    Defendants' Answering Position ..............................61

    3.    Plaintiffs' Reply Position.........................................61

    4.    Defendants' Sur-Reply Position ...............................64

## **TABLE OF CONTENTS (CONTINUED)**

**Page**

    D.    "between about 0.1 M and about 1.0" (Claims 1 & 10)......................65

          1.    Plaintiffs' Opening Position.......................................................65

          2.    Defendants' Answering Position ...............................................66

          3.    Plaintiffs' Reply Position..........................................................69

          4.    Defendants' Sur-Reply Position ...............................................74

    E.    "formulating the protein" (Claim 8)................................................76

          1.    Plaintiffs' Opening Position.......................................................76

          2.    Defendants' Answering Position ...............................................77

IV.    CONCLUSION.................................................................................77

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

CASES

*Amgen Inc., et al. v. Mylan Inc., et al.*
  Case No. 2:17-cv-01235 (W.D. Pa) ............................................................*passim*

*Ancora Techs. v. Apple, Inc.*,
  744 F.3d 732 (Fed. Cir. 2014) ...........................................................................71

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013) .........................................................................55

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
  783 F.3d 1374 (Fed. Cir. 2015) .........................................................................29

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004) ...........................................................................67

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
  192 F.3d 973 (Fed. Cir. 1999) .....................................................................45, 69

*Ferring B.V. v. Watson Labs., Inc.*,
  764 F.3d 1382 (Fed. Cir. 2014) .........................................................................65

*Forest Labs., Inc. v. Teva Pharms. USA, Inc.*,
  716 F. App'x 987 (Fed. Cir. 2017) ...............................................................24, 40

*Genentech, Inc. v. Amgen Inc.*,
  No. 18-1363-CFC, 2019 WL 2493446 (D. Del. June 14, 2019)
  (Connolly, J.) ......................................................................................................65

*Genentech, Inc. v. Amgen Inc.*,
  No. 18-924, 2019 U.S. Dist. LEXIS 99959 (D. Del. June 14, 2019) ................56

*Geneva Pharms, Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003) ...................................................................23, 40

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008) .........................................................................25

## TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014) ...................................................25, 37

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
    341 F.3d 1332 (Fed. Cir. 2003) ...................................................24, 40

*In-Depth Test LLC v. Maxim Integrated, Prods., Inc.*,
    No. 14-887-CFC, 2018 WL 5669165 (D. Del. Nov. 1, 2018)
    (Connolly, J.) .....................................................................................13

*Intendis GMBH v. Glenmark Pharm. Inc., USA*,
    822 F.3d 1355 (Fed. Cir. 2016) ...........................................................73

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ...........................................................23

*Markman v. Westview Instruments*,
    52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370
    (1996) .................................................................................................14

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ...........................................................65

*Openwave Sys. v. Apple Inc.*,
    808 F.3d 509 (Fed. Cir. 2015) .............................................................69

*Pac. Coast Bldg. Prods. v. CertainTeed Gypsum, Inc.*,
    816 F. App'x 454 (Fed. Cir. 2020) ................................................23, 27

*Pazandeh v. Yamaha Corp. of Am.*,
    718 F. App'x 975 (Fed. Cir. 2018) .....................................................45

*Phillips v. AWH Corp.*,
    *415* F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................*passim*

*Tech Props. Ltd. LLC v. Huawei Techs. Co.*,
    849 F.3d 1349 (Fed. Cir. 2017) ...........................................................75

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

<u>Page(s)</u>

*UCB, Inc. v. KV Pharm. Co.*,
   No. 08-223-JJF, 2009 WL 2524519 (D. Del. Aug. 18, 2009)............................65

*Vitronics Corp. v. Conceptronic*,
   Inc., 90 F.3d 1576 (Fed. Cir. 1996) ....................................................................14

STATUTES

35 U.S.C. § 112.................................................................................................10, 29

vi

Pursuant to this Court's Scheduling Order (D.I. 33), Plaintiffs Amgen Inc. and Amgen Manufacturing, Limited (collectively, "Plaintiffs" or "Amgen") and Defendants Hospira, Inc. and Pfizer Inc. (collectively, "Defendants" or "Hospira" or "Pfizer") provide this joint claim construction brief in support of their proposed claim constructions for U.S. Patent No. 8,273,707 ("the '707 Patent") (attached as Exhibit 1).

## I.   INTRODUCTION

### A.   Plaintiffs' Introductory Remarks

This is a patent infringement action involving Amgen's assertion of the '707 Patent as to Hospira's biosimilar version of Amgen's NEULASTA®.  Amgen asserts two independent claims, Claims 1 and 10, and four dependent claims, Claims 2, 4, 8, and 11, of the '707 Patent against Hospira.  The parties have agreed on the construction of one term, "dynamic capacity," and disagree on the construction of five groups of related or identical terms.  The disputed terms are indicated in bold and underline below:

> 1. A process for purifying a protein on a hydrophobic interaction chromatography column **such that the dynamic capacity of the column is increased for the protein** comprising **mixing a preparation containing the protein with a combination of a first salt and a second salt**, **loading the mixture onto a hydrophobic interaction chromatography column**, and eluting the protein, wherein the first and second salts are selected from the group consisting of citrate and sulfate, citrate and acetate, and sulfate and acetate, respectively, and wherein

the concentration of each of the first salt and the second salt in the mixture is **between about 0.1 M and about 1.0**.

8. The process of claim 1, further comprising **formulating the protein**.

10. A method **of increasing the dynamic capacity of a hydrophobic interaction chromatography column for a protein**, comprising **mixing a preparation containing the protein with a combination of a first salt and a second salt**, and **loading the mixture onto a hydrophobic interaction chromatography column**, wherein the first and second salts are selected from the group consisting of citrate and sulfate, citrate and acetate and sulfate and acetate, respectively, and wherein the concentration of each of the first and second salts in the mixture is **between about 0.1 M and about 1.0 M**.

## 1.     Plaintiffs' Summary of Argument

Amgen's constructions should be adopted for the following reasons.

*First,* only Amgen proposes constructions for the terms "such that the dynamic capacity of the column is increased for the protein" (Claim 1), "of increasing the dynamic capacity of a hydrophobic interaction chromatography column for a protein" (Claim 10), and "formulating the protein" (Claim 8), and the constructions are consistent with what the inventors actually invented, and what is actually claimed and described in the patent and the intrinsic evidence.

A key inventive aspect of the invention described in the '707 Patent is the use of a combination of a first salt and a second salt to increase the dynamic capacity of the hydrophobic interaction chromatography ("HIC") column for a particular protein of interest to a level higher than that achieved with the use of a

2

single salt at a comparatively higher concentration.  The patent also teaches that the invention is particularly useful for purifying protein-based drugs (also known as biologics) and claims formulating the purified protein-based drugs.  Amgen's proposed constructions for these three terms incorporate these specific teachings of the '707 Patent.  Notwithstanding Hospira's claims of indefiniteness,[1] Amgen has demonstrated that these terms have constructions that are supported by the intrinsic evidence.  Further, because Hospira has not proposed any constructions for these terms, Amgen respectfully asks the Court to adopt its proposed constructions.

**Second,** while the parties seem to agree partially on the meaning of the term "mixing a preparation containing the protein with a combination of a first salt and a second salt," Hospira's proposed construction improperly imposes a further limitation by inserting "and no other salts" with respect to the combination of a first salt and a second salt.  Hospira is adding a limitation into the claims that is simply not there.

**Third,** Amgen's proposed construction for "loading the mixture onto a hydrophobic interaction chromatography column" captures the teachings of the

---

[1] Because Hospira bears the burden of proving indefiniteness, Amgen does not address it in its Opening Brief as to any of the terms for which Hospira has asserted indefiniteness or indefiniteness in the alternative.  Amgen reserves its right to respond to Hospira's indefiniteness arguments at an appropriate time.  As of the date of Amgen's Opening Brief, Amgen has only been advised of Hospira's indefiniteness arguments in its Initial Invalidity Contentions.

specification including the process of allowing the protein to interact with hydrophobic groups on the matrix and to bind to the column as a result of such interactions. In addition, Amgen's proposed construction is the same as that ordered by the District Court for the U.S. Western District of Pennsylvania in *Amgen Inc., et al. v. Mylan Inc., et al.* Case No. 2:17-cv-01235 (W.D. Pa) (the "Mylan Case"). Hospira's construction ignores the specific teachings of the '707 Patent and does not include what it means to load a protein onto a HIC column. Further, Hospira reads into the claim an additional limitation such that the "mixture" contain no salts other than the first and second salts. This is improper. Such a limitation would require that the "preparation containing the protein" used in creating the mixture be devoid of salts. However, the specification discloses the use of partially purified protein preparations which, as the POSITA would recognize, are in solutions containing buffering salts to maintain the stability of the protein.

**Fourth**, Amgen's construction for "between about 0.1 M and about 1.0" is consistent with the plain and ordinary meaning of "about" and was previously adopted by the district court in the Mylan Case, whereas Hospira's proposed construction introduces strict numerical boundaries in a manner that is inconsistent with established Federal Circuit decisions.

Accordingly, Amgen respectfully requests that the Court adopt Amgen's proposed constructions for the '707 Patent.

### 2.    Level of Ordinary Skill in the Art

Amgen submits that a person of ordinary skill in the art ("POSITA") as of the priority date of the '707 Patent, January 30, 2004, would have had a Ph.D. in biochemical engineering, biomedical engineering, biochemistry, or a related discipline, with at least two years of work experience in the field of protein purification by chromatography. Additional training or study could substitute for additional work experience and additional work experience or training could substitute for formal education.

To provide technical background, Amgen is submitting the Declaration of Richard C. Willson, Ph.D., ("Willson Decl." attached as Exhibit 2).

### B.    Defendants' Introductory Remarks

There are three pegfilgrastim biosimilars currently on the market. Amgen settled all prior lawsuits against those biosimilar manufacturers. Amgen filed this patent case against Pfizer under the Biologics Price Competition and Innovation Act ("BPCIA") to delay additional biosimilar competition for its Neulasta® pegfilgrastim product.

The patent-in-suit, U.S. Patent No. 8,273,707 ("the '707 patent"), generally covers a process for purifying proteins through hydrophobic interaction

chromatography ("HIC") using a combination of two salts at certain concentrations. It is not specific to and does not mention pegfilgrastim. The parties initially identified five claim terms from the asserted claims as requiring construction; however, only three issues remain: (i) whether the preamble of the claims is indefinite; (ii) whether the claims are limited to processes utilizing two salts and no other salts; and (iii) the scope of the claimed salt concentration range.

### 1.    Technology Overview

The process of purifying proteins by HIC has been known since the 1940s. Declaration of Todd M. Przybycien, Ph.D. ("Przybycien Decl.") (attached as Exhibit 3) at ¶ 13. Since then, HIC purification has become a mainstream technique used for downstream processing of proteins in the biotechnology and pharmaceutical industries to purify a variety of biomolecules. Przybycien Decl. ¶ 13.

In a typical HIC purification process, the protein of interest is mixed with a buffer containing one or more salts, and that protein-salt mixture is then loaded onto the HIC column. Przybycien Decl. ¶ 14. The purpose of mixing the protein with a salt buffer is to increase protein retention to the column. In general, protein retention (*i.e.*, the strength of protein binding to the column) increases as a function of salt concentration. Przybycien Decl. ¶ 14. As the protein is adsorbed onto (*i.e.*, retained by) the column with the aid of the salt mixture, it is separated from impurities that are less-strongly adsorbed, or not adsorbed at all, and can be washed off the column.

Przybycien Decl. ¶ 15. After such nonbinding proteins and impurities have been washed off the column, the bound proteins are eluted—*i.e.*, released from the column—typically by washing the column with a mixture containing one or more salts in a lower concentration. Przybycien Decl. ¶ 16. The resulting protein is thus purified, and can be formulated into a biopharmaceutical product. Przybycien Decl. ¶ 17.

The amount of protein that can be loaded onto the HIC column without significant breakthrough (*i.e.*, separation from the column) is referred to as the dynamic capacity of that column for the protein. Przybycien Decl. ¶ 15. It is a basic principle of HIC purification that increasing the amount of protein that can be loaded and bound to the HIC column will increase the yield of purified protein, so long as the protein can be eluted from the column. Przybycien Decl. ¶ 17. As the '707 patent explains, maximizing the purified protein yield results in a more efficient— and thus less expensive—manufacturing process. '707 patent at 1:52-62.

Long before the priority date, the prior art emphasized that the type and concentration of salts used in HIC is critically important to the performance and efficiency of protein purification. Przybycien Decl. ¶ 18. The prior art reported many examples of mixing a protein with two salts—each within the concentration range of 0.1 M to 1.0 M claimed by the '707 patent—for loading onto the HIC column. Przybycien Decl. ¶ 20.

2.      The '707 Patent

The '707 patent, titled "Process for Purifying Proteins," issued on September 25, 2012, from U.S. Application No. 12/822,072, filed June 23, 2010.  The '707 patent is a divisional of U.S. Application No. 10/895,581, filed on July 21, 2004, now U.S. Patent No. 7,781,395, and claims priority to Provisional Application No. 60/540,587, filed on January 30, 2004.

Amgen asserts claims 1, 2, 4, 8, 10, and 11 of the '707 patent.  The disputed claim terms appear in independent claims 1 and 10.  Claim 1 is reproduced below, with the disputed terms bolded and underlined:

> 1. A process for purifying a protein on a hydrophobic interaction chromatography column [1] **such that the dynamic capacity of the column is increased for the protein** comprising [2] **mixing a preparation containing the protein with a combination of a first salt and a second salt**, [3] **loading the mixture onto a hydrophobic interaction chromatography column**, and eluting the protein, wherein the first and second salts are selected from the group consisting of citrate and sulfate, citrate and acetate, and sulfate and acetate, respectively, and wherein the concentration of each of the first salt and the second salt in the mixture is between [4] **about** 0.1 M and **about** 1.0.

'707 patent at 15:8-18; 16:9-18.

Independent claim 10 is similar to claim 1, except it does not require "eluting the protein," and the preamble is phrased differently:  "A method **of increasing the dynamic capacity of a hydrophobic interaction chromatography column for a protein**…." *Id.*  The parties agree that this term should have the same construction as term [1] in the preamble of claim 1.  *See* D.I. 48-1.

8

Below is an illustration of the HIC purification process as required by the asserted claims:



## II.     AGREED-UPON CONSTRUCTIONS

### A.     "dynamic capacity"

The parties agree on the meaning of this term and respectfully submit that the term "dynamic capacity" should be construed to mean:  "the maximum amount of protein in solution which can be loaded onto a column without significant breakthrough or leakage of the protein into the solution phase of the column before elution."   '707 Patent, at col. 3:65- col. 4:3.

## III.   DISPUTED CONSTRUCTIONS

### A.   "such that the dynamic capacity of the column is increased for the protein" (Claim 1) and "of increasing the dynamic capacity of a hydrophobic interaction chromatography column for a protein" (Claim 10)

| Claim Nos. | Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 and 10 | "such that the dynamic capacity of the column is increased for the protein" (claim 1)<br><br>"of increasing the dynamic capacity of a hydrophobic interaction chromatography column for a protein" (claim 10) | such that the dynamic capacity of the hydrophobic interaction chromatography column for the protein that is achieved by using a combination of a first salt and a second salt, at least one at a reduced concentration compared to the concentration of that salt when used alone, is greater than the dynamic capacity of the column for the protein that is achieved by using a single salt at a higher concentration | Indefinite |

### 1.   Plaintiffs' Opening Position

Amgen and Hospira agree that, to the extent the disputed terms are included in the preamble of the claims, they are nevertheless limiting. The parties further agree that these disputed terms from Claims 1 and 10 should be treated in the same way, but disagree as to how. Hospira has not offered constructions for these terms and instead alleges that these terms are invalid as indefinite under 35 U.S.C. § 112. *See* Joint Claim Terms Chart (D.I. 48-1) at 2, 5. Amgen's proposed constructions

should be adopted as they are consistent with what the inventors actually invented, and what is actually claimed and described in the patent and the intrinsic evidence. *See Phillips v. AWH Corp., 415* F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

### a.     Amgen's Construction is Consistent with the '707 Patent Invention

Amgen's construction for this term is consistent with "what the inventors actually invented and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316.  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.*  The '707 Patent is directed to a process for protein purification using what is known as HIC.  HIC separates a protein from impurities based on a property known as hydrophobicity, or tendency to avoid water.  *See* '707 Patent, at col. 1:36-49.  Hydrophobic regions on the surface of the protein interact with the hydrophobic groups on the matrix in the chromatography column, and this interaction causes the protein to adsorb to the matrix while impurities flow past and out of the column.  *See id.* at 1:36-49; 3:53-64.  In HIC, a liquid, known as the "solution phase" or "mobile phase," is passed through a column containing a solid matrix, known as the "solid phase" or "resin," which is covered with immobilized hydrophobic groups.  *See id.* at col. 3:7-12, 53-64.  When proteins and salts are included in the mobile phase, the salt(s) in the mobile phase promote hydrophobic interactions between the protein and the hydrophobic groups on the matrix and

thereby facilitate protein adsorption to the HIC matrix.  *Id.* at col. 1:40-49; 3:7-16.
Elution (*i.e.*, release) of the protein from the column is typically achieved by
reducing the salt concentration in the mobile phase to reverse the adsorption of the
protein from the matrix.  *See id.* at col. 1:45-49; 3:13-16.

The invention described and claimed in the '707 Patent improves on
processes known at the time by increasing a HIC column's "dynamic capacity" for
proteins, which is the maximum amount of protein in solution that can be loaded
onto a column without significant breakthrough or leakage of the protein into the
solution phase of the column before elution.  *Id.* at col. 2:9-20, 3:6–4:3.  Before the
'707 Patent, HIC purification relied on the addition of salt to a protein preparation
at relatively high concentrations, not exceeding the amount of salt that would cause
precipitation, in order to increase the dynamic capacity.  *See, e.g., id.* at col. 3:37-
41.  But high concentrations of salt can be detrimental.  *Id.* at col. 3:41-45.  A key
inventive aspect of the '707 Patent is the use of a combination of a first salt and a
second salt, at least one of which is at a lower concentration than the concentration
the salt would be used at for single salt HIC, which results in an increase in "the
dynamic capacity of the HIC column for a particular protein."  *See id.* at col. 4:46-
51, 5:26-28; *see also id.* at col. 2:9-15; 4:33-42, 56-60; 5:25-26; 15:8–16:26.  The
inventors discovered that this approach was not only gentler on the protein but also
increased the dynamic capacity of the column for the protein.  *See id*. at col. 2:9-

12

20.  In other words, the effect of the dual salts was unexpected in the sense that the decreased salt concentrations that could be used created a less harsh environment for the protein and yet the dynamic capacity of the matrix for the protein was increased.

Further, by increasing the dynamic capacity of a HIC column and using a lower salt concentration, the invention improves the efficiency of the HIC purification process.  *See id.* at col.1:54-62.  This in turn decreases the cost and time required to purify a batch of protein, which is particularly useful in commercial production and purification of proteins, especially therapeutic proteins, such as human granulocyte-colony stimulating factor ("G-CSF") which is used to produce both Amgen's innovator NEULASTA® product and Hospira's accused biosimilar product NYVEPRIA™.  *See id.* at col. 10:4-24; 11:36-46.

### b.  Amgen's Construction is Supported by the Claim Language and the Specification

Amgen's proposed construction is supported by the claim language.  The words of a claim "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art at the time of the invention."  *Phillips* at 1312-1313; *see also*, *In-Depth Test LLC v. Maxim Integrated, Prods., Inc.*, No. 14-887-CFC, 2018 WL 5669165, at *1 (D. Del. Nov. 1, 2018) (Connolly, J.).  Both Claim 1 and Claim 10 indicate that the

13

dynamic capacity of the HIC column is increased by a combination of a first salt and a second salt.

Amgen's proposed construction is also supported by, and consistent with, the specification. Claims "must be read in view of the specification [*i.e.*, written description]," which is "always highly relevant to the claim construction analysis." *Phillips.* at 1315 (quoting *Markman v. Westview Instruments*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996); *Vitronics Corp. v. Conceptronic*, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp.*, 90 F.3d at 1582.

While the claims by themselves do not expressly define what the comparator is for the "increas [e]" in the dynamic capacity, a POSITA would understand from numerous consistent and unequivocal statements in the specification that using a salt pair, one or both of which salts is at a concentration lower than would be used with either salt individually in a single salt approach, increases the dynamic capacity of the column for the protein compared to the dynamic capacity achieved with either salt alone:

- "According to the present invention a first salt and a second salt are selected which have differing lyotropic values. This combination of salts acts together to increase the dynamic capacity of the HIC column for a particular protein. It has been found according to the present invention that ***each salt in combination can be provided at a lower concentration tha[n]***

14

> *the concentration of the salt alone to achieve a higher dynamic capacity for a protein compared with the dynamic capacity using a single salt.*" '707 Patent, at col. 5:25-33 (emphasis added).

- "The present invention provides combinations of salts useful for increasing the dynamic capacity of an HIC column compared with the dynamic capacity of the column using separate salts alone." *Id.* at col. 2:9-13.

- "The present invention differs from [prior art] practices in the use of an intermediate concentration of a buffering salt in combination with an intermediate concentration of a second [salt] … to achieve increased dynamic capacity." *Id.* at col. 3:31-36.

- "These combinations of salts allow for a decreased concentration of at least one of the salts to achieve a greater dynamic capacity." *Id.* at col. 2:13-16.

The specification therefore clearly explains that the increase refers to the increase in the dynamic capacity of the column for the protein using a combination of two salts, at least one at a reduced concentration, compared with the dynamic capacity of the column for the protein using either salt individually at a higher concentration.

The specification also expressly defines "dynamic capacity" (*id.* at col. 3:65-col. 4:6) and teaches how it is measured:

> "Practically, dynamic capacity of a given HIC column is determined by measuring the amount of protein loaded onto the column, and determining the resin load which is mg protein/column volume (mg/ml−r). The amount of protein leaving the column in the solution phase after the column is loaded ("breakthrough") but before elution begins can then be measured by collecting fractions during the loading process and

15

first wash with equilibrium buffer. The load at which no significant breakthrough occurs is the dynamic capacity of the protein for those conditions."

'707 Patent, at col. 4:7-16.

Thus, Amgen requests that the Court adopt its proposed construction for these two terms.

### 2. Defendants' Answering Position

The parties agree that the preambles of claims 1 and 10 are limiting and should be construed the same. But they disagree as to whether the meaning and scope of the limitations can be determined. Pfizer asserts that the claim terms "such that the dynamic capacity of the column is increased for the protein" in claim 1, and "of increasing the dynamic capacity of a hydrophobic interaction chromatography column for a protein" in claim 10, render these claims—along with all asserted dependent claims—indefinite. The claims, specification, and file history of the '707 patent do not provide guidance as to what the baseline is for measuring an "increase" in dynamic capacity and how such a determination should be made. Without such a baseline, it is impossible to determine whether a particular process satisfies the claims or not.

Amgen's lengthy construction imports new limitations into the claim by defining "increased" dynamic capacity comparison as follows: **"that is achieved by using a combination of a first salt and a second salt, at least one at a reduced**

**concentration compared to the concentration of that salt when used alone, is greater than the dynamic capacity of the column for the protein that is achieved by using a single salt at a higher concentration."** These imported limitations, in addition to being legally improper, do not accurately reflect the patent's disclosure, as there are inconsistent disclosures in the specification on this very issue. Rather than resolving indefiniteness, Amgen's proposed construction creates further ambiguity regarding the meaning of "increased" dynamic capacity.

### a. The specification does not sufficiently inform a POSA how to conduct the relevant dynamic-capacity comparison.

As explained by Dr. Przybycien, a POSA is unable to determine with reasonable certainty how to evaluate whether the dynamic capacity of a HIC column for a protein has been "increased," as required by the asserted claims. Przybycien Decl. ¶¶ 32-41. The claims require that there is an increase in dynamic capacity, but provide no additional information. The phrase "the dynamic capacity of the column is *increased* for the protein" thus begs the question: increased compared to what? The claims are silent on this issue, and the specification provides inconsistent—and insufficient—guidance.

For example, one portion of the specification suggests that the claimed two-salt combination must increase the dynamic capacity of the HIC column compared

with "separate salts alone," and "at least one of the salts" in the combination must have "a decreased concentration":

> The present invention provides combinations of salts useful for increasing the dynamic capacity of an HIC column *compared with the dynamic capacity of the column using separate salts alone*.  These combinations of salts allow for *a decreased concentration of <u>at least one of the salts</u> to achieve a greater dynamic capacity*, without compromising the quality of the protein separation.

'707 patent at 2:9-16 (emphasis added).  This disclosure suggests that just one of the individual salts used for the comparison needs to have a concentration higher than what is used in the two-salt combination.

But other specification disclosures suggest that "each single salt" must have "higher salt concentrations" than in the two-salt combination:

> According to the present invention, combining two different salts having different lyotrophic [sic] values with a protein preparation allows more protein to be loaded onto a column with no or negligible breakthrough *compared with <u>higher salt concentrations</u> of **<u>each single salt</u>**.
>
> ***
>
> It has been found according to the present invention that **<u>each salt</u>** *in combination can be provided at a <u>lower concentration</u> tha[n] the concentration of the salt alone* to achieve a higher dynamic capacity for a protein *compared with the dynamic capacity using a single salt*.
>
> ***

18

> These results show that reduced concentrations of the salts together compared with a salt alone could precipitate the protein . . . This indicated that *reduced concentrations of **each** **salt** in combination* produced equivalent hydrophobic effects *compared with underlined higher concentrations of **each** salt alone*.

*Id.* at 4:46-51; 5:28-33; 12:35-40 (emphasis added).

As a result of these conflicting disclosures, the patent fails to inform a POSA whether the claims require the dynamic capacity of the column with the claimed two-salt mixture to be increased compared with (1) the dynamic capacity of the column with each salt individually at higher concentrations, or (2) just one of the salts with an increased concentration.  This ambiguity makes it impossible to determine with reasonable certainty whether an accused process falls within the scope of the claims.  Przybycien Decl. ¶ 36.

The examples in the specification illustrate the ambiguity of the claims. Example 1 describes an experiment comparing the dynamic capacity of a column for a protein mixed with single salts to the dynamic capacity of a column using two salts.  '707 patent at 11:50–14:5.  Table 1 lists the salts tested in this experiment, as well as the results:

TABLE 1

Dynamic capacities of antibody against EGFR with
four salts and their combinations. Only anions are
listed; the cations were sodium for every salt

| Experimental Conditions | Dynamic Capacity (mg/ml-r) |
|---|---|
| 0.55M Citrate | 24 |
| 0.5M Phosphate | 12 |
| 0.8M Sulfate | 24 |
| 1.2 M Acetate | 5 |
| 0.55M Citrate/0.3M Sulfate | 30 |
| 0.6M Acetate/0.5M Citrate | 29 |
| 0.35M Phosphate/0.6M Citrate | 39 |
| 0.6M Acetate/0.7M Sulfate | 27 |
| 0.5M Citrate/1M Acetate | 34 |
| 0.5M Sulfate/1M Acetate | 33 |
| 0.4M Phosphate/0.3M Sulfate | 15 |
| 0.5M Sulfate/0.3M Citrate | 33 |
| 0.5M Sulfate/0.3M Phosphate | 17 |
| 0.3M Citrate/0.6M Phosphate | 35 |

*Id.* at 13:40-58.   According to the specification: "Table 1 shows that the combinations of citrate/sulfate, acetate/citrate, phosphate/citrate, acetate/sulfate, citrate/acetate, sulfate/acetate, sulfate/citrate, and citrate/phosphate increased the dynamic capacity of the HIC column for the antibody by factors varying from approximately 1.5 to 2 times or more that of each salt alone."  *Id.* at 13:59-64.

However, the salt concentrations used in Table 1 vary considerably—spanning from as low as 0.3 M to as high as 1.2 M.  Sometimes only one of the individual-salt concentrations was increased compared to the concentration of that salt in the combination (e.g., 0.55 M citrate/0.3 M sulfate compared to 0.55 M citrate and 0.8 M sulfate), and sometimes both individual-salt concentrations were increased (e.g., 0.6 M acetate/0.5 M citrate compared to 1.2 M acetate and 0.55 M citrate).  As a result, it is unclear whether dynamic capacity must be increased

20

compared to one salt alone at an increased concentration, both salts individually at increased concentrations, or either one of the two salts alone. Przybycien Decl. ¶¶ 37-38. Thus, a POSA would not know how to conduct their own experiments to determine whether dynamic capacity has "increased" for a particular process. Przybycien Decl. ¶ 38.

In addition, Example 1 does not provide guidance as to how the concentrations of the four individual salts were chosen for purposes of making the dynamic capacity comparison in Table 1. The specification indicates that precipitation curves were prepared for each salt individually to determine the concentration at which "percent recovery" decreased significantly. '707 patent at 12:4-22. However, these particular concentrations were not used in Table 1 for the single salt comparisons. For example, the specification indicates that percent recovery of the protein in Example 1 decreased significantly at greater than about 0.8 M for sodium phosphate buffer, but in Table 1 the concentration of sodium phosphate alone is 0.5 M. Similarly, the specification identifies 0.6 M sodium sulfate as the concentration at which solubility decreased significantly, whereas Table 1 indicates that 0.8 M was the concentration used for the single salt comparison. This raises yet more questions regarding the dynamic capacity comparison required by the claims. Przybycien Decl. ¶ 39.

The ambiguity regarding salt concentrations is critically important. As the specification acknowledges, "increasing salt concentrations can increase the

'dynamic capacity' of a column." '707 patent at 3:37-38. Thus, the dynamic capacity of a column loaded with two salts, each at a concentration of 0.6 M, may be increased compared to a column loaded with the single salts at a concentration of 0.8 M, but not compared to a column loaded with the same single salts at a concentration of 1.2 M. Przybycien Decl. ¶ 40. At the same time, the effect of salt concentration on binding capacity is not necessarily linear, which makes the outcome even less predictable. *Id.* With no guidance as to how to conduct the required comparison (e.g., what salt concentrations to use for the comparison), the POSA is left with no way to determine with reasonable certainty whether an accused process infringes the claims or not.

This point is made clear by the data reported in Table 1. According to the table, dynamic capacity of the column increased using an acetate/sulfate combination as compared to the dynamic capacity with either acetate alone or sulfate alone—but only with certain concentrations. The study used 0.6 M acetate and 0.7 M sulfate in the two-salt combination, and 1.2 M acetate and 0.8 M sulfate when each salt was tested alone. The study found that the dynamic capacity for the acetate/sulfate combination was 27 mg/ml-r, and the dynamic capacity for sulfate alone was 24 mg/ml-r. Thus, the two-salt combination resulted in a slight increase in dynamic capacity. However, it is likely that that the dynamic capacity would not necessarily be increased at other concentrations that could have been used for the

single salt.  *See* Przybycien Decl. ¶ 41.  In such instances, the dynamic capacity of the acetate/sulfate combination would be *decreased* compared to the sulfate salt alone, and a process using this salt combination would not infringe the claims according to that comparison.  *Id.*  As the Federal Circuit has explained, if an accused product might infringe or not depending on changing circumstances, this is the "epitome of indefiniteness."  *See Geneva Pharms, Inc. v. GlaxoSmithKline PLC,* 349 F.3d 1373, 1384 (Fed. Cir. 2003).

This is just one example of how varying the salt concentrations when conducting the comparison required by the claims would lead to inconsistent infringement conclusions.  There is a virtually infinite number of experiments a POSA could conduct for any particular protein and salt combination.  And whether the dynamic capacity is "increased" would depend on which parameters were selected.  Przybycien Decl. ¶ 44.

In short, the '707 patent does not "provide objective boundaries for those skilled in the art."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (finding indefiniteness where claim limitation was "highly subjective and, on its face, provide[d] little guidance to one of skill in the art").  The Court should follow a long line of precedent finding claims indefinite under analogous circumstances.  *See, e.g.*, *Pac. Coast Bldg. Prods. v. CertainTeed Gypsum, Inc.*, 816 F. App'x 454, 459 (Fed. Cir. 2020) (affirming district court's claim-construction

order finding patent invalid for indefiniteness where "claims and specification fail[ed] to explain what the value represent[ed] or how to consistently and reproducibly measure" it); *Forest Labs., Inc. v. Teva Pharms. USA, Inc.*, 716 F. App'x 987, 994 (Fed. Cir. 2017) (affirming indefiniteness where "claims require[d] measured quantities (absolute or relative), different techniques for such measurements [were] known in the art and some produce[d] infringing results and others not"); *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1339 (Fed. Cir. 2003) (affirming indefiniteness under the more stringent "insolubly ambiguous" standard where the choice of "sample preparation method [was] critical" to infringement and intrinsic record did not "provide sufficient clues to discern which methods are acceptable.").

> **b.      Amgen's construction improperly imports a limitation into the claims and does not resolve indefiniteness.**

Amgen's lengthy construction does not help resolve the ambiguity of the preambles.  If anything, it underscores indefiniteness.

According to Amgen, the preamble is satisfied if the dynamic capacity of the two-salt combination (with "at least one at a reduced concentration compared to the concentration of that salt when used alone") is greater than the dynamic capacity of "a single salt at a higher concentration."  There are at least two significant problems with Amgen's construction.

24

<u>First</u>, Amgen is reading limitations from the specification into the claims. The preambles simply require that "the dynamic capacity of the column is increased for the protein" (e.g., claim 1) without providing any concentration limitations for the comparator salt(s), or information on whether the dynamic capacity must be increased as compared to the first salt, the second salt, or both salts. To try to save its claims, Amgen is trying to import a new limitation requiring the comparator to have "at least one" of the salts "at a higher concentration" than in the dual-salt combination. But the specification provides no clear intention to so limit the claim scope. As discussed above, the specification is inconsistent in describing whether just one comparator salt, or both salts, need to have higher concentrations. The Court should thus reject Amgen's proposal to redraft the claims based on one of two inconsistent disclosures in the specification. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) ("the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction") (internal citation omitted); *see also Phillips v, AWH Cprp.,*, 415 F.3d 1303,  1323 (Fed. Cir. 2005) (courts must be careful not to read limitations from the specification into the claim).

<u>Second</u>, Amgen's construction, if adopted, still would leave the claims indefinite. *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1256

(Fed. Cir. 2008) (rejecting proposed construction as "not sufficiently definite" and discerning "no other construction that c[ould] properly be adopted that would render the claims definite"). Amgen proposes that the dynamic capacity of the two-salt combination must be increased compared to the dynamic capacity "*that is achieved by using a single salt at a higher concentration*." This raises additional questions as to the appropriate comparison. For example, if both salts in the two-salt combination are at a reduced concentration, is the preamble satisfied by showing an increase in dynamic capacity compared to just one of the salts at a higher concentration, or would it be necessary to show an increase compared to both salts individually? Alternatively, if only one of the salts in the two-salt combination is at a reduced concentration, could the preamble be satisfied by showing an increase in dynamic capacity compared to *either* salt alone, or would it be necessary to show an increase compared to the single salt that is at a higher concentration? Amgen's construction does not appear to exclude any of these possibilities, as it requires that only one of the salts in the combination must at a reduced concentration and simply states that dynamic capacity must be increased compared to "a single salt" at a higher concentration. *See* Przybycien Decl. ¶ 42.

Amgen's construction also does nothing to address the ambiguity concerning the single salt concentrations to be used in making the comparison to the two-salt combination. For example, Amgen's construction would not address the ambiguity

raised above with the acetate/sulfate combination described in Example 1. That combination showed a relatively small increase in dynamic capacity compared to sulfate alone at 0.8 M (27 mg/ml-r vs. 24 mg/ml-r), but likely would have showed a decrease at other concentrations. *See* Przybycien Decl. ¶ 43. This is a classic situation where the claims are indefinite. *See, e.g., Pac. Coast*, 816 F. App'x at 458–59.

In sum, all asserted claims should be declared invalid as indefinite because the claims do not inform a POSA with reasonable certainty (1) whether dynamic capacity of the column must be increased compared to the dynamic capacity with each salt individually at higher concentrations, or just one of the salts at an increased concentration, and (2) what salt concentration(s) to use when comparing the dynamic capacity for the two-salt combination to the dynamic capacities of the single salts. As a result, the POSA is left with no way to assess the scope of the claimed process, and no way to sufficiently determine whether an accused process infringes. If the Court agrees, such a holding would be case-dispositive—and there would be no need to address the other disputed claim terms.

### 3. Plaintiffs' Reply Position

#### a. Amgen's Proposed Construction is Correct

Hospira does not propose its own construction for these terms. Amgen's construction is consistent with the claims and the specification's teaching that the

present invention provides combinations of salts useful for increasing the dynamic capacity of a HIC column as compared with the dynamic capacity of the column when using separate salts alone. '707 Patent at col .2:9-12. These combinations of salts allow for use of a decreased concentration of at least one of the salts to achieve a greater dynamic capacity, without compromising the quality of the protein separation. *Id*. at col. 2:12-15.

Hospira accuses Amgen of reading limitations into the claims since the preambles of claim 1 and claim 10 do not themselves provide "any concentration limitations to the comparator salt(s), or information on whether the dynamic capacity must be increased as compared to the first salt, the second salt, or both salts." Br. at 25. But this ignores the express teachings about "the present invention" in the specification. '707 Patent at col. 2:9-15. Amgen incorporates those teachings into its construction, which is not an improper "importation" of limitations into the claims.

The specification describes what dynamic capacity is: "the maximum amount of protein in solution which can be loaded onto a column without significant breakthrough or leakage of the protein into the solution phase of a column before elution." *Id*. at col. 3:65-4:3. The specification also describes how to measure dynamic capacity. *Id*. at col. 4:7-16. And the specification further describes how to confirm an increase in dynamic capacity as compared to single

28

salts.  Example 1 in the specification provides examples of  increased dynamic

capacity where  "at least one" of the salts in the combination of two salts is present

at a decreased concentration compared to the concentration of the single salt when

used individually.  *Id*. at col.2:9-16.  Consistent with the specification, Amgen's

proposed construction also encompasses embodiments in which both salts are

present at decreased concentrations.  *See, e.g*., *id.* at col. 5:25-33; col. 13:40-58.

### b.    Hospira Fails to Prove Indefiniteness of This Term

#### (1)    The Claims Apprise a POSITA of the Scope of the Invention With Reasonable Certainty

At the outset, Amgen wishes to state that it is aware of the Court's

preference not to address indefiniteness during claim construction and has done so

only in response in response to Hospira's arguments.

A patent's specification must "conclude with one or more claims particularly

pointing out and distinctly claiming the subject matter which the inventor ...

regards as the invention."  35 U.S.C. § 112.  The Supreme Court in *Nautilus, Inc.*

*v. Biosig Instruments, Inc.* held that a patent claim is indefinite if, when "read in

light of the specification delineating the patent, and the prosecution history, [the

claim] fail[s] to inform, with reasonable certainty, those skilled in the art about the

scope of the invention."  572 U.S. 898, 901 (2014).  "Reasonable certainty" does

not require "absolute or mathematical precision."  *Biosig Instruments, Inc. v.*

*Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015) (internal quotation marks

omitted).  Hospira has the burden of "proving indefiniteness by clear and convincing evidence." *Id.* at 1377.

Hospira argues, based on expert testimony from Dr. Todd Przybycien, that the patent does "not provide guidance as to what the baseline is for measuring an 'increase' in dynamic capacity and how such a determination should be made." Br. at 16.  Contrary to Hospira's arguments, and as explained in the testimony of Amgen's expert (and POSITA), Dr. Richard Willson, the specification provides guidance such that a POSITA would understand the scope of the claims with reasonable certainty.

Claims 1 and 10 at issue here are directed to the use of a combinations of a first salt and a second salt, where the salt combinations are selected from the groups: citrate and sulfate, citrate and acetate, and sulfate and acetate.  Those claims, when read in light of the specification, inform those skilled in the art about the scope of the invention, with reasonable certainty.  *See* Willson Reply Decl. at ¶¶ 15-34 (Exhibit 4).

Contrary to Hospira's assertions, a POSITA reading the claims in light of the specification would understand the identity of the comparators to be used when determining whether there is an increase in the dynamic capacity.  The Abstract and specification explain that an increase in the dynamic capacity of the column through using a salt pair would be in reference to the dynamic capacity of the

column when using a single salt.  *See* '707 Patent, Abstract; *see also*, *id*. at col. 2:11-12 and col. 5:32-33.  Thus, a POSITA would understand that the comparators used to determine whether there is an increase in the dynamic capacity of the column when using a salt pair are: (1) the dynamic capacity achieved by the use of the salt pair, (2) the dynamic capacity achieved by the use of the first salt individually, and (3) the dynamic capacity achieved by the use of the second salt individually.  If the dynamic capacity obtained using a combination of the claimed salts is greater than the dynamic capacity obtained with the first salt individually or the dynamic capacity obtained with the second salt individually, the claimed increase in dynamic capacity has been demonstrated.  *See* Willson Reply Decl. at ¶ 34.

There is also clear guidance in the specification regarding the selection of salt concentrations for the individual salts and the salt combination.  A POSITA reading the claims in light of the specification would understand that a few closely ranged concentrations of an individual salt would need to be tested to determine the maximum dynamic capacity of the column for each individual salt.  *See* Willson Reply Decl. at ¶ 25.  The specification teaches how to select the concentrations of each of the individual salts and the combination of salts in the claimed combination so as to maximize the dynamic capacity of the column for a particular protein.  '707 Patent at col. 5:35-58, *see also*, *id*. at col. 11:57-13:7;

31

Willson Reply Decl. at ¶¶ 16-20.  Specifically, the patent teaches: "The first and second salt combinations are selected for each particular protein through a process of establishing precipitation curves for each salt individually, and precipitation curves for the combination of salts holding one salt constant and varying the second."  '707 Patent at at col. 2:16-20; *see also*, *id*. at col. 5:35-38.  In addition, the patent describes how to determine the salt concentrations to use in order to obtain maximum dynamic capacity: "the results of the single and two salt precipitations provided a range of single and combined salt concentrations for the determination of dynamic capacity for an HIC column."  *Id.* at col. 12:41-44; *id*. at col. 5:43-45.

Further, a POSITA reading the claims in light of the specification would understand that the concentration of at least one of the salts in the pair is lower than the concentration of the individual salt when that salt is used alone in the dynamic capacity experiments.  *See* Willson Reply Decl. at ¶ 30.  The patent describes that "These combinations of salts allow for a decreased concentration of at least one of the salts to achieve a greater dynamic capacity."  *See* '707 Patent col. 2:12-14.  A POSITA would also understand that the concentration of both salts in the pair may be lower than the concentrations of each individual salt when used alone.  *See* Willson Reply Decl. at ¶ 31.  The patent states, "According to the present invention, combining two different salts having different lyotrophic [sic]

32

values with a protein preparation allows more protein to be loaded onto a column with no or negligible breakthrough compared with higher salt concentrations of each single salt." '707 Patent, col. 4:46-51.  And the patent also describes that "It has been found according to the present invention that each salt in combination can be provided at a lower concentration that [sic] the concentration of the salt alone to achieve a higher dynamic capacity for a protein compared with the dynamic capacity using a single salt."  *Id.* at col. 5:28-33.

### (2)    Hospira's Indefiniteness Arguments Fail

Hospira and its expert Dr. Przybycien argue that a POSITA would be unable to determine the appropriate comparator by which to measure the claimed increase in dynamic capacity, rendering all of the claims indefinite.  Hospira has failed to carry its burden of demonstrating indefiniteness.

*First,* Hospira argues that the description of the relative salt concentrations in the Summary of the Invention is inconsistent with teachings elsewhere in the specification.  Br. at 17-20.  This is incorrect.  The Summary of the Invention states that the claimed "combinations of salts allow for a decreased concentration of ***at least one*** of the salts to achieve a greater dynamic capacity, without compromising the quality of the protein separation."  '707 Patent at col. 2:9-16 (emphasis added).  Hospira argues that other portions of the specification (col. 4:46-51, col. 5:28-33, col. 12:35-40) teach that both salts in the combination can be

present at lower concentrations than when used as single salts, and thus there is a conflict.  Br. at 17-19.  This is simply wrong.  Amgen's proposed construction reflects the Summary of Invention's teaching because at least one of the first salt or second salt is at a lower concentration in the combination than the concentration of the single salt that is used as a comparator.  It is permitted but nor required for both salts to present at lower concentrations than when either is used individually.  *See, e.g*., *id.* at col. 5:28-33.  Amgen's construction is entirely consistent with the teachings other portions of the specification.

**Second,** Hospira and Dr. Przybycien allege that a POSITA would find the data presented in Table 1 confusing.  This is incorrect.  As Dr. Willson explains, the data reflect different embodiments of the invention.  Willson Reply Decl. at ¶¶ 43-46.  For example, Table 1 includes an example of a salt pair with increased dynamic capacity in which one of the salts is used at a reduced concentration: 0.55 M citrate/0.3 M sulfate (0.3M sulfate is lower than the 0.8M sulfate used alone) and an example of a salt pair with increased dynamic capacity in which both salts are used at reduced concentrations:  0.5 M sulfate/0.3 M citrate.  '707 Patent at col. 13:40-58.

**Third,** Hospira argues that "Example 1 does not provide guidance as to how the concentrations of the four individual salts were chosen for purposes of making the dynamic capacity comparison in Table 1."  Br. at 21.  This is incorrect.  The

specification provides a detailed description of how the precipitation curves were generated and how those results were used to determine the range for assessing dynamic capacity. '707 Patent at col. 11:54-13:7. For example, with regard to the precipitation curves using the sulfate salt, the specification states that "[t]he percent recovery decreased significantly … at greater than ***about*** 0.6 M for sodium sulfate." '707 Patent at col.12:17-22 (emphasis added). A POSITA would understand that range of concentrations from the precipitation curves including "greater than about 0.6 M" for sodium sulfate also includes the 0.8 M that was reported in Table 1. *See e.g.*, Willson Reply Decl. at ¶ 50.

**Fourth**, Hospira speculates that "the dynamic capacity of a column loaded with two salts, each at a concentration of 0.6M, may be increased compared to a column loaded with the single salts at a concentration of 0.8 M, but not compared to a column loaded with the same single salts at a concentration of 1.2 M." Br. at 22. This is contrary to how the POSITA would understand the patent. *See* Willson Reply Decl. at ¶¶ 52-53. A POSITA following the teachings of the '707 Patent would understand that the concentration of the individual salt that provides the optimum dynamic capacity, and is used as a comparator, is approaching the concentration at which the protein will precipitate. *Id*. at ¶ 53. That POSITA would not understand that the concentration of the single salt alone could be arbitrarily increased from 0.8 M to 1.2 M as Hospira suggests because such an

increase in the salt concentration would likely result in the protein precipitating rather than facilitating the more efficient purification of the patent.  *Id.*

Amgen's proposed construction is consistent with the teachings of the specification and the understanding of the POSITA.  Moreover, Hospira has failed to demonstrate that a POSITA would be unable to understand, with reasonable certainty, the scope of the claimed invention.  Therefore, Amgen respectfully requests that the Court adopt its proposed construction.

### 4.   Defendants' Sur-Reply Position

The preamble renders the claims indefinite and Amgen's proposed construction only exacerbates their indefiniteness.  Pfizer is aware that the Court may prefer to address indefiniteness at a later stage.  Pfizer presents indefiniteness at the claim construction stage because the preamble term cannot be reasonably construed.  If the Court does not address indefiniteness at the Markman hearing, Pfizer requests that the Court not adopt the construction proposed by Amgen and leave the preamble term as written.  Amgen's construction improperly imports limitations from the specification into the claim and creates further ambiguity in the

meaning of "increased" dynamic capacity.  The Court should decline to adopt such a construction.

> **a.      The specification does not inform a POSA whether the dynamic-capacity comparison is against one salt or both salts.**

Amgen does not dispute that the specification provides two alternative approaches for conducting the dynamic-capacity comparison: (1) comparing the dynamic capacity for the two-salt combination against the dynamic capacity for "at least one" of the salts alone; and (2) comparing the dynamic capacity for the two-salt combination against both salts alone.  Br. at 32-33.  Amgen resolves this ambiguity by selecting one of the competing disclosures as its proposed construction.  The specification provides no clear intention to select one of these alternatives over the other, and in fact refers to both embodiments as "the present invention."  *See* '707 patent at 2:9-16, 4:46-51.  Amgen's importation of the "at least one" embodiment is thus improper and should be rejected.  *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) ("the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction") (internal quotation marks and citation omitted); *see also Phillips v.*

*AWH Corp.,* 415 F.3d 1303, 1323 (Fed. Cir. 2005) (courts must be careful not to read limitations from the specification into the claim).

Even accepting that the preamble may be satisfied by showing an increase in dynamic capacity against only one of the salts, this raises further questions as to the scope of the claims. Amgen states that "[i]f the dynamic capacity obtained using a combination of the claimed salts is greater than the dynamic capacity obtained with the first salt individually *or* the dynamic capacity obtained with the second salt individually, the claimed increase in dynamic capacity has been demonstrated." Br. at 31 (emphasis added). Under Amgen's construction, the preamble could be satisfied if the dynamic capacity of the two-salt combination was increased compared to one of the salts, but *decreased* compared to the other salt. A given two-salt combination could therefore be found to infringe the claims even if the dynamic capacity for the combination was worse than the dynamic capacity achieved using one of the salts alone. This is contrary to the stated purpose of the invention, *i.e.* to "improve[] the process of protein purification by increasing the capacity and

efficiency of an intermediate step." '707 patent at 1:60-62. The Court should decline to adopt Amgen's construction.

> **b.** **The specification does not inform a POSA what salt concentrations should be used for the single-salt comparisons.**

Amgen's construction does not resolve the ambiguity regarding the salt concentration to be used when making the dynamic capacity comparison(s). As explained by Dr. Przybycien in his declaration in support of Defendants' Answering Claim Construction Brief, the dynamic capacity for a particular protein and salt combination may not necessarily be "increased" depending on the concentration used for the single salt comparison. Przybycien Decl. (Ex. 3) ¶¶ 40-41. Dr. Przybycien provided a hypothetical where the dynamic capacity using a combination of two salts, each at 0.6 M, is increased compared to the dynamic capacity using a single salt at 0.8 M, but not at 1.2 M (equal to the combined concentration of both salts). *Id*. Amgen does not refute this possibility, but instead argues that a POSA would understand that "such an increase in the salt concentration would likely result in the protein precipitating rather than facilitating the more efficient purification of the protein." Br. at 35-36. This argument is contradicted by Example 1, where, according to Table 1, the concentration of sodium sulfate as a single salt was 0.8 M ('707 patent at 13:47-48), even though the specification states that solubility decreased significantly at "greater than about *0.6 M* for sodium sulfate." *Id*. at 12:17-

22 (emphasis added); Przybycien Decl. ¶ 39.  Amgen accounts for this discrepancy by arguing that 0.8 M is within the range of "about 0.6 M."  Br. at 35; Willson Reply Decl. ¶ 50.  Amgen's response exposes the moving target of its proposed construction and reinforces the indefiniteness of the preamble, consistent with Dr. Przybycien's analysis.

Under Amgen's proposed construction, it is necessary to conduct a series of at least four precipitation curve experiments to determine whether the dynamic capacity for a particular two-salt combination is increased compared to the dynamic capacity using either (or both) single salts alone.  Br. at 31-32.  A POSA would not know whether the process satisfied the claim until conducting such experiments, which may be influenced by the arbitrary selection of salt concentrations.  As explained by Dr. Przybycien, whether the process resulted in an "increase" in dynamic binding capacity could depend on the particular salt concentrations used for the comparison.  Przybycien Decl. ¶ 41.  The Federal Circuit has repeatedly held that this is the "epitome of indefiniteness."  *Geneva Pharms., Inc. v. GlaxoSmithKline PLC,* 349 F.3d 1373, 1384 (Fed. Cir. 2003); *see also Forest Labs., Inc. v. Teva Pharms. USA, Inc.*, 716 F. App'x 987, 994 (Fed. Cir. 2017) (affirming indefiniteness where "claims require[d] measured quantities (absolute or relative), different techniques for such measurements [were] known in the art and some produce[d] infringing results and others not"); *Honeywell Int'l, Inc. v. Int'l Trade*

*Comm'n*, 341 F.3d 1332, 1338-39 (Fed. Cir. 2003) (affirming indefiniteness under the more stringent "insolubly ambiguous" standard where the choice of "sample preparation method [was] critical" to infringement and intrinsic record did not "provide sufficient clues to discern which methods are acceptable.").

## B. "mixing a preparation containing the protein with a combination of a first salt and a second salt" (Claims 1 & 10)

| Claim Nos. | Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 and 10 | "mixing a preparation containing the protein with a combination of a first salt and a second salt" | mixing a preparation containing the protein with a combination of a first salt and a second salt (plain and ordinary meaning)<br><br>This step must be completed before the "loading the mixture" step begins | mixing a preparation containing the protein with a combination of a first salt and a second salt and no other salts; Amgen's proposed construction renders the claims indefinite |

### 1. Plaintiffs' Opening Position

The parties appear to agree that a preparation containing the protein is mixed with a combination of a first salt and a second salt which is consistent with the teachings of the specification that it is the combination of two salts (a first salt and a second salt of differing lyotropic values) that, when mixed with a protein preparation, act together to increase the dynamic capacity of the HIC column for a particular protein. *See, e.g.* '707 Patent, at col. 5:25-28. Amgen's proposed

construction is the plain and ordinary meaning of the term, *i.e.*, "mixing a preparation containing the protein with a combination of a first salt and a second salt" and makes explicit that the "mixing" step must be completed before loading the resulting "mixture" onto the HIC column.  Amgen's construction is consistent with the claim language and is the same as that adopted by Chief Judge Hornak in the Mylan Case. *Amgen Inc. v. Mylan Inc.*, No. 2:17-cv-01235, 2018 WL 6061213, at *20-22 (W.D. Pa. Nov. 20, 2018).  In contrast, Hospira's proposed construction improperly inserts the additional limitation of "no other salts," which is not found in the claim language or the specification and should thus be rejected. Further, Hospira's proposed construction is inconsistent with its alternative assertion that the term is indefinite.

### 2. Defendants' Answering Position

Amgen's construction does not address the parties' dispute.  To be clear, Pfizer does not contest Amgen's assertion that this step must be completed before the subsequent "loading" step.  Instead, the dispute here is whether the protein preparation when combined with a first salt and a second salt contains only the two claimed salts—*and no other salts*.  Pfizer's construction is the plain and ordinary meaning of the term in view of the claim language and the intrinsic record.  Amgen's proposal, which permits additional salts at unspecified concentration to be present,

is at odds with Amgen's own arguments to the Patent Office and would render the claims indefinite.

### a. This limitation requires a protein-salt mixture with two salts only.

The asserted claims require "mixing a preparation containing the protein with a combination of a first salt and a second salt." Three different salt pairs are recited in the claims: citrate/sulfate, citrate/acetate, and sulfate/acetate. '707 patent at 15:14-16; 16:14-16. Thus, the claims recite specific combinations of two salts, and do not suggest that additional salts may be present.

The specification similarly refers to the claimed "first salt and a second salt" as a combination of "two salts," without reference to any other salts in the "preparation containing the protein" or the "mixture" that is loaded onto the HIC. For example, the Abstract states: "The invention relates to a process for purifying a protein by mixing a protein preparation with a solution having *a first salt and a second salt* . . . The dynamic capacity of the column for a protein using the *two salt combination* will be increased compared with the dynamic capacity of the column for either single salt alone." '707 patent at Abstract (emphasis added); *see also id*. at 2:39-42; 4:46-48; 6:41-62; 7:20-22. Nowhere does the patent refer to any other salts in the protein preparation or mixture. The "mixing" term should therefore be

given its plain and ordinary meaning requiring the use of two-salts as recited in the claims, and no other salts.   Przybycien Decl. ¶¶ 45-47.

The prosecution history supports Pfizer's construction.  During prosecution of the parent application to the '707 patent (U.S. Application No. 10,895,581, now US Patent No. 7,781,395), Amgen unequivocally distinguished the prior art Holtz reference (U.S. Patent No. 5,231,178) ("Holtz") (attached as Exhibit 5A), which used four salts, on the ground that Amgen's claimed process requires "*two salts only*":

- "Instead [according to Holtz] a protein solution containing lower concentrations of sodium acetate and sodium phosphate, together with NaCl and a high concentration of ammonium sulfate (*four salts, not a combination of two salts as recited in the claimed method*), is loaded onto the HIC column." ('395 Patent File History, 7/14/08 Remarks (attached as Exhibit 5B) at 6 (emphasis added).)

- "Therefore, because the reference to Holtz et al. does not describe all of the elements of the claimed process for purifying a protein comprising mixing the protein with a combination of *two salts only*, citrate and phosphate, at concentrations of between about 0.1 M and 1.0 M, and loading this mixture onto the column, Applicants submit that Holtz et al. does not anticipate the claimed subject matter."  (*Id.* at 7 (emphasis added).)

- "Further, there is no suggestion in Holtz et al. to use two salts, let alone the particular combination of salts of the claimed method, since, as described above, *more than two salts* are used in the protein solutions for every HIC column described in Holtz et al."  (*Id.* at 8 (emphasis added).)

44

The claims that were pending at the time Amgen made these statements recited "mixing the preparation containing the protein with a combination of a first salt and a second salt"—just as the claims of the '707 patent do. '395 Patent File History, 7/14/08 Amendment at 3-4. Amgen's statements thus apply with equal force to the '707 patent. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation.").

Amgen should be held to the representations it made to the Patent Office when securing its patent. "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Pazandeh v. Yamaha Corp. of Am.*, 718 F. App'x 975, 979 (Fed. Cir. 2018) (quoting *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

> **b.  Amgen's construction allowing more than two salts would render the asserted claims indefinite.**

Amgen contends that other components from previous purification processes, including additional salts and proteins, can be present in the protein "preparation" that is combined with the first salt and the second salt. Br. at 59. As discussed above, the claims refer to a "preparation *containing* the protein" (emphasis added)

45

that is mixed with the first salt and the second salt.  No other salts are contemplated by the claims or the specification.  (*See* III.B.2.a supra).  However, to the extent additional salts may be present, as Amgen proposes, the claims would be indefinite. The specification fails to inform a POSA how to determine whether a particular salt in a given process involving more than two salts is a "first" salt, a "second" salt, or neither.  Przybycien Decl. ¶ 51.  This is particularly so where more than two salts are present within the claimed range of "between about 0.1 M and 1.0" (discussed below).  *Id*.  Amgen's construction would thus render the claims indefinite.

The prior art Holtz reference at issue during prosecution illustrates the problems with Amgen's position.  The Holtz reference describes a purification process in which certain salts are used during cation exchange chromatography earlier in the purification process, followed by addition of other salts that are added in subsequent steps prior to loading the mixture onto the HIC column.  Przybycien Decl. ¶ 49.  As a result, more than two salts are present in the mixture that is loaded onto the HIC column.  *Id*.  At no point during prosecution did Amgen explain how a POSA could determine which of the salts in such a process constitute a "first salt" and a "second salt."  The presence of additional salts would also have an impact on the dynamic capacity of the column (discussed below).  Thus, Amgen's construction would leave a POSA guessing as to whether a third or fourth salt present in the mixture could be implicated by the claimed process.  Przybycien Decl. ¶ 52.

Compounding the problem, under Amgen's construction, a POSA would be unable to determine whether dynamic binding capacity has "increased" for a process involving more than two salts.  For example, assuming there are three salts in a protein mixture that gets loaded onto a HIC column, each at a concentration within the claimed range, it is possible that the dynamic capacity of the column will be increased when compared to the dynamic capacity for two of the salts alone, but not when compared to the third salt alone.  Przybycien Decl. ¶ 53.  In such a scenario, a POSA would not know whether the process satisfied the claim or not.  *Id.*  Pfizer's proposed construction, which limits the claims to two-salt mixtures, eliminates such scenarios and provides necessary clarity to the claims.

Amgen distinguished Holtz, at least in part, on the basis that the pending claims (like the claims of the '707 patent) recited a combination of only two salts, whereas Holtz used four salts.  (*See* Section III.B.2.a above).  Thus, Amgen's argument that the claims can be construed to read on a process involving more than two salts recaptures subject matter that was surrendered during prosecution and throws any determination of "increased" dynamic capacity into further disarray.

### 3.    Plaintiffs' Reply Position

#### a.    The "Preparation Containing the Protein" Is Not Limited to Only  the Combination of a First Salt and a Second Salt

Amgen proposes that the term "mixing a preparation containing the protein with a combination of a first salt and a second salt" be given its plain and ordinary meaning whereas Hospira's proposed construction adds the limitation "and no other salt" to the end of the term.  Hospira's additional limitation is not consistent with the intrinsic evidence.  Further, Hospira's proposal introduces ambiguity into the construction of the term because it is unclear whether "and no other salt" modifies the "combination of a first salt and second salt" or the "preparation containing the protein."   To be clear, Amgen agrees that the "combination of a first salt and a second salt" used to condition the preparation containing the protein contains no salts other than the claimed salt pairs.  But Amgen disagrees with importing an additional limitation into the phrase "preparation containing the protein" so as to exclude protein preparations that already contain buffer salts or salts carried forward from prior purification steps.

The patent repeatedly teaches the preparation of a "two salt solution" comprising a "first salt and a second salt" which is then mixed with a protein preparation.  *See* '707 Patent, Abstract, col.1:66-2:5, col.4:46-48, col.4:56-60, col.6:41-62.  Amgen agrees that the two salt solution refers to a solution containing

two salts and there is no mention of other salts.  In contrast, the specification is not

so limited regarding the "preparation containing the protein" (henceforth the

"preparation") with which the solution containing the two salts is mixed.  The

specification discloses at least four preparations of partially purified proteins.  *See*

'707 Patent, col.12:4-6, col.14:16-18.  The specification defines the term "protein

preparation" as "protein in any stage of purification in an aqueous solution."  *Id*. at

col. 7:30-31, *see also*, *id*. col. 3:16-18, col. 7:13-15.  Moreover, "solution" is

expressly defined to include both buffered and non-buffered solutions.  *Id*. at

col.4:30-32; col.7:26.  Also, the specification states that the term HIC column

refers to a column in which the interaction between the column matrix and the

protein as the basis for separating the protein from impurities, including residual

impurities from other purification steps.  *See id.* at col.3:53-61.  Thus, based on the

specification, a POSITA would not understand the claims to require that the

"preparation containing the protein" be devoid of salts.

In addition, Hospira's proposal is inconsistent with the knowledge and

experience of the POSITA.  As Dr. Willson has described, many chromatography

techniques use salt solutions to promote the release of the protein from the column

matrix as well as to maintain the stability of the protein.  Willson Decl. at ¶ 35;

Willson Reply Declaration at ¶ 13.  Further, a POSITA would understand that a

protein, whether it is partially or completely purified, is typically maintained in an

49

aqueous solution that contains at least one buffer salt to retain its biological activity. *See, e.g.*, Willson Decl. at ¶ 35.

Hospira relies on Amgen's arguments during the prosecution of the parent patent, the '395 Patent, as support for its position. This misreads Amgen's prosecution history statements distinguishing U.S. Patent No 5,231,178 ("Holtz"). The claims of the parent application, now the '395 Patent, were directed to combinations of citrate/phosphate salts rather than the citrate/sulfate, citrate/acetate, or sulfate/acetate combinations of the current claims. During prosecution, Amgen repeatedly distinguished the pending claims over Holtz on the ground that Holtz did not teach the combination of the particular citrate/phosphate salt pair. Instead, the Holtz preparation containing the protein was mixed with a combination of more than two salts (up to four salts which are acetate/ phosphate/ sulfate/chloride). For example, Amgen stated:

- "Holtz et al. on column 11 does not describe or suggest combining the protein to be purified with the particular ***combination*** of two salts, citrate and phosphate salts." (Ex. 5B ['395 Patent File History, 7/14/08 Remarks] at 6.)

- "Again, Holtz et al. column 26 and 27 does not teach or suggest combining the protein to be purified with the particular ***combination of two salts, citrate and phosphate salts*** at concentrations of between about ***0.1M and 1.0M*** before loading the protein on the HIC column. Instead, a protein solution containing lower concentrations of sodium acetate and sodium phosphate, together with NaCl and a high concentration of ammonium sulfate (four salts, not a combination of two salts as

50

recited in the claimed method), is loaded onto the HIC column." (*Id.* at 6.)

- "Again Holtz et al. does not disclose *the particular combination of two salts, citrate and phosphate salts*." (*Id.*)

- "Therefore, because the reference to Holtz et al. does not describe all of the elements of the claimed process for purifying a protein, comprising mixing the protein with a combination of two salts only, citrate and phosphate, at concentrations of between about 0.1M and 1.0M, and loading this mixture onto the column, Applicants submit that Holtz et al. does not anticipate the claimed subject matter." (*Id.*)

That Amgen pointed out in the '395 Patent prosecution that Holtz does not teach mixing of a protein preparation with a combination of the claimed citrate/ phosphate salt pair is not evidence that the '707 Patent claims are limited to a protein preparation that is devoid of salts.

### b. Hospira Fails to Prove Indefiniteness of This Term

Hospira incorrectly asserts that Amgen's proposed construction that permits additional salts in the preparation renders the claim indefinite and that Hospira's additional limitation of "and no other salts" is needed to cure indefiniteness. Br. at 42-43. Each of Hospira's arguments fails.

*First,* Hospira's expert asserts that when more than two salts are present, the specification fails to inform a POSITA whether a particular salt is a first salt, a second salt, or neither. *See, e.g.*, Przybycien Decl. at ¶ 51. Not so. The claim specifies that the first and the second salts are combined and that combination of

two salts, i.e., citrate and sulfate, citrate and acetate, or sulfate and acetate, will be mixed with the preparation containing the protein. *See, e.g.*, '707 Patent at col. 15:14-16. Thus, as long as that solution, the combination of salts before it is mixed with the preparation containing the protein, consists of only two salts (as the parties appear to agree), there is no ambiguity as to the identities of the first and the second salt as there are only two salts combined in the salt solution.

**Second,** Hospira argues that, in Holtz, more than two salts are present in the mixture that is loaded onto the HIC column and that Amgen did not explain how a POSITA would determine which of the salts in such a process would be the first salt and the second salt. Br. at 46. This is incorrect. Amgen has never suggested that Holtz used a first and second salt or practiced the claims of the '707 Patent. Rather, Holtz does not have a combination of a first salt and a second salt and instead mixes the preparation containing the protein with a solution that contains four salts (acetate/ phosphate/ sulfate/ chloride) before loading the mixture on a HIC column.

**Third,** Hospira argues based on a conclusory statement by its expert that, if three salts were present in the mixture that is loaded onto the HIC column, it is possible that the dynamic capacity of the column will be increased as compared to two of the salts alone but not when compared to the third salt alone. Br. at 47. This fails too. The claims require that the increase in dynamic binding is due to the

addition of the claimed salt pairs.  Even if the presence of a "third" salt in the

protein preparation could affect the dynamic capacity, Hospira has not

demonstrated that the POSITA would not understand how to determine whether or

not the addition of the claimed salt pairs increases the dynamic capacity, let alone

understanding the scope of the claims with reasonable certainty.

Even if the Court were to consider Hospira's expert's conclusory statement

and to assume that the preparation containing the protein contained a third salt at

concentrations sufficient to affect the dynamic capacity of the HIC column, it does

not alter a POSITA's understanding that the claims are directed to an increase in

dynamic capacity due to the addition of the claimed first and second salts.

Specifically, in Dr. Przybycien's hypothetical scenario involving a protein

preparation with the "third salt," a POSITA would identify the optimal

concentration for the two salt solution using the same methodology that would be

used for a protein preparation that did not contain the "third salt."  Specifically, a

POSITA would generate precipitation curve using the protein preparation (here,

with the "third salt")by adding increasing amounts of the claimed first salt, then

another curve for the claimed second salt, and then a third and fourth curve for the

combination of the first and second salts.  '707 Patent at col. 5:35-45; col. 12:4-34.

These four precipitation curves would allow the POSITA to determine the

concentration ranges of claimed salt pair to optimize the dynamic capacity on the

HIC column. '707 Patent at col. 5:35-45; col. 12:41-13:7. The POSITA would then compare the dynamic capacities of the HIC column for the protein preparation (here,  with the "third salt") when mixed with the claimed combination of first and second salts and when the first salt or second salt are mixed with the protein preparation.

Accordingly, the presence (or absence) of a "third salt" in the preparation containing the protein is irrelevant to determining whether the addition of the claimed combination of two salts increases the dynamic capacity as compared to the addition of each salt in the claimed pair individually.

### 4.    Defendants' Sur-Reply Position

The parties agree that a "combination of a first salt and a second salt" contains no other salts besides the claimed salt pairs. Br. at 48. However, the parties dispute whether additional salts may be present in a "preparation containing the protein" that is mixed with a combination of a first salt and a second salt. Pfizer's construction is that this claim limitation requires a protein-salt mixture with two salts only. Br. at 43. There is no "ambiguity" regarding Pfizer's proposed construction. Br. at 48.

The prosecution history reveals why the claims should be so limited. During prosecution of the parent '395 patent, Amgen described the claimed process as requiring only two salts in order to distinguish the prior art Holtz reference. Br. at 44-45. Amgen now contends that it merely "pointed out in the '395 Patent

prosecution that Holtz does not teach mixing of a protein preparation with a combination of the claimed citrate/phosphate salt pair." Br. at 51. However, Amgen's statements must be put in context. In the same response, Amgen stated that Holtz does not anticipate the '395 patent claims because in Holtz, unlike the claimed method, a "protein solution" containing "four salts, not a combination of two salts as recited in the claimed method," is loaded onto the HIC column. Ex. 5B at 6. This statement does not distinguish Holtz based on the particular combination of salts claimed in the '395 patent, as Amgen now argues. Rather, it demonstrates a clear disavowal of "protein solutions" (*i.e.*, the protein preparation combined with the claimed salt pairs) that contain more than two salts. The claims should not be construed to encompass protein-salt mixtures that include salts in addition to the "first salt and the second salt" recited in the claims, the very subject matter that Amgen disclaimed during prosecution. *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) (finding statements in prosecution history "sufficient to overcome the 'heavy presumption' that the term carries its full ordinary and customary meaning").

To supports its position that the protein-salt mixture includes more than two salts, Amgen relies on the declaration of its expert, Dr. Willson, to argue that "a POSITA would understand that a protein, whether it is partially or completely purified, is typically maintained in an aqueous solution that contains at least one

buffer salt to retain its biological activity." Br. at 49-50. Such extrinsic evidence is in general "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318. "A court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history." *Id*. (internal quotation marks and citation omitted); *see also Genentech, Inc. v. Amgen Inc.*, No. 18-924, 2019 U.S. Dist. LEXIS 99959, at *33 (D. Del. June 14, 2019) (adopting defendant's construction notwithstanding plaintiff's argument that it was "inconsistent with the real-world conditions") (citation omitted). Furthermore, contrary to Amgen's argument, Pfizer's construction does not require that the protein preparation be "devoid of salts." Br. at 49, 51. Rather, the buffer salt can be one of the salts in the claimed dual salt pair, provided that the protein-salt mixture that is loaded onto the column contains only two salts as claimed.

The presence of additional salts from buffer, assuming they are different from the combination of a first salt and a second salt in solution, would of course further complicate the already convoluted construction Amgen proposes for determining the change in dynamic capacity and the complexity of the tests that would need to be performed to determine if such a claim is infringed. Indeed, Amgen does not directly refute Dr. Przybycien's testimony that the presence of a third salt in the protein-salt mixture could result in a situation where dynamic capacity is increased relative to

one or two of the salts alone, but not the third salt.  Przybycien Decl. ¶ 53.  Amgen

states in conclusory fashion that "[e]ven if the presence of a 'third' salt in the protein

preparation could affect the dynamic capacity, Pfizer has not demonstrated that the

POSITA would not understand how to determine whether or not the addition of the

claimed salt pairs increases the dynamic capacity, let alone understanding the scope

of the claims with reasonable certainty."  Br. at 53.  Notably, Amgen does not rely

on its expert to rebut Dr. Przybycien's testimony, nor to support its contention that

a POSA would be able to generate "four precipitation curves" based on the three

salts used in such a process to determine whether the dynamic capacity of the three-

salt mixture was "increased."  Br. at 53-54.  Amgen's attorney-argument on how a

POSA would assess dynamic capacity under such circumstances creates even further

confusion and does not resolve the ambiguity.

The Court should adopt Pfizer's proposed construction that the "mixing" step

requires two of the claimed salts and no other salts.

### C.    "loading the mixture onto a hydrophobic interaction chromatography column" (Claims 1 & 10)

| Claim Nos. | Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 and 10 | "loading the mixture onto a hydrophobic interaction chromatography column" | causing the protein in the mixture to contact the hydrophobic groups on the matrix | loading a mixture containing the protein and the first salt and second salt, and no other salts, onto a hydrophobic interaction chromatography column; Amgen's proposed |

| | | | construction renders the claims indefinite |
|---|---|---|---|

### 1.    Plaintiffs' Opening Position

The parties appear to agree that "loading the mixture onto a hydrophobic chromatography column" means that the protein in a mixture is loaded onto a HIC column.  But the parties appear to have a dispute as to (1) what it means to be loaded onto a HIC column and (2) what the "mixture" contains.  Amgen's proposed construction is correct and should be adopted because it aligns with the claim language and the teachings of the specification.

First, whereas Hospira's construction is silent as to what it means to load a mixture onto a HIC column as described in the patent, Amgen's construction provides that explanation: passing the protein mixture through a HIC matrix where there are hydrophobic interactions between a protein and hydrophobic groups on the matrix.

> "As used herein, the term 'hydrophobic interaction chromatography (HIC)' column refers to a column containing a stationary phase or resin and a mobile or solution phase in which *the hydrophobic interaction between a protein and hydrophobic groups on the matrix* serves as the basis for separating a protein from impurities including fragments and aggregates of the subject protein, other proteins or protein fragments and other contaminants such as cell debris, or residual impurities from other purification steps."

'707 Patent, col. 3:53-61 (emphasis added); *see also id.* at col. 4:46-51.  Further, when the specification teaches how "dynamic capacity" is measured, the

specification makes clear that loading onto a column is the process of adding

protein to a column and causing the protein to bind to the column matrix.  *Id.* at

col. 4:7-16.  The specification also teaches that the basis for the protein's retention

by the HIC matrix is "hydrophobic interactions between non-polar regions on the

surface of proteins and insoluble, immobilized hydrophobic groups on the matrix."

*Id.* at col. 3:9-12.  Accordingly, "loading" refers not only to the act of adding a

solution with a protein to the column, but also to causing the protein in the solution

to contact, and thus interact with, the hydrophobic groups on the separation matrix.

Second, Hospira's proposed construction improperly narrows the claims by

limiting the "mixture" to the protein, a first salt and a second salt, but no other salt

and is inconsistent with Hospira's alternative assertion that the term is

indefinite.  Hospira's proposed construction would preclude the use of any protein

preparation that contained any amount of "other" salt.  But the specification

expressly contemplates that the method of invention can be applied to protein

preparations at any stage of purification.  *See, e.g.*, '707 Patent, at col. 7:13-19, 30-

31.  As the specification teaches, the protein in the mixture may be partially

purified, *i.e.*, it is mixed with other contaminants like other proteins and salts.  '707

Patent, at col. 12:4-6  ("The antibody preparation used for testing was a ***partially***

***purified eluant from a previous column* ….**") (emphasis added); *see also id.* at

3:56-61; 7:13-19, 30-31(defining and describing "protein preparation" as protein in

any stage of purification in an aqueous solution) and col. 4:17-32 (defining and describing solution and buffered solution).  In addition, three of the protein preparations used to generate the data reported in Example 2 of the '707 Patent were partially purified eluants from other chromatography columns, indicating that the protein preparations contain other components (albeit undefined) besides the proteins of interest.  *Id.* at col. 14:9-19.  A POSITA would understand an eluant from a previous column to include at least one salt as well as other proteins.  *See, e.g.*, Willson Decl. at ¶ 44.  When proteins are eluted from a column, the elution solution typically contains salts to aid the releasing of the protein from the column matrix.  *Id.* at ¶ 52.  The salt in the elution solution also serves to maintain the stability of the protein.  A POSITA would know that a protein is typically kept in a preparation that contains at least one buffer salt to retain the protein's biological activity.  *Id.* at ¶ 35.  Therefore, a protein preparation to be used in the purification method disclosed in the '707 Patent can contain at least one salt before it is mixed with the combination of the first salt and the second salt.

Thus, consistent with Amgen's proposed constructions, when a mixture is loaded onto the HIC column, the mixture contains the protein and the two salts affecting the dynamic capacity and may contain other salts or proteins.  Amgen requests that the Court reject Hospira's proposal and adopt Amgen's proposed construction.

### 2. Defendants' Answering Position

Again, Amgen's construction does not address the parties' core dispute, which is whether this limitation requires that the "mixture" that is loaded onto the HIC column contains two salts (the "first salt" and the "second salt" required by the claims) and *no other salts*. As discussed in the preceding section, "loading the mixture onto a hydrophobic interaction chromatography column" requires two—and only two—salts to be loaded with the protein onto the HIC column. This is the plain and ordinary meaning of the term in view of the claims, specification, and prosecution history. *See* Section III.B.2. To the extent this claim limitation were construed to encompass a process that loads a mixture having more than two salts onto a HIC column (as Amgen proposes), the specification provides no information regarding how many additional salts can be added, what concentration of the salts should be added, what type of additional salt should be added to achieve the desired result, or which two salts should be evaluated for the question of increased capacity. Thus, Amgen's construction would render the asserted claims indefinite. *See* Section III.B.2; Przybycien Decl. ¶¶ 50-54.

### 3. Plaintiffs' Reply Position

The parties dispute what the "mixture" contains and may also have a dispute regarding what it means to load a mixture onto a HIC column. Amgen's construction provides the latter explanation whereas Hospira's construction is

silent on that issue.  Further, as with the "mixing" term, Hospira now asserts that

"Amgen's proposed construction renders the claims indefinite" as opposed to

asserting that the term is "alternatively, indefinite."  *Compare* [D.I. 48-1] and Br.

at 57-58.

As Amgen explained in its opening brief, "loading" refers not only to the act

of adding a solution with protein to a column, but also to causing the protein in the

solution to contact and interact with the hydrophobic groups on the column matrix.

This is consistent with the claim language and the specification.  It is still not clear

whether Hospira disagrees with this portion of Amgen's proposed construction.

Next, as explained for the preceding "mixing" term, Hospira's proposed

construction seeks to improperly narrow the claims by limiting the "mixture" that

is loaded on the HIC column to the protein, a first salt and a second salt, and no

other salt.  The effect of Hospira's proposed construction would be to require that

the "preparation containing the protein," that is the protein prior to mixing with the

combination of a first salt and a second salt, be entirely devoid of salts, even buffer

salts.  Such a limitation would exclude the specification's definition of "protein

preparation," and the express disclosure that the method can be used on a protein at

any stage of purification, and the examples provided in the specification as four of

the five disclosed protein preparations are partially purified.  '707 Patent at col.

3:16-18; col. 7:13-19.  A POSITA would understand that partially purified protein

preparations are rarely, if ever, devoid of salts.  *See, e.g*., Willson Reply Decl. at ¶ 13.

Hospira argues that if a process loads more than two salts onto a HIC column, "the specification provides no information regarding how many additional salts can be added, what concentrations of the salts should be added, what type of additional salt should be added to achieve the desired result, or which two salts should be evaluated for the question of increased capacity."  Br. at 61.  Not so. Because the protein preparation may be "partially purified eluant from a previous column," the protein preparation does not contain only the protein.  *See, e.g*., '707 Patent at col. 12:4-6.  Depending on which column is used in the prior step, the eluate may include different salts at various concentrations.  The presence of these salts and their concentrations are typically dictated by the prior purification step. Thus, a POSITA would not look at the specification of the '707 Patent to provide any specific information about the composition of a protein preparation, rather a POSITA would look at the prior purification step.

Further, as explained in above, regarding which salts are evaluated for the dynamic binding capacity, a POSITA would know that the comparators for the dynamic binding capacity for the mixture would be the mixture obtained by mixing the protein preparation only with the first salt but not the second salt and the mixture obtained by mixing the protein mixture only with the second salt but not

63

the first salt.  Thus, the identities of additional salts in the protein preparation are irrelevant for the construction of the relevant claim terms for the '707 Patent and would not render the claims indefinite.

Therefore, Amgen respectfully submits that its proposed construction for this term should be adopted.

### 4.    Defendants' Sur-Reply Position

Pfizer does not dispute Amgen's contention that the "loading" step includes causing the protein in the solution to contact hydrophobic groups on the column matrix.  However, as with the "mixing" term, the parties disagree whether this limitation requires that the "mixture" that is loaded onto the HIC column contains two salts and *no other salts*, and whether Amgen's proposed construction renders the claims indefinite.

Amgen's argument that the specification provides a clear "definition" for the protein preparation is wrong.  The cited portions of the specification do not define the "preparation containing the protein" as necessarily containing additional salts in addition to the "first salt and the second salt."  In fact, as Amgen admits, the specification provides an example where the protein of interest was already "fully purified" before it was combined with the two salts.  '707 patent at 14:18-19; Br. at 62 (noting that only "four of the five" proteins in the examples were partially purified).  The Court should adopt Pfizer's construction that the "loading" step

requires that the mixture that is loaded onto the HIC column contains two salts and no other salts.

### D.   "between about 0.1 M and about 1.0" (Claims 1 & 10)

#### 1.   Plaintiffs' Opening Position

| Claim Nos. | Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|
| 1 and 10 | "between about 0.1 M and about 1.0" | between approximately 0.1 M and approximately 1.0 M | +/-10%; alternatively, indefinite |

The parties dispute whether the term "about" has defined numerical boundaries. Amgen's construction of "about" stays true to that term's plain and ordinary meaning, which does not have such boundaries. *See Ferring B.V. v. Watson Labs., Inc.*, 764 F.3d 1382, 1389 (Fed. Cir. 2014) (affirming a construction of "about" to mean "approximately" and refusing to construe "about" to represent a particular numerical range.) As the Federal Circuit has held, unless a patentee clearly redefines "about" in the specification, "the term 'about' should be given its ordinary and accepted meaning of 'approximately.'" *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005); *see also, UCB, Inc. v. KV Pharm. Co.*, No. 08-223-JJF, 2009 WL 2524519, at *6 (D. Del. Aug. 18, 2009); *see also, Genentech, Inc. v. Amgen Inc.*, No. 18-1363-CFC, 2019 WL 2493446, at *9 (D. Del. June 14, 2019) (Connolly, J.). Here, the patentee has not clearly defined "about" in the specification, so, consistent with Federal Circuit

precedent, Amgen's proposed construction is based on the plain and ordinary meaning of the term. Amgen's proposed construction is also the construction adopted by Chief Judge Hornak in the Mylan Case. *Amgen Inc. v. Mylan Inc.*, No. 2:17-cv-01235, 2018 WL 6061213, at *23-25 (W.D. Pa. Nov. 20, 2018).

In contrast, Hospira's proposed construction applies an exact numerical limitation without any basis found in the specification. In addition to being inconsistent with Hospira's alternative assertion that the term is indefinite, Hospira's proposed construction is incorrect because, as the specification teaches, "the concentration of the salts used according to the present invention will depend on the characteristics of the particular salts." '707 Patent, at col. 6:8-10; 6:12-13. Thus, Amgen requests that the Court adopt its construction.

### 2. Defendants' Answering Position

| Claim Nos. | Term | Amgen's Proposed Construction | Pfizer's Proposed Construction |
|---|---|---|---|
| 1 and 10 | "between about 0.1 M and about 1.0" | between approximately 0.1 M and approximately 1.0 M | between approximately 0.1 M and approximately 1.0 M; excludes concentrations described in the specification as outside the scope of the claims |

Pfizer initially proposed that the term "about" should be construed as ± 10%. However, to narrow the issues in dispute, Pfizer agrees with Amgen's construction

that the term "about" means "approximately," but asserts that the claims cannot be stretched to read on concentrations that the specification clearly states are not within the scope of the claims.   For example, they cannot be construed to include concentrations below 0.05 M or above 1.4 M that the specification teaches are not within the invention.

In describing the "present invention," the specification explains that the claimed salt concentrations represent an "intermediate" concentration as compared to "low" and "high" concentrations used in prior art processes:

> The practice was to add a high concentration of salt to a low concentration buffer solution, such as, for example, 1.4 M NH4SO4 added to a 0.024 M phosphate buffer . . . ; or 1.7 M ammonium sulfate in 50 mM NaPO4 . . . The present invention differs from these practices in the use of an *intermediate concentration* of a buffering salt in combination with an *intermediate concentration* of a second buffering salt, or in combination with an *intermediate concentration* of a second non-buffering salt, to achieve increased dynamic capacity.

'707 patent at 3:24-36 (emphases added).

The specification thus characterizes the "present invention" as requiring an intermediate concentration (*i.e.*, between about 0.1 M to 1.0 M), distinct from "a low concentration buffer solution" such as a 0.024 M or 50 mM (0.05 M), or a "high concentration" such as 1.4 M or 1.7 M.  *Id.*  "Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term."  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004).

Tables 1 and 2 of Example 1 support Pfizer's position. No two-salt combination disclosed in these tables includes any salt concentration outside the claimed range of 0.1 M to 1.0 M. And critically, no salt—either in the two-salt combination, or alone—has a concentration below 0.1 M. '707 patent at 13:40-58, 14:28-40. As explained by Dr. Przybycien, a POSA would understand that the term "between about 0.1 M to about 1.0 M" requires that the salt concentrations are generally within this range, *i.e.* "between" approximately 0.1 M and 1.0 M. Przybycien Decl. ¶ 57.

The prosecution history also supports Pfizer's interpretation. During prosecution of the parent application to the '707 patent, Amgen distinguished the prior art Holtz reference by arguing that the 0.04 M concentrations of acetate and phosphate salts used in Holtz did not "teach or suggest," among other things, "concentrations of between about *0.1 M and 1.0 M*." '395 Patent File History, 7/14/08 Remarks at 6 (citing Holtz at cols. 26–27) (emphasis in original). Amgen argued that Holtz taught "a protein solution containing lower concentrations of sodium acetate and sodium phosphate," containing only "40 mM [0.040 M] sodium acetate" and "40 mM [0.040 M] sodium phosphate." *Id*. Thus, Amgen expressly disclaimed "lower" salt concentrations such as 0.04 M from the scope of the claims. The claims pending at the time of Amgen's statements recited the same concentration range as in the asserted claims of the '707 patent, *i.e.*, "between about

0.1 M and about 1.0 [M]."  Amgen's statements to the Patent Office are thus equally applicable to the '707 patent and confirm that the claims should not be construed to read on salt concentrations below at least 0.05 M.  *Elkay Mfg. Co. v. Ebco Mfg. Co*, 192 F.3d 973, 980 (Fed. Cir. 1999).[2]

### 3.      Plaintiffs' Reply Position

Because Hospira now agrees with Amgen's construction that the term "about" means "approximately," the only remaining dispute on this term is whether the claimed range should "exclude concentrations described in the specification as outside the scope of the claims" as Hospira asserts.

Hospira's argument that Amgen disclaimed salts below 0.024 M or 50 mM is based upon the specification's discussion of prior publications utilizing *phosphate* salts.  Br. at 67 (quoting '707 Patent at col. 3:24-36).  These statements are not a disclaimer as to the current claims that are directed to the use of citrate, acetate, and sulfate salts.  That the specification's description of  conditions used for those particular proteins and HIC columns with phosphate salts does not mean that those conditions should be understood as a limit for all salts or with different proteins and HIC columns.  *Openwave Sys. v. Apple Inc*., 808 F.3d 509, 513 (Fed. Cir. 2015) ("Disavowal requires that 'the specification make [] clear that the

---

[2] Pfizer's arguments regarding Amgen's disclaimer of such concentrations are more fully discussed in its Motion to Dismiss (D.I. 12).

invention does not include a particular feature." (quoting *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)).

Specifically, Hospira cites to portions of the specification that states that prior "practice was to add a high concentration of salt to a low concentration of buffer solution . . . such as . . . 1.4 M $NH_4SO_4$ added to a 0.024 M phosphate buffer . . . or 1.7 M ammonium sulfate in 50 mM $NaPO_4$."[3] '707 Patent at col. 3:24-29. Hospira also asserts that the claims must be limited because the specification states that the "present invention differs from these practices in the use" of intermediate concentrations of salts.  Br. at 67 (quoting '707 Patent at col. 3:31-36).  These statements fail to limit the claimed invention to exclude the use of all salts at concentrations lower than 0.024 M or 50 mM or higher than 1.4 M or 1.7 M.  The specification teaches that "at least one" of the salts is reduced from the higher concentration of the salt used individually meaning that the other salt need not be reduced in concentration.  *Id.* at col. 2:12-15.  Further, the specification teaches that the appropriate salt concentrations are dependent upon the particular salt pair being used, the protein being purified, and the HIC resin used to purify it:

- "The concentration of the salts used according to the present invention will depend on the characteristics of the particular salts." '707 Patent, col. 6:8-10; *see also*, *id.* at col. 2:16-20.

---

[3] "$NaPO_4$" is the formula for sodium phosphate, a phosphate salt.

- "The first and second salt combinations are selected for each particular protein …." *Id.* at col. 2:16-20; *see also*, *id.* col. 5:35-38; col. 1:45-46.

- HIC "relies on separation of proteins on the basis of hydrophobic interactions between … proteins and … the [HIC] matrix," (*id.* at 3:9-12), and HIC matrices "vary in terms of ligand, ligand chain length, ligand density, and type of matrix or support." *Id.* at col. 6:20-22; *see also*, *id.* at col. 13:40-67; col. 14:51-59.

That the cited portions of the specification compare aspects of two prior publications with the inventor's discovery does not mean that the specification limits the claims to the conditions described in the prior publications.

Hospira's reliance on Tables 1 and 2 is equally unavailing.  The fact that "no salt—either in the two-salt combination or alone—has a concentration below 0.1 M" (Br. at 68) in Table 1 and Table 2 does not represent a disclaimer regarding meaning of "about" for all uses of the claimed salt pairs, for all proteins, and for all HIC columns.  *See e.g.*, *Ancora Techs. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014).  Rather, Tables 1,2, and 3 provide the concentrations of single salts, and dual salt combinations, that provided maximum dynamic binding for particular proteins (three monoclonal antibodies and one fusion protein), using particular HIC resin (TOYOPEARL BUTYL 650 M), at particular flow rates (90 cm/hr).  '707 Patent at col. 11:53-56; col. 12:54-65; col. 14:9-20.

In addition, Hospira argues that, during the prosecution of the '395 Patent, Amgen "expressly disclaimed 'lower salt' concentrations such as 0.04 M from the

71

scope of the claims." Br. at 68. This is incorrect. Hospira relies on a piecemeal selection of Amgen's prosecution statements which is misleading. Amgen did not suggest that Holtz taught the use of a combination of only sodium acetate and sodium phosphate. Rather, Amgen stated:

> Again, Holtz et al. column 26 and 27 does not teach or suggest combining the protein to be purified with the particular ***combination of two salts, citrate and phosphate salts*** at concentrations of between about ***0.1M and 1.0M*** before loading the protein on the HIC column. Instead, a protein solution containing lower concentrations of sodium acetate and sodium phosphate, together with NaCl and a high concentration of ammonium sulfate (four salts, not a combination of two salts as recited in the claimed method), is loaded onto the HIC column.

(Ex. 5B at 6 ['395 Patent File History, 7/14/2008 Response to Office Action and Amendment]). Nor did Amgen distinguish Holtz on the basis of the use of 40 mM sodium acetate and 40 mM sodium phosphate. Rather, Amgen distinguished Holtz because it did not teach or suggest combining the protein with the particular salt pair (citrate and phosphate) that was the subject of the then-pending claims in the parent application, and because Holtz combined the protein to be purified with a combination of four salts, not the claimed combination of citrate and phosphate. Contrary to Hospira's argument, nothing in the cited portion of the '395 Patent prosecution history "evince[s] a clear and unmistakable surrender of subject matter" as to the meaning of the term "about" in the claims of the '707 Patent when describing the concentration of salts in the claimed combinations of citrate

72

and sulfate, citrate and sulfate, or sulfate and acetate, salts.  *Intendis GMBH v. Glenmark Pharm. Inc., USA*, 822 F.3d 1355, 1365 (Fed. Cir. 2016).

Lastly, the same argument regarding prosecution disclaimer advanced by Hospira here was considered and rejected in *Amgen Inc. v. Mylan Inc.*, No. 17-cv-01235, 2018 WL 6061213, at *23-25 (W.D. Pa. Nov. 20, 2018), in which the court held that the alleged surrender—if relevant to concentration at all—was directed to a different salt pair than those claimed in the '707 Patent asserted claims.  The *Mylan* district court recognized that the '395 Patent (citrate/phosphate) claimed a different pair of salt than those claimed by the '707 Patent (citrate/sulfate, citrate/acetate, and sulfate/acetate).  *Id*. at *24.  The *Mylan* district court recognized that Amgen "only unequivocally disclaimed the salt concentrations below 0.04 M for citrate and phosphate salt pairs" and that "to secure, the issuance of that claim, the patentee would have only needed to surrender concentrations pertaining to those salt pairs."  *Id*.  Thus, the *Mylan* district court declined to extend the prosecution disclaimer to any other salt pair.  *Id*.

Amgen respectfully submits that Hospira's attempts to introduce an additional limitation are improper and requests that the Court adopt Amgen's proposed construction.

73

### 4.     Defendants' Sur-Reply Position

The claims are limited to concentration ranges **"between"** two defined endpoints.  The range should not be expanded to include concentrations clearly excluded by the specification or disclaimed in order to obtain allowance.

Amgen argues that its disclaimer of salt concentrations below 0.024 M or 50 mM is limited to phosphate salts.  Br. at 69-70.  Not so.  The specification states that "[t]he practice was to add a high concentration of salt to a low concentration buffer solution, ***such as, for example***, 1.4 M $NH_4SO_4$ added to a 0.024 M phosphate buffer . . . ."  '707 patent at 3:24-26 (emphases added).  The salts (and salt concentrations) recited in the specification were merely exemplary "low concentration buffer solution[s]," and other salts at these concentrations would similarly be excluded from the scope of "the present invention."  *Id*. at 3:31-36.  Amgen's argument that the appropriate salt concentration would depend on "the particular salt pair being used, the protein being purified, and the HIC resin used to purify it" converts the concentration range into a moving target and reinforces the indefiniteness of the claims.  Br. at 70; *see* Przybycien Decl. ¶ 44.

Amgen argues that its statements during prosecution distinguishing Holtz were limited to the particular salt pair (citrate and phosphate) recited in the then-pending claims.  Br. at 72.  However, Amgen cannot and does not dispute that it stated that Holtz taught "a protein solution containing lower concentrations of

sodium acetate and sodium phosphate," containing only "40 mM [0.040 M] sodium acetate" and "40 mM [0.040 M] sodium phosphate," and that the claims pending at the time of Amgen's statements recited the same concentration range as in the asserted claims of the '707 patent, *i.e.*, "between about 0.1 M and about 1.0 [M]." Ex. 5B at 3, 6.  As the Federal Circuit has made clear, "the scope of surrender is not limited to what is absolutely necessary to avoid a prior art reference; patentees may surrender more than necessary." *Tech Props. Ltd. LLC v. Huawei Techs. Co*., 849 F.3d 1349, 1359 (Fed. Cir. 2017).  The Court should not permit Amgen to recapture subject matter that it expressly disclaimed, both in the specification and during prosecution.

Amgen's reliance on *Mylan* fails because the court in that case did not apply the proper legal standard in construing the term.  In particular, the *Mylan* court found that "the patentee would have only needed to surrender concentrations pertaining to [the claimed] salt pairs" in order to secure allowance of the claims, and thus declined to "extend the scope of the disavowal beyond what was surrendered in order to secure the patent." *Amgen Inc. v. Mylan, Inc*., No. 17-cv-01235, 2018 U.S. Dist. LEXIS 197482, at *77 (W.D. Pa. Nov. 20, 2018).  Even if Amgen surrendered more than was necessary, precedent requires that Amgen be held "to the actual arguments made, not the arguments that could have been made." *Tech Props*., 849 F.3d at 1359. This Court is not bound by *Mylan* and should not follow the reasoning in that case.

### E.    "formulating the protein" (Claim 8)

| Claim Term | Amgen's Proposed Construction | Hospira's Proposed Construction |
|---|---|---|
| "formulating the protein" | formulating the protein for pharmaceutical use as a biologic | Indefinite |

### 1.    Plaintiffs' Opening Position

This term appears in Claim 8, which is dependent on Claim 1. Claim 8 states that "the process of claim 1, further comprising formulating the protein." The parties disagree as to whether this term requires construction. Hospira has not proposed a construction for this term and asserts that this term is indefinite. Amgen's construction makes clear that (1) "formulating a protein" is in addition to the process in Claim 1, and (2) that one skilled in the relevant art would understand "formulating a protein" to mean formulating it for pharmaceutical use as a biologic.

Amgen's proposed construction is consistent with the language of the claim and the teachings in the specification. First, the use of the word "further" indicates that "formulating" is in addition to the purification process described in Claim 1: the protein is "formulat[ed]." Second, a POSITA would understand the formulation of the protein is to be in the context of pharmaceutical use as a biologic because that is what the specification says: the "present invention is particularly suitable for purifying protein-based drugs, also known as biologics"

76

('707 Patent, at col. 7:56-58); "a number of other proteins are capable of purified [sic] according to the improved purification methods of the present invention include[ing] a number of proteins of commercial, economic, pharmacologic, diagnostic, or therapeutic value" (*id.* at col. 10:4-8); and "[f]or large-scale production of commercially important biologics, for example, this represents a significant savings in cost and time."  *Id.* at col. 11:44-46.

### 2.   Defendants' Answering Position

Claim 8 recites "the process of claim 1, further comprising formulating the protein."  '707 patent at 16:5-6.  To the extent that this term requires construction, Pfizer does not dispute Amgen's proposed construction.

## IV.   CONCLUSION

**Plaintiffs' Positon:** For the foregoing reasons, Amgen respectfully requests that the Court adopt Amgen's proposed constructions for the disputed claim terms of the '707 Patent.

**Defendants' Position:** For the reasons discussed above, the Court should declare the asserted claims of the '707 patent invalid as indefinite or, in the alternative, adopt Pfizer's proposed claim constructions.

| | |
|---|---|
| */s/ Katharine L. Mowery* | */s/ Dominick T. Gattuso* |
| Robert W. Whetzel (#2288) | Dominick T. Gattuso (#3630) |
| Katharine Lester Mowery (#5629) | HEYMAN ENERIO |
| Tyler E. Cragg (#6398) | GATTUSO & HIRZEL LLP |
| RICHARDS, LAYTON & FINGER, P.A. | 300 Delaware Avenue, Suite 200 |
| 920 North King Street | Wilmington, DE 19801 |
| Wilmington, DE 19801 | (302) 472-7300 |
| (302) 651-7700 | dgattuso@hegh.law |
| whetzel@rlf.com | |
| mowery@rlf.com | Of Counsel: |
| cragg@rlf.com | |
| | Dimitrios Drivas |
| Of Counsel: | Alison Hanstead |
| | John P. Scheibeler |
| Nicholas Groombridge | Amit Thakore |
| Jennifer H. Wu | Kevin J. Georgek |
| Jennifer Gordon | Brigid Bone |
| Peter Sandel | WHITE & CASE LLP |
| Naz E. Wehrli | 1221 Avenue of the Americas |
| PAUL, WEISS, RIFKIND, WHARTON | New York, New York 10020 |
| & GARRISON LLP | (212) 819-8200 |
| 1285 Avenue of the Americas | ddrivas@whitecase.com |
| New York, NY 10019 | ahanstead@whitecase.com |
| (212) 373-3000 | jscheibeler@whitecase.com |
| | athakore@whitecase.com |
| Wendy A. Whiteford | kevin.georgek@whitecase.com |
| Kimberlin L. Morley | brigid.bone@whitecase.com |
| Paula S. Fritsch | |
| J Drew Diamond | Elizabeth Chang |
| AMGEN INC. | WHITE & CASE LLP |
| One Amgen Center Drive | 555 South Flower Street, Suite 2700 |
| Thousand Oaks, CA 91320-1799 | Los Angeles, CA 90071-2433 |
| (805) 447-1000 | (213) 620-7700 |
| | elizabeth.chang@whitecase.com |
| *Attorneys for Plaintiffs Amgen Inc.* | |
| *and Amgen Manufacturing, Limited* | *Attorneys for Defendants Hospira, Inc.* |
| | *and Pfizer Inc.* |
| Dated: March 15, 2021 | |