## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMGEN INC. and AMGEN MANUFACTURING, LIMITED, | ) ) ) | C.A. No. 20-201-CFC |
| Plaintiffs, | ) ) | |
| v. | ) ) | ███████████████████ |
| HOSPIRA, INC. and PFIZER INC., | ) ) ) | |
| Defendants. | ) ) | **PUBLIC VERSION** |

### DECLARATION OF JENNIFER WU IN SUPPORT OF AMGEN'S ANSWERING BRIEF IN OPPOSITION TO PFIZER'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

I, Jennifer H. Wu, hereby declare as follows:

1.      I am a partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP, and I represent Plaintiffs Amgen Inc. and Amgen Manufacturing, Limited (together, "Amgen") in this action.  I have personal knowledge of the facts set forth herein.

2.      Amgen is filing its Answering Brief in Opposition to Pfizer's Motion for Summary Judgment of Non-Infringement and three exhibits identified below under seal.  Amgen's Motion includes information which Defendants have deemed CONFIDENTIAL and thus "shall be filed under seal" pursuant to Paragraph 23 of the Protective Order entered by the Court, D.I. 23.  Consistent with the Court's Form Scheduling Order and Paragraph 23 of the Protective Order, D.I. 23, Amgen will file redacted copies of these documents within seven days of this filing.

1

3.      Attached as Exhibit 1 is a true and correct copy of excerpts of the transcript of the *Markman* Hearing held on June 11, 2021, which Amgen has annotated with highlighting to direct the Court's attention to the portions on which Amgen relies.

4.      Attached as CONFIDENTIAL Exhibit 2 is a true and correct copy of Amgen's Infringement Contentions, which Amgen has annotated with highlighting to direct the Court's attention to the portions on which Amgen relies.

5.      Attached as Exhibit 3 is a true and correct copy of the Order Construing Disputed Claims Terms of U.S. Patent Nos. 8,461,187 and 8,173,158 (*Takeda Pharm. Co. Ltd., v. TWI Pharms, Inc.,* No. 13-cv-01927-LHK, Dkt. No. 78 (N.D. Cal. June 6, 2014)), which Amgen has annotated with highlighting to direct the Court's attention to the portions on which Amgen relies.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 3, 2021

_____

Jennifer H. Wu

2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 3, 2021, a true and correct copy of the foregoing document was filed with the Clerk of Court via CM/ECF which will send notification of such filing to counsel of record and I further certify that a true and correct copy of the foregoing document was caused to be served on the following counsel as indicated:

<u>**VIA ELECTRONIC MAIL:**</u>

Dominick Gattuso
Elizabeth A. DeFelice
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Avenue
Suite 200
Wilmington, DE  19801
302-472-7311
dgattuso@hegh.law
edefelice@hegh.law

<u>**VIA ELECTRONIC MAIL:**</u>

Dimitrios Drivas
Alison Hanstead
John P. Scheibeler
Amit H. Thakore
Kevin J. Georgek
Brigid Bone
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
212-819-8200
ddrivas@whitecase.com
ahanstead@whitecase.com
jscheibeler@whitecase.com
Athakore@whitecase.com
Kevin.georgek@whitecase.com
Brigid.bone@whitecase.com

Elizabeth Chang
White & Case LLP
555 South Flower Street
Suite 2700
Los Angeles, CA 90071-2433
213-620-7700
Elizabeth.chang@whitecase.com

/s/ Katharine L. Mowery
Katharine L. Mowery (#5629)

# EXHIBIT 1

1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          IN AND FOR THE DISTRICT OF DELAWARE

 3                      - - -

 4
     AMGEN INC. and AMGEN        :   CIVIL ACTION
 5   MANUFACTURING, LIMITED,     :
                                 :
 6              Plaintiffs,      :
                                 :
 7        vs.                    :
                                 :
 8   HOSPIRA, INC. and PFIZER    :
     INC.,                       :
 9                               :
              Defendants.    :   NO. 20-00201-CFC
10
                        - - -
11
                    Wilmington, Delaware
12                 Friday, June 11, 2021
13                 9:00 o'clock, a.m.
14                      - - -
15   BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.
16                      - - -
17   APPEARANCES:
18
             RICHARDS, LAYTON & FINGER
19           BY:  ROBERT W. WHETZEL, ESQ.
20                    -and-
21
22
23
24                        Valerie J. Gunning
                          Official Court Reporter
25
```

2

```
 1   APPEARANCES (Continued):

 2
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 3   BY:  NICHOLAS GROOMBRIDGE, ESQ.,
          JENNIFER WU, ESQ.,
 4        JENNIFER GORDON, ESQ. and
          PETER SANDEL, ESQ.
 5        (New York, New York)

 6
             Counsel for Plaintiffs
 7

 8
     HEYMAN ENERIO GATTUSO & HIRZEL LLP
 9   BY:  DOMINICK GATUSSO, ESQ.

10
                  -and-
11

12
     WHITE & CASE LLP
13   BY:  DIMITRIOS DRIVAS, ESQ.,
          ALISON HANSTEAD, ESQ.,
14        AMIT H. THAKORE, ESQ. and
          KEVIN GEORGEK, ESQ.
15        (New York, New York)

16
             Counsel for Defendants
17

18                    - - -
19
20
21
22
23
24
25
```

3

```
 1                P R O C E E D I N G S

 2

08:56:43   3        (Proceedings commenced in the courtroom,

08:56:45   4   beginning at 9:00 a.m.)

08:58:48   5

08:58:49   6        THE COURT:  Good morning, everybody.  Have a

08:58:50   7   seat, please.

08:58:51   8        MR. WHETZEL:  Good morning, Your Honor.

08:58:52   9        THE COURT:  Good morning, Mr. Whetzel.

08:58:53  10        Before we start, I am following the CDC.  I

08:58:56  11   have from the start, so you don't have to wear a mask if

08:58:59  12   you've been vaccinated in my courtroom.  You are welcome

08:59:02  13   to wear a mask.  You should feel comfortable wearing a

08:59:14  14   mask.  I'm not going to hold it against you.  And the

08:59:07  15   witness, whoever testifies, will be required to testify

08:59:09  16   without a mask, so if that's going to be a problem, let me

08:59:12  17   know right away.  We'll have to figure out what to do about

08:59:16  18   that.  All right?

08:59:17  19        Mr. Whetzel?

08:59:18  20        MR. WHETZEL:  Good morning.  It's good to be

08:59:20  21   back.  Robert Whetzel for plaintiffs, Amgen Inc. and Amgen

08:59:23  22   Manufacturing, Limited.  From Paul Weiss I think Your Honor

08:59:26  23   has met most or all of the team, but we have Nick

08:59:30  24   Groombridge, Jennifer Wu, Jennifer Gordon and Peter Sandel.

08:59:35  25        From Amgen we have Kimberlyn Morley and Drew
```

4

```
08:59:38   1   Diamond.  Also in the courtroom is Dr. Richard Willson, who

08:59:41   2   will be presenting testimony later this morning.

08:59:43   3        THE COURT:  All right.  Thank you.

08:59:44   4        MR. WHETZEL:  Thank you, Your Honor.

08:59:45   5        THE COURT:  Mr. Gattuso?

08:59:51   6        MR. GATTUSO:  Good afternoon, Your Honor.

08:59:52   7   Dominick Gattuso on behalf of defendant Pfizer.  We have a

08:59:56   8   number of people in the courtroom, Your Honor.

08:59:57   9        First, from White & Case, Dimitrios Drivas,

09:02:02  10   Alison Hanstead, Amit Thakore, Kevin Georgek, and then also

09:00:07  11   from the client, Your Honor.  And we also have a law clerk

09:00:11  12   who is interning with Pfizer, Alexander Leah.

09:00:14  13        THE COURT:  All right.

09:00:16  14        MR. GATTUSO:  Thank you.

09:00:17  15        THE COURT:  Thank you.  All right.  Have you all

09:00:19  16   figured out how you want to proceed?

09:00:22  17        MR. GROOMBRIDGE:  Yes, Your Honor, and let me

09:00:26  18   maybe just summarize that and make sure it's acceptable to

09:00:30  19   the Court.

09:00:30  20        What I think we have agreed is I understand Your

09:00:33  21   Honor has allocated three hours for this hearing.  We've

09:00:35  22   agreed that the time would be split equally.

09:00:38  23        And --

09:00:38  24        THE COURT:  Do you think three hours is enough?

09:00:40  25        MR. GROOMBRIDGE:  I think it is probably enough,
```

5

09:00:42  1    Your Honor.  I mean, if we got a little bit over, maybe
09:00:46  2    that's fine, but I don't think we need four hours or
09:00:47  3    anything like that.
09:00:48  4         THE COURT:  That's fine.  I mean, my point was I
09:00:51  5    want to make sure -- I mean, I don't know how this is going
09:00:54  6    to end up.  I want to make sure for both sides that no one
09:00:57  7    is complaining that they didn't get to lay the record that
09:00:59  8    they think they need to lay.
09:01:01  9         MR. GROOMBRIDGE:  We understand that, Your
09:01:02 10    Honor, and we're keenly aware of Your Honor's, you know,
09:01:04 11    prior comments on the issues, but we believe that three
09:01:09 12    hours will be enough.
09:01:10 13         THE COURT:  Okay.
09:01:11 14         MR. GROOMBRIDGE:  And I think what we have
09:01:14 15    agreed, Ms. Hanstead will confirm or correct me, that we'll
09:01:18 16    start off with presentations by the lawyers by way of
09:01:21 17    typical Markman presentation, argument, and then -- so first
09:01:27 18    from Amgen and then from Pfizer.  Then Amgen will call its
09:01:31 19    technical expert, Dr. Willson.  There will be direct and
09:01:34 20    cross and any questions from Your Honor.  And then Pfizer
09:01:39 21    will call their technical expert, Dr. Przybycien.  We'll
09:01:43 22    have the same thing, and then to the extent that there's
09:01:45 23    time permitting or open issues, counsel can, we can have
09:01:49 24    some sort of wrap up and, of course, Your Honor I'm sure
09:01:51 25    will, you know, may very well have certain questions.

6

09:01:54  1         THE COURT:  Great.  Thank you.  That sounds
09:01:55  2    good.
09:02:02  3         MR. GROOMBRIDGE:  And so with that then, if it's
09:02:03  4    acceptable, I will just get started.
09:02:05  5         THE COURT:  Please.
09:02:13  6         MR. GROOMBRIDGE:  And so let me see if I can
09:02:14  7    make this work.  We wanted to start by talking about what is
09:02:17  8    the invention.  So the invention is combinations of salts
09:02:21  9    useful for increasing dynamic capacity of a HIC column and
09:02:26 10    we'll get into how that happens and what's a HIC column.
09:02:29 11    And the combinations of salts allow for decreased
09:02:32 12    combination.  And in our view, Your Honor, that's very
09:02:34 13    important.  It's a theme that runs through the patent.
09:02:37 14         Now, what we're trying to do here is use less
09:02:40 15    salt, not use more salt.  And I think what we're going to
09:02:43 16    see is that the patent tells us that there are detrimental
09:02:47 17    effects to having too much but there isn't really a
09:02:50 18    detrimental effect of having too little other than that you
09:02:53 19    don't get the result you're looking for.
09:02:55 20    ==And in our view, the entire teaching of the==
09:02:58 21    ==patent here is really that the invention is relative, not==
09:03:02 22    ==absolute.==  It's looking at what you would have used in the
09:03:04 23    prior art and using less to get as good or better of the
09:03:06 24    result.
09:03:09 25         And the way that that is captured in the claim,

7

09:03:12  1    as Your Honor is keenly aware, is through this limitation
09:03:16  2    between about .1 molar and about 1.0, obviously, molar,
09:03:21  3    although it doesn't say that.
09:03:24  4         And we'll be talking about that.  But the
09:03:26  5    limitation uses the term about, and one of the things that
09:03:31  6    we wanted to -- let me just show that.  That's what we take
09:03:37  7    to be the dispute here, is whether that claim concentration
09:03:43  8    range excludes concentrations described in the specification
09:03:46  9    as outside the scope of the claims, Pfizer's position, or
09:03:51 10    whether that is not a part of the appropriate construction,
09:03:55 11    Amgen's position.
09:03:56 12         And at the outset we wanted to talk about the
09:04:00 13    Cohesive case to which Your Honor directed us, and to be
09:04:05 14    perfectly frank, we had not focused on this until Your Honor
09:04:08 15    raised it, but we have gone away and thought long and hard
09:04:11 16    about this and studied Cohesive and its progeny in some
09:04:15 17    detail.  And our position, Your Honor, is that Cohesive
09:04:22 18    would provide, does provide an important framework for
09:04:25 19    construing the concentration limitation here, and there are
09:04:31 20    many, many patent claims that have the word about in them
09:04:35 21    to which Cohesive may not be applicable, but we think in
09:04:38 22    this circumstance, having lot it, we think it is applicable.
09:04:41 23         What Cohesive teaches us is that where we have
09:04:45 24    an about limitation, that we look, first of all, at what is
09:04:49 25    the criticality, is there criticality to that limitation.

8

09:04:53  1    We look at what is the purpose of that limitation, not the
09:04:55  2    invention, but the limitation, and we asked in Cohesive what
09:05:00  3    was the function of the low end in a range, there about
09:05:04  4    30 micrometers, how did that play into or affect the
09:05:08  5    operation of the claimed invention, and that's what we
09:05:11  6    contend the Court should do here.
09:05:14  7         And then as the Federal Circuit said in
09:05:19  8    Cohesive, having construed it, what it would encompass,
09:05:22  9    encompass within the literal scope of the claim would be
09:05:26 10    anything that performs the same function in the same way to
09:05:28 11    obtain the same result unless that is in some way excluded
09:05:34 12    by other aspects of the specification.  And so what we think
09:05:38 13    here, Your Honor, is that that is exactly the right way to
09:05:41 14    construe this.  And to be clear, if the Court were to do
09:05:45 15    that, we would only get one bite at the function, way,
09:05:48 16    result.  Right?  In other words, if the Court were to say
09:05:52 17    that is correct, then that is literal infringement.  We
09:05:54 18    don't get another go-around of some greater function,
09:05:57 19    greater result for equivalents.  That's it.  It only happens
09:06:01 20    once.
09:06:02 21         And we think that that is the best way to deal
09:06:04 22    with that.  We think it fairly construes the claim
09:06:11 23    limitation in a way fairly to the patent owner and to the
09:06:15 24    public and it avoids what would otherwise be a retractable
09:06:21 25    issue of what is the boundary between literal infringement

9

1 and doctrine of equivalents.

2 THE COURT: So just to be clear then, if I were

3 to leave this hearing and I were to construe the term to be

4 between approximately 0.1 molars and approximately 1. molar

5 and the claimed range excludes concentrations below .05

6 molar and above 1.4 molar, you say that was your one shot?

7 MR. GROOMBRIDGE: I believe so, Your Honor.

8 THE COURT: So, in other words, we're not

9 talking doctrine of equivalents. Right? It has to be

10 within what I just said?

11 MR. GROOMBRIDGE: I think if Your Honor has

12 said -- the Court embraces Cohesive, but the Court in the

13 language of Cohesive, the Court finds that there are other

14 disclosures in the specification that operate to cut back

15 things. Otherwise that would be covered by the claim, then,

16 yes. Right? That's a ruling, we're done, we live with it

17 and maybe we take it to the Court of Appeals or whatever.

18 THE COURT: Right.

19 MR. GROOMBRIDGE: But that's the consequence.

20 THE COURT: Right. And that's fair. All right.

21 MR. GROOMBRIDGE: And so what we're going to try

22 to do today is, or at least in the next half-an-hour or so,

23 is walk through and say how do we apply Cohesive to this

24 patent and the facts that we have in front of us.

25 And so the asserted --

10

1 THE COURT: And I guess, just to be clear, like,

2 my thinking when I raised Cohesive was looking at a way to

3 manage the case and essentially say if I were to find, as I

4 thought I might find that the construction was what I just

5 articulated, that under Cohesive, that would effectively put

6 an end to the case. In other words, it's not so much I was

7 raising it to inform the construction itself, although I

8 think it does.

9 MR. GROOMBRIDGE: Right.

10 THE COURT: But my point was there's lots of

11 cases that it would inform the construction. I raised it

12 more to bring to light what I thought might happen were I to

13 construe it. Does that make sense?

14 MR. GROOMBRIDGE: That makes total sense, Your

15 Honor.

16 THE COURT: And I think what you are doing, and

17 reasonably, as you want to do, is say this is the whole

18 game. We've got to decide the construction, but if I

19 construe it the way I was inclined, we're not going to have

20 a viable doctrine of equivalence argument.

21 MR. GROOMBRIDGE: That correct, Your Honor.

22 THE COURT: All right.

23 MR. GROOMBRIDGE: I just want to caveat that.

24 The Court could construe it and say I reject the affirmative

25 claim construction part, or at least I choose not to apply

11

1 it here, but I am going to apply the second part of Cohesive

2 that says, and you don't get a doctrine of equivalents.

3 THE COURT: Right. And we'll quibble about

4 that.

5 MR. GROOMBRIDGE: Right.

6 THE COURT: I think Cohesive, the claim

7 construction aspect of it, if you will, I don't know that

8 that is anything other than consistent with just general

9 principles that I would otherwise apply, and you'll be free

10 to argue otherwise and to shed light on what you think

11 Cohesive means in terms of the construction.

12 MR. GROOMBRIDGE: Yes.

13 THE COURT: All right.

14 MR. GROOMBRIDGE: Thank you, Your Honor. I

15 mean, to try and crystallize that, what we think it means is

16 you look at, in this case, the bottom end of a numerical

17 range that's prefaced with about to look at it functionally,

18 what's it doing here in the context of this invention.

19 THE COURT: And your point is that the, the

20 whole point is that the gist of this invention is to

21 decrease as opposed to find an intermediate range, is to

22 decrease?

23 MR. GROOMBRIDGE: The benefit of the invention

24 is using less salt and I will come to this in more detail.

25 But there's no, there's no negative consequence to having

12

1 too little apart from the fact that the invention won't work

2 or won't work very well. Right.

3 And so the --

4 THE COURT: I'm just curious. Would you

5 stipulate to a construction that about means between

6 approximately .1 molar and approximately 1.0 molar and the

7 claimed range excludes concentrations above 1.4 molar?

8 MR. GROOMBRIDGE: I mean, let me -- my personal

9 reaction to that is the -- I don't think that that is

10 necessarily a correct reading of the patent. I think for

11 purposes of Amgen's position in this case, we'd be happy to,

12 because, you know.

13 THE COURT: Right.

14 MR. GROOMBRIDGE: But I believe, you know, if

15 I'm trying to be true to what is this patent actually

16 teaching, and for that matter, you know, do we ever end up

17 litigating this against some other litigant, I don't think

18 that's correct because I think it's entirely relative.

19 THE COURT: Got you.

20 MR. GROOMBRIDGE: And I just want -- I mean,

21 while we have this slide set up, I just wanted to say what I

22 will be calling the disclaimer argument. In other words, in

23 the language of Cohesive, there is something, the premise

24 that there is something in the specification that offers to

25 cut back what would otherwise be the scope of the claim. As

13

| | |
|---|---|
| 09:11:05 1 | we understand, it flows entirely from these two sentences in |
| 09:11:09 2 | column 3, right, and talking in some great detail about |
| 09:11:14 3 | them. |
| 09:11:14 4 | We think that there is no disclaimer for three |
| 09:11:19 5 | reasons. The first is that low, high and intermediate |
| 09:11:24 6 | concentrations are relative, not absolute, and so that is by |
| 09:11:28 7 | all means an example in column 3, but it is an example of a |
| 09:11:32 8 | particular system, system meaning a particular salt pair |
| 09:11:39 9 | with concentrations for those salts, a particular protein |
| 09:11:43 10 | and a particular HIC column, and that you can't pour it |
| 09:11:49 11 | across absolute numbers from one such system to a different |
| 09:11:52 12 | system. The invention is relative, not absolute. |
| 09:11:55 13 | And the second reason is that the concentrations |
| 09:11:58 14 | given in those two prior art references measure something |
| 09:12:02 15 | that's different from the about .1 molar to one range of the |
| 09:12:08 16 | claim. In other words, it's not an apples-to-apples |
| 09:12:12 17 | comparison, and we'll get into, to the extent it's possible |
| 09:12:14 18 | to make an apples-to-apples comparison, I will come to that |
| 09:12:18 19 | and Dr. Willson will testify about it. |
| 09:12:20 20 | And the third item here, Your Honor, is that the |
| 09:12:27 21 | salt pair or at least, I'm not sure if it's fair to call it |
| 09:12:31 22 | salt pair, but let's call it that, that the salt pair used |
| 09:12:34 23 | in Nau and Singleton, in both of them, is sulfate phosphate, |
| 09:12:38 24 | and that is not one of the three salt pairs claimed in this |
| 09:12:43 25 | patent. And if Your Honor has touched on this and I think |

15

| | |
|---|---|
| 09:14:27 1 | the ligands, and because they are both hydrophobic, they |
| 09:14:32 2 | both dislike an aqueous environment, they bind together, and |
| 09:14:37 3 | what will cause them to do that, what will cause the protein |
| 09:14:40 4 | flowing through to do that is appropriate choice of salt |
| 09:14:44 5 | conditions. |
| 09:14:44 6 | And so now what we've done is something that we |
| 09:14:46 7 | didn't want is run through and gone out at the bottom. By |
| 09:14:49 8 | changing the salt conditions, we can now cause the thing |
| 09:14:54 9 | that we do want to run out or elute from the column and |
| 09:14:57 10 | collect it and we've affected purification. |
| 09:15:00 11 | And so the key to this is what salt conditions |
| 09:15:03 12 | are going to be appropriate in any given case. And the |
| 09:15:10 13 | patent talks in some detail about that and I'm going to |
| 09:15:10 14 | focus on three variables. There are more variables, but |
| 09:15:14 15 | three that are called out and I think probably the major |
| 09:15:18 16 | focus here are the hydrophobicity of the protein. Protein |
| 09:15:22 17 | differs in different ways that matter. The identity of the |
| 09:15:24 18 | salt or in the case of the patent, the salt pair, what salts |
| 09:15:28 19 | have we elected to use and the hydrophobicity of the column |
| 09:15:33 20 | itself, and each one of those will have an effect on how |
| 09:15:36 21 | much salt or concentration of salt you need. |
| 09:15:39 22 | And so the first thing that the patent tells us |
| 09:15:42 23 | is that salt conditions are adjusted to individual proteins. |
| 09:15:47 24 | Right. So that this, it's telling us there is no one set of |
| 09:15:51 25 | concentration ranges that fits everything, and that the more |

14

| | |
|---|---|
| 09:12:47 1 | as Your Honor is aware, the Court in Pennsylvania only |
| 09:12:49 2 | touched on it, that we can't pour it across concentration |
| 09:12:56 3 | ranges from one salt pair to a different salt pair. In |
| 09:12:59 4 | fact, Your Honor, as we'll see, sulfate/phosphate, not only |
| 09:13:03 5 | is it claimed, but a fair reading of the public record is |
| 09:13:05 6 | that the patentee made a deliberate decision not to claim |
| 09:13:08 7 | it, right, and thus in our view we don't think it is -- it |
| 09:13:16 8 | would be fair or proper to have a disclaimer that flows from |
| 09:13:18 9 | something that was purposefully not included in the scope of |
| 09:13:23 10 | this invention. |
| 09:13:24 11 | And so what I wanted to do was run through what |
| 09:13:29 12 | does the patent tell us about salt concentrations and to |
| 09:13:33 13 | begin with a discussion of HIC, what I'm sure is simplistic |
| 09:13:38 14 | terms that Dr. Willson and Dr. Singleton will probably |
| 09:13:41 15 | cringe at. |
| 09:13:43 16 | So here's a cartoon of a HIC column, and we have |
| 09:13:46 17 | in the column these -- this matrix, which is made up of |
| 09:13:51 18 | beads. Oops, let me go back. There we are. Beads that |
| 09:13:58 19 | have attached to them what are customarily called ligands, |
| 09:14:02 20 | and the ligands are chemical groups that are themselves |
| 09:14:05 21 | hydrophobic. In other words, they like oil and don't like |
| 09:14:08 22 | water. And the way we, the principle underlying HIC as a |
| 09:14:14 23 | separation mechanism is that we run through the column a |
| 09:14:18 24 | mixture that has various kinds of things, some more and some |
| 09:14:22 25 | less hydrophobic. And the ones that are hydrophobic find |

16

| | |
|---|---|
| 09:15:55 1 | hydrophobic the molecule, the protein molecule, the less |
| 09:15:59 2 | salt is needed to effectuate binding. |
| 09:16:01 3 | And so what does that mean? Well, as Your Honor |
| 09:16:05 4 | is I'm sure aware, proteins are often characterized as a |
| 09:16:09 5 | string of amino acids and some of those amino acids are |
| 09:16:13 6 | hydrophobic or oil-loving and some of them are hydrophilic |
| 09:16:18 7 | water-loving. And what will happen after the protein has |
| 09:16:23 8 | been created by the process of synthesizing that chain of |
| 09:16:26 9 | amino acids, it's in an aqueous environment typically in the |
| 09:16:30 10 | body, let's say, or in a reactor, it will fold up, and it |
| 09:16:36 11 | will fold up in part driven by the desire of the hydrophobic |
| 09:16:42 12 | parts of it to get away from water, and so the folding |
| 09:16:46 13 | process will typically mean most of the hydrophobic parts |
| 09:16:49 14 | will be on the inside and the hydrophilic parts would prefer |
| 09:16:53 15 | to be on the outside. But that is an absolute. And there |
| 09:16:56 16 | are some proteins that are -- proteins vary in terms of how |
| 09:17:01 17 | hydrophobic or hydrophilic they are. Some are quite |
| 09:17:05 18 | hydrophobic. |
| 09:17:06 19 | This is an example and we picked it because it's |
| 09:17:09 20 | the protein that's at issue in this case. It's also one, |
| 09:17:11 21 | although a long list of proteins that appears in the patent. |
| 09:17:15 22 | And what we see here is that in the case of this protein, |
| 09:17:18 23 | you say it there, that it is particularly hydrophobic |
| 09:17:22 24 | because when it folds up, what you get on the outside are |
| 09:17:24 25 | these patches. You can see grossly three patches, and we've |

17

```
09:17:27  1   used throughout this, we've used red to indicate hydrophobic
09:17:31  2   and blue to indicate hydrophilic or water-loving.
09:17:34  3          And so here you've got a protein that has large
09:17:37  4   hydrophobic areas on the outside and that will make it
09:17:39  5   easier to cause it to adhere to the matrix in the column,
09:17:50  6   and what's easier in the sense that a lower salt
09:17:52  7   concentration would be required with such a protein.
09:17:54  8          And here is an example, and this is from a
09:17:57  9   handbook published in 1993 that I think both experts agree
09:18:01 10   is something that a skilled person would know and would
09:18:05 11   refer to.  And what we see, we've added the depictions of
09:18:08 12   the proteins, but the figure, the graph in the middle is
09:18:12 13   from this handbook, and what it's showing us, Your Honor, is
09:18:14 14   two salt -- two proteins.  The one that we've depicted on
09:18:21 15   the left here, all physical chymotrypsinogen, which is more
09:18:27 16   hydrophobic, and the one on the left is less hydrophobic.
09:18:31 17   All of the conditions are the same and we can see that the
09:18:33 18   salt concentration that would be required to cause the
09:18:35 19   hydrophobic protein to bind are very different from those
09:18:38 20   that would cause, that would be required for the less
09:18:41 21   hydrophobic protein, and if we were to round a concentration
09:18:45 22   of 1.5 molar of ammonium sulfate, we would have very
09:18:50 23   substantial binding of one protein and essentially no
09:18:54 24   binding at all of the other protein.  And this goes to the
09:18:56 25   point that the concentration is relative.  Right?  It's not
```

18

```
09:19:02  1   an absolute.  Low and high aren't absolute, they're
09:19:05  2   relative.
09:19:05  3          And the next thing that the patent tells us
09:19:08  4   about the concentration, what affects the concentration
09:19:14  5   range is what salts.  Right?  The concentration range is
09:19:17  6   going to depend upon one's choice of salt, and so at this
09:19:22  7   point it may be useful to say, what is a salt?
09:19:25  8          Well, a salt is a combination of an ions and
09:19:29  9   cations, cations being positively charged ions and anions
09:19:35 10   being negatively charged ions.  Probably for the purposes of
09:19:39 11   the task in front of us, the anions are more important here.
09:19:42 12   But we can see there's a sort of one from column A and one
09:19:46 13   from column B aspect to this.  We see that, of course, salt,
09:19:51 14   sodium chloride, the one that everyone would know.  But a
09:19:54 15   salt that one would select could have any, essentially any
09:19:57 16   combination of anions and cations, and depending on which
09:20:02 17   one picked, it would have potentially profound consequences
09:20:05 18   in terms of what concentration is needed.
09:20:08 19          The patent refers to this it, uses the term
09:20:13 20   lyotropic to say that's the influence that different salts
09:20:17 21   have.  Basically, the degree to which any particular anion
09:20:22 22   increases the salting out effect or the salt that would lead
09:20:25 23   ultimately to precipitation, and for cations, less germane
09:20:30 24   here, I suspect, but which increases the salt in effect.
09:20:35 25          This is a reference.  It mentions the Hofmeister series that
```

19

```
09:20:41  1   we may talk about.  This is something extremely well-known
09:20:43  2   to those in the art.
09:20:44  3          Here, Your Honor, is a figure from a publication
09:20:46  4   that goes all the way back to 1932, and what it's showing us
09:20:51  5   is in essence the -- it's charting solubility against salt
09:20:57  6   concentration.  This says ionic strength.  That's a measure
09:21:02  7   of concentration for a series of different salts.  And we
09:21:05  8   can see, for example, the top, this is sodium chloride.
09:21:09  9   This one here is sodium sulfate.  This one is ammonium
09:21:15 10   sulfate.  And we can see that the effects of these, the same
09:21:18 11   concentration the way a salt will behave is dramatically
09:21:22 12   different in terms of what effect it will have to induce a
09:21:27 13   hydrophobic confirmation, or eventually if you get high
09:21:31 14   enough, to cause the protein to precipitate.
09:21:34 15          And so this is a large part of why you can't
09:21:37 16   port across an absolute concentration number from one salt
09:21:43 17   to another.  In my primitive way, Your Honor, I thought
09:21:45 18   about it to say I could talk about the price for a piece of
09:21:48 19   land and say it's $50,000, but if I don't know how big the
09:21:52 20   land is, the price isn't a meaningful comparator in terms of
09:21:55 21   how expense it or not expensive is the land.  Right?
09:21:58 22          THE COURT:  The verb you're using is pour
09:22:02 23   across?
09:22:02 24          MR. GROOMBRIDGE:  Port.  Port in the sense of
09:22:03 25   carrier.
```

20

```
09:22:03  1          THE COURT:  I just want to make sure I got it
09:22:05  2   right.
09:22:05  3          MR. GROOMBRIDGE:  I apologize.
09:22:06  4          THE COURT:  You don't need to apologize.  It's
09:22:08  5   not a word I use in my regular conversations and I get the
09:22:13  6   point of it.  I'm trying to think of a synonym for it and I
09:22:16  7   can't.
09:22:16  8          MR. GROOMBRIDGE:  I was using it by analogy as
09:22:22  9   to portage in the sense if you were traveling by canoe
09:22:24 10   across rivers.  You can't take one and just move it across
09:22:26 11   and say this absolutely numerical value is applicable here
09:22:26 12   because the conditions have changed.
09:22:26 13          THE COURT:  Right.
09:22:33 14          MR. GROOMBRIDGE:  And just while we're on the
09:22:34 15   subject of clarity for the record, I should say for the
09:22:36 16   benefit of the court reporter that I'm referring to the
09:22:39 17   prior art reference Nau, N-a-u, and I will do my best to try
09:22:43 18   and avoid confusion with the word N-o-w.
09:22:46 19          THE COURT:  All right.
09:22:46 20          MR. GROOMBRIDGE:  And the third variable that
09:22:52 21   the patent calls out here is the HIC medium or matrix
09:22:58 22   itself, and it says, the invention can be used with any type
09:23:00 23   of HIC stationary phase and that tells us that they vary in
09:23:04 24   terms of things that are going to impact how hydrophobic
09:23:07 25   they are.  And, again, to illustrate that, here's another
```

21

```
09:23:11   1    figure from a literature article, and what this is showing
09:23:17   2    us is how much salt is required to cause a protein to detach
09:23:23   3    from a series of columns.  Each one of these is a different
09:23:26   4    kind of column.  And we can see here -- and by the way, this
09:23:30   5    toyopearl butyl is the one that's referred to in the patent,
09:23:37   6    that you would require much less, a much lower -- I'm sorry.
09:23:42   7    Let's see.  One would require a much lower concentration of
09:23:45   8    salt with a particularly hydrophobic column than one would
09:23:51   9    with something that's in the middle of the range or at the
09:23:55   10   far end.
09:23:55   11           And so salt concentration here is going to
09:23:58   12   depend as well on the column, and if I pick a particularly
09:24:01   13   hydrophobic matrix, I will need a lower concentration of
09:24:04   14   salt.
09:24:05   15           And so the patent in our view, Your Honor, has
09:24:08   16   got this clear teaching that there's a whole lot of
09:24:10   17   variables that affect what concentration you would use and
09:24:13   18   that's why we're speaking in relative, not absolute terms.
09:24:16   19           And now following the --
09:24:18   20           THE COURT:  Just give me a second.
09:24:19   21           MR. GROOMBRIDGE:  Yes.
09:24:49   22           THE COURT:  Okay.
09:24:49   23           MR. GROOMBRIDGE:  And, Your Honor, my colleague
09:24:51   24   points out that I neglected at the beginning to offer hard
09:24:53   25   copies.
```

22

```
09:24:54   1            THE COURT:  Oh, sure.  Thank you.
09:24:56   2            MR. GROOMBRIDGE:  All right.  I will pass those
09:24:57   3    up.  Thank you.
09:25:06   4            (Mr. Groombridge handed slides to the Court.)
09:25:06   5            MR. GROOMBRIDGE:  Now, the next thing I'd like
09:25:07   6    to turn to, Your Honor, is the purpose of the concentration
09:25:10   7    range following the guidance of Cohesive.  What is this
09:25:15   8    limitation doing in the claim?  And this is by way of a
09:25:20   9    summary slide.
09:25:21   10           What we think, Your Honor, is the patent teaches
09:25:24   11   that the purpose of the upper bound about .1 molar is to
09:25:27   12   avoid salt concentrations that could be detrimental either
09:25:30   13   to the protein itself or to the purification process, but
09:25:35   14   very importantly in our view, Your Honor, there's no
09:25:37   15   equivalent teaching that the patent, that there's any
09:25:40   16   detrimental effect resulting from the concentration that is
09:25:44   17   too low and that the and at lower bound, the concentration,
09:25:48   18   the only real requirement is that it be sufficient to
09:25:51   19   achieve the purpose of increasing dynamic capacity, and as
09:25:54   20   I've now covered in some detail, the concentration needed to
09:25:57   21   do that will depend upon the variables that we just looked
09:26:00   22   at.
09:26:04   23           And in our view, Your Honor, recognizing that
09:26:07   24   the terms low, intermediate and high are not in the claim
09:26:10   25   but these are relative terms, that low means with respect to
```

23

```
09:26:13   1    any given system means something that is not enough to
09:26:17   2    increase dynamic capacity and high means something that's
09:26:21   3    detrimental to the process and intermediate means what's
09:26:25   4    between those, and in our view, they're purposely defined to
09:26:38   5    be relative because they're what the patent is teaching.
09:26:41   6            And so the patent is very clear about high salt
09:26:44   7    concentrations being bad.  It says it's detrimental to
09:26:48   8    protein stability, it can actually cause the protein, for
09:26:51   9    example, to unfold and then lose its activity.  It increases
09:26:55   10   the viscosity of the solution, making it hard to handle.  It
09:26:59   11   results in the formation of aggregates.  It can actually
09:27:02   12   cause the protein particles to adhere to themselves and then
09:27:06   13   in a way that's difficult to undo and causes them to cease
09:27:11   14   to be of any value.  And all of these factors can lead to
09:27:15   15   reduced purity and reduced yield.  And so this is why the
09:27:20   16   patent is saying we'd like to get away from high salt
09:27:23   17   concentration.  And a theme that runs through this, I don't
09:27:29   18   want to beat it to death, but we have four slides on this,
09:27:32   19   is there are numerous statements in the patent that say what
09:27:36   20   we're doing here is reducing the concentration of salts used
09:27:41   21   and we are reducing them so we see -- I will just run
09:27:45   22   through these.
09:27:45   23           THE COURT:  Go back to that sentence.
09:27:47   24           MR. GROOMBRIDGE:  Yes.
09:27:57   25           THE COURT:  Give me a second.
```

24

```
09:27:58   1            MR. GROOMBRIDGE:  Sure.
09:28:15   2            THE COURT:  Can you give me a definition for
09:28:47   3    fail to increase dynamic capacity?
09:28:50   4            MR. GROOMBRIDGE:  I'm not sure if I can, but I
09:28:56   5    could certainly think about it, Your Honor, and I can
09:28:59   6    consult with --
09:29:00   7            THE COURT:  Well, it's on your slides.
09:29:01   8            MR. GROOMBRIDGE:  Yes.
09:29:02   9            THE COURT:  So just go back to the last slide or
09:29:04   10   go to slide 25.
09:29:05   11           MR. GROOMBRIDGE:  Right.
09:29:06   12           THE COURT:  So what do you mean, fails to
09:29:08   13   increase dynamic capacity?  What do you mean?
09:29:11   14           MR. GROOMBRIDGE:  What we mean there, what the
09:29:12   15   patent says there is a comparison here and we look at --
09:29:15   16   and this, by the way, is a subject of other disputes between
09:29:19   17   the parties, but the way we view it is what you do, you
09:29:23   18   look, you would compare what is my dynamic capacity with one
09:29:29   19   salt and it's going to be the salt that's there in the
09:29:32   20   greater amount we think.
09:29:34   21           THE COURT:  Okay.  Let's put it this way.  I'm
09:29:36   22   looking for literally a definition.
09:29:37   23           MR. GROOMBRIDGE:  Yes.
09:29:37   24           THE COURT:  So let's start with, what do you
09:29:39   25   mean by dynamic capacity?
```

29

09:34:52 1 some fashion.

09:35:07 2 THE COURT: How do you differentiate protein

09:35:10 3 loss from the breakthrough or leakage of the protein?

09:35:17 4 MR. GROOMBRIDGE: I suspect, and I'm not sure

09:35:22 5 that I know, but we happily ask either of the experts --

09:35:27 6 THE COURT: Well, do you think they are

09:35:28 7 different?

09:35:28 8 MR. GROOMBRIDGE: I don't think they are

09:35:29 9 necessarily different. In other words, I think if we're

09:35:32 10 loose -- if the material of interest is not being retained

09:35:34 11 on the column, then that is a form of protein loss. In

09:35:39 12 other words, that process is becoming less efficient.

09:35:41 13 THE COURT: So go back to slide 25 again. So I

09:35:48 14 understand how you got detrimental to protein.

09:35:51 15 MR. GROOMBRIDGE: Yes.

09:35:51 16 THE COURT: That's folding. But let's say you

09:35:54 17 get rid of that and it's just detrimental to purification

09:35:58 18 process. Is purification process anything different than

09:36:04 19 what is captured by the words dynamic capacity?

09:36:07 20 MR. GROOMBRIDGE: I think it is. I think

09:36:09 21 dynamic capacity has to do with how efficient the process

09:36:13 22 is, but there could be other reasons, like it's not -- I'm

09:36:20 23 not sure that I know enough technically to know whether

09:36:23 24 things like formation of aggregates would be included in the

09:36:27 25 loss of dynamic capacity or not. I take dynamic capacity to

30

09:36:30 1 be meaning I've basically exceeded the concentration of

09:36:36 2 protein that can attach to the hydrophobic beads, right, and

09:36:42 3 therefore some of it is coming out of the bottom whereas

09:36:45 4 there are also phenomena, like I've made the protein attach

09:36:48 5 to itself and now it doesn't attach to anything. Whether

09:36:53 6 those are subsumed within dynamic capacity or whether

09:36:56 7 they're a different aspect that's also bearing to the

09:37:00 8 efficiency of the process, I'm not sure that I'm competent

09:37:03 9 to answer Your Honor.

09:37:04 10 THE COURT: Okay. Go ahead.

09:37:06 11 MR. GROOMBRIDGE: And I will just move quickly

09:37:10 12 through this, but we have many places in the specification

09:37:13 13 where it tells us that what the combination of salts is

09:37:17 14 doing is allowing decreased concentration of at least one

09:37:21 15 salt, and typically, what we're seeing hear the way we view

09:37:25 16 the invention is you've got -- typically, you're going to

09:37:29 17 have a salt that's present in the greater concentration,

09:37:31 18 that's the one that's doing the heavy lifting, and a salt

09:37:33 19 that's present in a lesser concentration. What the second

09:37:37 20 one is doing is in essence potentiating or improving the

09:37:41 21 effectiveness of the first one.

09:37:43 22 THE COURT: All right.

09:37:44 23 MR. GROOMBRIDGE: So what underlies this patent

09:37:49 24 is the discovery that the salts will interact and that the

09:37:52 25 second salt can help the first salt be more effective at any

31

09:37:57 1 given concentration and therefore you can use less of the

09:38:00 2 first salt, and that's the -- heart, that's the

09:38:05 3 scientific principle that underlies this improved

09:38:08 4 purification process.

09:38:10 5 And so we have numerous places in the spec that

09:38:15 6 talk about the combination allowing for decreased

09:38:21 7 concentration and typically of the, much of at least one

09:38:25 8 salt, and that would be the salt that's present in the

09:38:27 9 greater concentration.

09:38:31 10 And --

09:39:02 11 THE COURT: Oh, I'm sorry.

09:39:03 12 MR. GROOMBRIDGE: I did want to move on.

09:39:04 13 THE COURT: No, you can go ahead. Sorry.

09:39:06 14 MR. GROOMBRIDGE: So here is another one, and,

09:39:08 15 again, I'm not sure that each one of these, the intent of

09:39:10 16 this step, of course, is simply to call out some of the

09:39:14 17 examples where the patent, this recurrent theme in the

09:39:17 18 patent that we can use a lower concentration as a result of

09:39:21 19 the combination.

09:39:24 20 And if Your Honor is ready, I will move to the

09:39:26 21 fourth and final of this set.

09:39:37 22 THE COURT: Okay.

09:39:38 23 MR. GROOMBRIDGE: This is the last of the

09:39:42 24 examples that we called out here.

09:39:48 25 THE COURT: All right.

32

09:39:48 1 MR. GROOMBRIDGE: Now, by contrast, and this is

09:39:51 2 important in our view under Cohesive.

09:39:53 3 When we turn to what is the purpose of the lower

09:39:55 4 bound in the concentration range, there's really -- there's

09:40:00 5 no corresponding statements in the specification about here

09:40:03 6 is the problem with having too little, and this is one of

09:40:07 7 the figures. And I should point out, this is one of the

09:40:09 8 salt pairs that's not claimed, but the figures are

09:40:14 9 essentially the same for all of them.

09:40:16 10 But what we see here, this is showing what is

09:40:22 11 our recovery and the percentage recovery, and we see as we

09:40:27 12 increase concentration that each of these curves is starting

09:40:33 13 with holding constant a concentration of one salt and

09:40:38 14 increasing the concentration of the second salt. And there

09:40:38 15 comes a point where the recovery falls off a cliff. And for

09:40:42 16 each of these it just starts to go down and that's telling

09:40:45 17 us that's too much concentration.

09:40:47 18 But at the bottom end that we're talking about

09:40:50 19 here, there's no corresponding scientific phenomena. Right?

09:40:54 20 It's simply -- there isn't a negative to having too little

09:40:58 21 other than that you that you don't get the benefit.

09:41:02 22 And so, for example, there's not -- this is --

09:41:06 23 there's not a lot in the spec on this, but here's one place

09:41:10 24 where it's addressed, where it says in the particular system

09:41:14 25 they were looking at here, the low concentrations turned out

33

1  to be too low to improve dynamic capacity. And this is in

2  our view the teaching about the patent at the low end is

3  this. The only limited constraint on the low end is it has

4  to be enough to get you the effect, this helper effect, if

5  you will, and if it's not doing that, then you've got too

6  little, but there's no corresponding teaching that having

7  too little is bad or too low of a concentration is bad.

8           THE COURT:  Well, isn't it too bad in that it

9  doesn't improve dynamic capacity?

10          MR. GROOMBRIDGE:  Correct.  That's exactly

11  right.

12          THE COURT:  Okay.

13          MR. GROOMBRIDGE:  That --

14          THE COURT:  It is bad.

15          MR. GROOMBRIDGE:  That's the constraint on the

16  low end in our view, Your Honor, exactly.

17          THE COURT:  But that's detrimental.

18          MR. GROOMBRIDGE:  It is detrimental, right, but

19  it's functionally defined.  You need enough to improve

20  dynamic capacity and that's the only thing that is governing

21  the low end of the range.

22          And so now I will turn to the -- why we think

23  there's no disclaimer.  And I don't know that we need to --

24  well, I guess looking at the language that we have here with

25  the amount.  It then goes on in the next sentence, as Your

34

1  Honor is keenly aware, to characterize the invention as

2  differing in the sense that an intermediate amount is used,

3  and we think, again, that those words would were chosen to

4  be relative, not absolute.  There's a reason that it's not

5  saying, it's not characterizing the amount in terms of

6  numerical value.

7           THE COURT:  But I mean when you say relative --

8           MR. GROOMBRIDGE:  Yes.

9           THE COURT:  -- it chose intermediate to

10  differentiate between low.

11          MR. GROOMBRIDGE:  Correct.

12          THE COURT:  All right.

13          MR. GROOMBRIDGE:  But --

14          THE COURT:  And -- and to differentiate with

15  high.

16          MR. GROOMBRIDGE:  Correct.

17          THE COURT:  Okay.

18          MR. GROOMBRIDGE:  But our view, Your Honor --

19          THE COURT:  It's not low and it's not high.

20          MR. GROOMBRIDGE:  That's exactly right, Your

21  Honor.

22          THE COURT:  Okay.

23          MR. GROOMBRIDGE:  And in our view, I mean,

24  here's an example of showing why you can't turn that into an

25  absolute numerical value.  Here we've got an example of a

35

1  salt pair.  Two pairs of the exact same concentrations,

2  radically different results here, and that's the idea, you

3  can't read across from a numerical value that applies to one

4  salt.

5           THE COURT:  So let's say it's all relative.

6  Let's say I agree with you.

7           MR. GROOMBRIDGE:  Right.

8           THE COURT:  Why did they put any number in the

9  claim?

10          MR. GROOMBRIDGE:  That is an absolute --

11  that is a great question and one to which we don't know the

12  answer.

13          THE COURT:  But you're the patentee.

14          MR. GROOMBRIDGE:  Trust me, Your Honor, I have

15  tried to find that out and the way that this got into the

16  claim --

17          THE COURT:  But I've got to give meaning to

18  something you put in the claim.  Even if you don't have an

19  answer for why, I've got to attribute there's meaning of

20  1.0.

21          MR. GROOMBRIDGE:  Absolutely.

22          THE COURT:  If I listen to you today, I'm

23  thinking there's going to be no number in this claim.

24          MR. GROOMBRIDGE:  I think if we follow Cohesive,

25  what about 0.1 means is an amount that in the system we're

36

1  talking about is sufficient to increase dynamic capacity.

2  That's what it means.

3           THE COURT:  But that just basically then gets

4  rid of any significance to the fact that there's a number in

5  the claim language because it's all relative.

6           MR. GROOMBRIDGE:  I would suggest, Your Honor,

7  that is what Cohesive is saying, is where we have an

8  about followed by a numerical value, we are looking to say

9  things that perform the same function in the same way get

10  the same result are satisfying that limitation.

11          And --

12          THE COURT:  Right.  But I'm saying if it's -- as

13  I understand your argument, it's purely relative, and I

14  think you even admitted that it's really hard to explain why

15  they put a number in.

16          MR. GROOMBRIDGE:  Correct, Your Honor.

17          THE COURT:  Okay.  But be that as it may, I have

18  to give significance to the number.  Right?

19          MR. GROOMBRIDGE:  Yes.

20          THE COURT:  You agree with that.  Fundamental

21  principle of claim construction.

22          So we say then, well, the one must have some

23  significance and why did they pick it?  They must have had a

24  reason to call out and put one there.

25          MR. GROOMBRIDGE:  Well, it says they put about

37

09:45:15 1  0.1, and our reading of that --

09:45:18 2       THE COURT:  Well, get to the about for starters.

09:45:20 3  But they put one.  I've got to give meaning to about and I

09:45:23 4  have to give meaning to one.

09:45:25 5       MR. GROOMBRIDGE:  Your Honor, what I take

09:45:28 6  Cohesive to be saying is we wouldn't break those two apart,

09:45:31 7  that we would give meaning to about 0.1.  That's what

09:45:35 8  Cohesive is telling us.

09:45:37 9       THE COURT:  Okay.  I'm not sure I understand

09:45:40 10 that.

09:45:44 11       MR. GROOMBRIDGE:  And I mean what I would say

09:45:46 12 here, Your Honor, is that this is the language that

09:45:49 13 immediately precedes the two sentences that we're focused

09:45:51 14 on, and in our view they need to be -- you can't read those

09:45:54 15 two sentences without also focusing on this, and it starts

09:45:58 16 off by saying generally, salt conditions are adjusted to

09:46:01 17 individual proteins.  We've talked about that.  But then it

09:46:03 18 goes on.  This is talking about the prior art, that

09:46:07 19 requirements saying in the prior art, this is the high.  It

09:46:12 20 could be for ammonium sulfate between .7 and 2 molar, or for

09:46:16 21 sodium chloride, between about 1.0 and 4 molar.

09:46:20 22       And what we're seeing then particularly as

09:46:23 23 exemplified by the about 0.7, they are not distinguishing

09:46:27 24 the prior art based on an absolute amount of protein.  That

09:46:30 25 overlaps.  We'd all agree, I think, that about 0.7 is in the

38

09:46:33 1  claimed range.  Right?

09:46:35 2       And the point here, Your Honor, is that an

09:46:38 3  amount that is high or low or intermediate for any -- in any

09:46:42 4  particular system could be not high or not low or not

09:46:46 5  intermediate in a different system, and that's what you've

09:46:49 6  got to look at.

09:46:50 7       And I take, I fully take your point that the

09:46:53 8  Court does need to give meaning to the concentration range,

09:46:58 9  but as I say, in our view, the teaching of Cohesive is that

09:47:01 10 when we have a range with a lower end that's bounded by

09:47:07 11 about, we would look at that and say that will encompass

09:47:12 12 things that are performing the function attributed to the

09:47:16 13 claim limitation.

09:47:20 14       And so turning to the second reason why we think

09:47:24 15 there's no disclaimer, as I mentioned earlier, it's not an

09:47:28 16 apples-to-apples comparison, so the claim 1 specifies that

09:47:32 17 the concentration range applies to a mixture and those

09:47:38 18 concentrations with reference to Nau and Singleton are not

09:47:45 19 in the mixture, and the best way I can describe this is

09:47:47 20 first look at the claim and depict it graphically.

09:47:53 21       The claim says we're going to mix two things --

09:47:55 22 a preparation containing the protein with a combination of a

09:47:57 23 first and second salt, and then it will be in that resulting

09:48:01 24 mixture that the concentrations are between about .1 molar

09:48:05 25 and 1 molar.

39

09:48:07 1       And so if we look at this graphically, what

09:48:12 2  we've got here in this figure is we've got the preparation

09:48:17 3  containing the protein shown on the left, the combination

09:48:19 4  of the two salts shown on the right, and the resulting

09:48:21 5  mixture, and that is where the concentration range is

09:48:25 6  defined to be.

09:48:28 7       If we now look at what we see in the Nau prior

09:48:31 8  art reference and Singleton prior art reference, in Nau --

09:48:36 9  the concentrations that are given aren't in the mixture.

09:48:39 10 They're in the salt on its own before it gets into the

09:48:46 11 mixture.  And if we do the math on this, for Nau, it's

09:48:52 12 possible to do it, and you would come out with two examples

09:48:56 13 that are relevant in Nau.  They're either 15 millimolar or

09:48:59 14 20 millimolar.

09:49:01 15       And for Singleton, it's not possible to do the

09:49:03 16 math because they simply don't give you the information.

09:49:07 17 You don't know the volumes involved and so you can't

09:49:10 18 calculate the concentration.

09:49:11 19       And so in our view, on an apples-to-apples

09:49:14 20 basis, even if one looks at that and says that's what's

09:49:17 21 being distinguished if one imports, attributes

09:49:19 22 significance to the absolute numerical values, what on an

09:49:23 23 apples-to-apples basis, what's being distinguished is at

09:49:27 24 most 20 millimolar or .02 -- .02 molar.

09:49:38 25       And the third reason why we think there's no

40

09:49:45 1  disclaimer is based on the identity of the salts.  The salt

09:49:50 2  pair, if it's fair to call it that in both Nau and

09:49:55 3  Singleton, is a phosphate/sulfate pair, and as Your Honor is

09:50:04 4  aware, for example, from the briefing on the motion to

09:50:06 5  dismiss and other things, the nature of the salt pair

09:50:10 6  matters.  Right.

09:50:12 7       And one can't simply, I was saying -- one can't

09:50:16 8  simply transfer numerical concentration values applicable to

09:50:20 9  one salt pair to a different salt pair.  And here, we think

09:50:27 10 that the intrinsic evidence is very clear that the

09:50:34 11 sulfate/phosphate pair is different, materially different

09:50:37 12 from what is claimed in this patent.

09:50:39 13       And the first thing that happened, this is the

09:50:42 14 parent application -- the first thing that happened of

09:50:45 15 substance in the prosecution was a restriction requirement

09:50:48 16 where the Patent Office said, you've got five different

09:50:51 17 pairs of salts here and they're all patently distinct

09:50:55 18 because they all have different actions, and we think that's

09:50:58 19 correct, Your Honor.  And so what happened as a result of

09:51:04 20 that was one salt pair, sulfate/phosphate was prosecuted to

09:51:10 21 allow it in the parent application, and three more of the

09:51:12 22 salt pairs, citrate/sulfate, citrate/phosphate,

09:51:18 23 sulfate/phosphate were prosecuted to allowance in the patent

09:51:22 24 in this lawsuit, but notably the sulfate phosphate pair was

09:51:25 25 never patented, was never prosecuted to allow this.  In

41

| | |
|---|---|
| 09:51:28 1 | fact, a fair reading of this is that the patentee elected |
| 09:51:31 2 | not to seek patent coverage. |
| 09:51:33 3 | THE COURT:  I'm just curious though.  I want to |
| 09:51:35 4 | make sure I understand your position. |
| 09:51:36 5 | MR. GROOMBRIDGE:  Yes. |
| 09:51:37 6 | THE COURT:  In the discussion in the written |
| 09:51:38 7 | description at column 3 in lines 24 through 36, which is the |
| 09:51:43 8 | discussion. |
| 09:51:44 9 | MR. GROOMBRIDGE:  Yes. |
| 09:51:44 10 | THE COURT:  What is the pair in that discussion? |
| 09:51:46 11 | MR. GROOMBRIDGE:  So the pair that's being |
| 09:51:52 12 | juxtaposed or -- |
| 09:51:54 13 | THE COURT:  Sulfate phosphate? |
| 09:51:55 14 | MR. GROOMBRIDGE:  Sulfate phosphate. |
| 09:51:57 15 | THE COURT:  Right.  Go back to your slide.  I |
| 09:51:59 16 | want to make sure I appreciate, you know, what you are |
| 09:52:01 17 | saying is no patent.  What you really mean is not claimed. |
| 09:52:04 18 | MR. GROOMBRIDGE:  Not, exactly.  Not -- |
| 09:52:07 19 | THE COURT:  Because it's in the patent.  I mean, |
| 09:52:09 20 | it's explicitly discussed in the patent. |
| 09:52:11 21 | MR. GROOMBRIDGE:  It is discussed in the patent. |
| 09:52:13 22 | THE COURT:  Right.  In fact, it's the only one |
| 09:52:15 23 | that's discussed in the passage that we're concentrating on. |
| 09:52:19 24 | MR. GROOMBRIDGE:  Well, Your Honor -- |
| 09:52:23 25 | THE COURT:  I mean, when I say it's the only |

42

| | |
|---|---|
| 09:52:24 1 | one, that's actually not really precise, but it is |
| 09:52:28 2 | explicitly discussed.  I mean, I think you could read this |
| 09:52:34 3 | discussion to apply it's not limiting in its discussion, |
| 09:52:37 4 | because it's talking about a buffering solution, but at |
| 09:52:39 5 | least we know for sure that what is expressly discussed in |
| 09:52:43 6 | this passage, which you've got on slide 42, is the phosphate |
| 09:52:49 7 | sulfate paring.  Right? |
| 09:52:51 8 | MR. GROOMBRIDGE:  I don't agree with that, Your |
| 09:52:56 9 | Honor. |
| 09:52:56 10 | THE COURT:  Really?  I mean, I'm surprised.  I |
| 09:52:58 11 | mean, it says, I mean, for example, and it has got a sulfate |
| 09:53:04 12 | added to a phosphate. |
| 09:53:05 13 | MR. GROOMBRIDGE:  Yes.  Exactly.  So maybe I can |
| 09:53:09 14 | go back and just find it.  So this is the text that |
| 09:53:12 15 | immediately precedes it. |
| 09:53:13 16 | THE COURT:  Right. |
| 09:53:14 17 | MR. GROOMBRIDGE:  It says, generally, salt |
| 09:53:15 18 | conditions are adjusted to individual proteins.  Generally, |
| 09:53:18 19 | in the prior art, you would use this concentration of |
| 09:53:22 20 | ammonium sulfate or this concentration of sodium chloride. |
| 09:53:28 21 | Then it goes on and we come to the part we've |
| 09:53:32 22 | been focusing on.  This is immediately following.  The |
| 09:53:36 23 | practice was to add a high concentration of salt to a low |
| 09:53:36 24 | concentration of buffer, such as, for example, and now it's |
| 09:53:42 25 | talking about the prior art. |

43

| | |
|---|---|
| 09:53:43 1 | THE COURT:  Yes. |
| 09:53:43 2 | MR. GROOMBRIDGE:  And it's calling out as an |
| 09:53:45 3 | example in the prior art, sulfate phosphate. |
| 09:53:46 4 | THE COURT:  Right. |
| 09:53:47 5 | MR. GROOMBRIDGE:  And then it's going on to say, |
| 09:53:49 6 | the present invention differs from these practices. |
| 09:53:51 7 | THE COURT:  I got you there. |
| 09:53:52 8 | MR. GROOMBRIDGE:  Okay. |
| 09:53:53 9 | THE COURT:  But all I'm saying is, then go back |
| 09:53:55 10 | to your slide, your summary slide where you've got the |
| 09:53:58 11 | pairings. |
| 09:53:58 12 | MR. GROOMBRIDGE:  Yes. |
| 09:53:58 13 | THE COURT:  I'm saying, I mean, you know, your |
| 09:54:03 14 | heading, it wasn't patented. |
| 09:54:04 15 | MR. GROOMBRIDGE:  Yes. |
| 09:54:05 16 | THE COURT:  Fair enough.  I mean, maybe.  I'm |
| 09:54:07 17 | not going to say that, but the point would be that is the |
| 09:54:12 18 | paring that's expressly disclosed in this passage that we're |
| 09:54:18 19 | focusing on. |
| 09:54:19 20 | MR. GROOMBRIDGE:  Undoubtedly so.  Right. |
| 09:54:21 21 | THE COURT:  Okay. |
| 09:54:21 22 | MR. GROOMBRIDGE:  But what it's saying is my |
| 09:54:22 23 | invention -- this is in the prior art.  My invention is |
| 09:54:25 24 | different from that, and it turns out -- |
| 09:54:25 25 | THE COURT:  But it doesn't say my invention is |

44

| | |
|---|---|
| 09:54:29 1 | different because we're not talking sulfate phosphate.  I |
| 09:54:32 2 | mean, the only thing it's saying that's different, I mean, |
| 09:54:35 3 | in the context in which difference is being discussed is |
| 09:54:39 4 | concentration levels. |
| 09:54:40 5 | MR. GROOMBRIDGE:  That's correct, but -- |
| 09:54:42 6 | THE COURT:  And -- and saying the present |
| 09:54:44 7 | invention is different because we used intermediate |
| 09:54:48 8 | concentrations. |
| 09:54:49 9 | MR. GROOMBRIDGE:  That is correct, but in our |
| 09:54:50 10 | view, Your Honor, you would have to look at what would be |
| 09:54:54 11 | intermediate for sulfate phosphate is certainly not |
| 09:54:58 12 | intermediate for every salt pair and the numerical values |
| 09:55:01 13 | would differ. |
| 09:55:02 14 | And if we look at -- I will scroll back through |
| 09:55:05 15 | the slides.  If we look at what the patents say about |
| 09:55:09 16 | sulfate phosphate, for example, right, it's certainly in |
| 09:55:12 17 | there, but here's another statement in the patent about |
| 09:55:15 18 | sulfate phosphate, right, that under the conditions of the |
| 09:55:17 19 | particular experiment they were running here, sulfate |
| 09:55:21 20 | phosphate didn't give very good results.  Right? |
| 09:55:24 21 | And so I think a fair reading of this would be |
| 09:55:29 22 | to say you can't look at amounts that were used in the prior |
| 09:55:33 23 | art for sulfate phosphate and say those amounts inform the |
| 09:55:36 24 | amounts that would be used for the salt pairs of the |
| 09:55:41 25 | invention that do give good results.  And that's a |

69

10:43:03 1 as much salt as you can get away with because we just
10:43:07 2 discussed that potentiates the binding of the protein to the
10:43:10 3 hydrophobic groups on the column patent.
10:43:13 4       So you want to run the salts as high as you can.
10:43:17 5 You want to get as much interaction, get the highest dynamic
10:43:22 6 binding capacity as you can.  Higher binding capacity is
10:43:26 7 essentially throughput.  So if you've got to purify a
10:43:28 8 hundred kilos of some drug and you don't want to spend all
10:43:32 9 your time running your column, you would like to load more
10:43:34 10 per column cycle because that improves your economics, you
10:43:37 11 have to make less buffer, and buffers are super pure water,
10:43:41 12 good enough to inject.  Everything is expensive in this
10:43:44 13 area.
10:43:44 14       And so dynamic binding capacity is just a
10:43:45 15 generic glue here.  Okay.  So you add salt, more sticks.
10:43:49 16 Your dynamic binding capacity goes up.  But there's an upper
10:43:52 17 bound where if you added too much, you may begin to
10:43:56 18 aggregate your protein and make add immunogenic aggregates
10:44:00 19 coming out.  That's bad.  In really bad cases, you actually
10:44:02 20 hit the aggregation precipitation limit and the stuff forms
10:44:06 21 into tiny particles of scrambled egg that are in your
10:44:11 22 column, disastrous.
10:44:12 23       Another somewhat more subtle column is that if
10:44:16 24 you make everything really sticky, all the contaminants will
10:44:20 25 stick, too.  Remember, it's a purification technique.

70

10:44:24 1       You showed a slide with two curved proteins
10:44:27 2 binding, so at different salt levels.  If you go high
10:44:28 3 enough, everything will bind.  So everything will bind to a
10:44:30 4 column and will come off and you wouldn't have purified
10:44:33 5 anything for all of your effort.  So these problems sort of
10:44:37 6 give you trouble at higher ranges.
10:44:39 7       Did I answer your question?
10:44:41 8 Q.   Yes.  Let me ask you this.  You mentioned dynamic
10:44:45 9 binding capacity.  Could you just tell us what that is
10:44:51 10 concisely?
10:44:52 11 A.   Sure.  So, you know, the columns that we're talking
10:44:55 12 about here are pipes full of little particles and little
10:44:58 13 particles are sticking to proteins under direct conditions.
10:45:02 14       So you can take the particles out and put them
10:45:04 15 in a dish with a liquid containing protein and some level of
10:45:09 16 salt, and they will add more.  They will take it up, sponge
10:45:13 17 it up.  So that's -- that's an equilibrium binding capacity.
10:45:17 18       So that's how much of the protein will stick at
10:45:23 19 equilibrium.  You give it time, let it mix for awhile, a few
10:45:27 20 hours.  So that's the binding capacity.  But you can't run
10:45:30 21 your column with infinite slowness.  You have to run it at
10:45:33 22 some reasonable speed for throughput, and so dynamic binding
10:45:37 23 capacity is binding capacity modified by what's called mass
10:45:41 24 transfer, by diminishing of the capture because the liquid
10:45:46 25 is flowing by.  The proteins don't have infinite time to

71

10:45:49 1 diffuse in the capsule.
10:45:51 2       So specifically, that's typically described in
10:45:55 3 mass of protein per volume of resin, of packing, and it's
10:46:01 4 very responsive to the -- in HIC, responsive to the
10:46:06 5 hydrophobicity of the protein, the hydrophobicity of the
10:46:11 6 packing, the nature of the salt, the amount of the salt, and
10:46:16 7 also very important here, how fast you flow.  If you go very
10:46:21 8 quick, it doesn't capture it.
10:46:23 9 Q.   Now, what factors affect the salt concentration that
10:46:26 10 one would use in hydrophobic interaction chromatography?
10:46:31 11 A.   This is -- you know, this is really the invention.
10:46:34 12 You know, classically, you would have a salt at, you know,
10:46:40 13 one salt that you thought was sort of doing the job of
10:46:42 14 driving the binding of the hydrophobic parts of your protein
10:46:46 15 onto the hydrophobic parts of the column, and you would, you
10:46:51 16 know, raise that up high enough to get good binding.  You
10:46:55 17 wanted the best dynamic binding capacity you could get.
10:46:58 18 Correct.
10:46:59 19       On the other hand, you know, here there would be
10:47:01 20 monsters at the top, aggregation, precipitation, loss of
10:47:05 21 selectivity, because everything sticks, so you sort of go up
10:47:10 22 to that level and stop.
10:47:11 23       The invention of the patent, which is, you know,
10:47:14 24 genuinely an amino type is the insight that if you used two
10:47:19 25 salts with the sort of algorithms for deciding how to use

72

10:47:24 1 them, you know, first look at the precipitation base.  And
10:47:28 2 the figures in the patent are all precipitation.  Right?
10:47:31 3 Raise salt, raise salt, and then recovery goes down, but
10:47:33 4 it's worth emphasizing, that's not recovery off of the
10:47:37 5 column.  Like, that's recovery in a screening for
10:47:39 6 precipitation experiment to see where you fall off the
10:47:43 7 cliff, went too high.  Let's not go there.
10:47:46 8       So we'll operate as high as we can get away with
10:47:48 9 and not precipitate our protein, and it turns out -- well,
10:47:53 10 so they give you a way of sort of checking the precipitating
10:47:58 11 power of each of your individual proteins.
10:48:00 12       And I apologize.  I will just make an asterisk
10:48:03 13 here.  Precipitating proteins with salt is a known and
10:48:07 14 useful thing.  Singleton uses it.  Right.  They make what's
10:48:10 15 called an ammonium sulfate of a way of bringing things down.
10:48:14 16 It's just in HIC you don't want precipitation because of all
10:48:17 17 the bad things I mentioned, gumming up your column, et
10:48:21 18 cetera.
10:48:21 19       So first you check how high you can go with your
10:48:23 20 single salts before you get precipitation and then once you
10:48:25 21 sort of establish that operating range, then you try dual
10:48:30 22 salts.  Right?  You hold one of your pairs constant and vary
10:48:36 23 the other one, and then you hold the other of your pair
10:48:39 24 constant and vary the first one, and that allows you to see
10:48:42 25 how far you can go.

73

10:48:43  1        Then you measure dynamic binding capacity and,
10:48:45  2   you know, within the claims, and this is, in fact, observed
10:48:48  3   and demonstrated in the patent by data, you can often do
10:48:51  4   better this way than you would have with the more
10:48:54  5   traditional single salt project.
10:48:56  6   Q.    Now, briefly, what role does protein hydrophobicity
10:49:02  7   play in terms of selecting the salt concentration?
10:49:04  8   A.    So in general -- so the amount of binding you'll get
10:49:16  9   to a column, the dynamic binding capacity that you will get
10:49:19  10  depends on a bunch of stuff.  I mean, it depends on
10:49:22  11  temperature.  Warm will give you more stickiness.  It can
10:49:26  12  depend on pH quite a lot.  But the sort of big three obvious
10:49:30  13  things are a more hydrophobic protein will stick to a given,
10:49:38  14  a given resin, a given column packing at less salt because
10:49:42  15  it has more greasy stuff to interact with that patent, so a
10:49:46  16  lower salt will make that bind.
10:49:48  17        And if your packing were more hydrophobic, it
10:49:52  18  would take still less salt.  If your packing was less
10:49:55  19  hydrophobic, you would need more salt to stick.  If your
10:49:59  20  protein were more hydrophobic, it would take still less
10:50:03  21  salt, and if your protein were less hydrophobic, then you
10:50:06  22  would need more salt.  And I emphasize, it's not just salt
10:50:09  23  as a generic thing.  The nature of the salt matters
10:50:11  24  enormously.
10:50:12  25  Q.    Let's look -- can we put up slide 16, please.  What

74

10:50:21  1   are we looking at here, Dr. Willson?
10:50:24  2   A.    Yes.  This is an illustration of what I was talking
10:50:27  3   about.  So on the Y axis here, this is protein capacity in
10:50:33  4   mass per ml of backed beds, so that's the same units that
10:50:38  5   are used in the patent.  It's how much protein will stick
10:50:42  6   into the package.  All right.
10:50:44  7        You know, I think this is dynamic binding
10:50:48  8   capacity.  It could be stacked.  It's almost dynamic.
10:50:52  9   Either way, you know, the ability -- how much of the protein
10:50:55  10  you can load onto the, onto the column material.
10:50:58  11       And then the X axis here is the salt
10:51:02  12  concentration being used in molar ammonium sulfate.  And so
10:51:07  13  a way to look at this is to start at the far left, lower
10:51:10  14  corner.  Right?
10:51:11  15       So down, you know, at .5, for example, nothing
10:51:15  16  much is happening.  The curves are how much of each of two
10:51:20  17  different proteins will bind.  The one on the left
10:51:25  18  corresponds, represents data for a protein called
10:51:28  19  alpha-chymotrypsinogen, which is more hydrophobic, and the
10:51:35  20  one on the right is data for a person called ribonuclease A,
10:51:42  21  RNA-A, and it's less hydrophobic.
10:51:46  22       And so if you -- either separately or you could
10:51:50  23  do it together.  It doesn't matter.  Start at the lower left
10:51:54  24  corner of the origin and begin to raise the salt
10:51:57  25  concentration.  So you start at zero salt and nothing sticks

75

10:52:01  1   and you get to .5 molar and still nothing sticks.  A little
10:52:04  2   higher than that you see the first curve, the
10:52:06  3   chymotrypsinogen curve begins to curve upward, so the amount
10:52:12  4   of protein bound in milligrams per ml of resin goes off of
10:52:17  5   zero and it hits, you know, even lower, 20 or 30.  So you
10:52:20  6   get some pretty good binding of chymotrypsinogen at
10:52:24  7   one-and-a-half molars.
10:52:26  8        So this is why hydrophobic interaction is
10:52:30  9   actually useful.  It's selective.  Right?  Under these
10:52:33  10  circumstances, this salt was packing these proteins, all of
10:52:38  11  which matter.  Alpha-chymotrypsinogen is not captured while
10:52:43  12  ribonuclease A is not captured.  So if you flowed this
10:52:46  13  mixture through under these conditions,
10:52:46  14  alpha-chymotrypsinogen would stop.  It would accumulate in
10:52:50  15  the column and ribonuclease A, most would flow through.
10:52:55  16  That's not breakthrough in the sense that breakthrough is
10:52:57  17  something that's being captured exhaustively, available
10:53:03  18  chairs.  And, you know, musical chairs, there's no more
10:53:05  19  place to sit, so you have to go out of the column.
10:53:07  20       So if you just ran this at one-and-a-half molar,
10:53:10  21  you would capture the alpha-chymotrypsinogen and the
10:53:14  22  ribonuclease A would flow through.  If you go higher, you
10:53:17  23  know, up to say two-ish or two-and-a-half or three, then you
10:53:20  24  would capture both proteins, and that's -- that's sort of a
10:53:24  25  thing that is done.  You can capture them both and then

76

10:53:29  1   decrease the salt and let them come off in decreasing order
10:53:34  2   of hydrophobicity, so the RNAse A would come out first.
10:53:38  3   There's a peak.  And chymotrypsinogen would come out second.
10:53:41  4   Q.    Let me ask you about another slide.  Could we put up
10:53:47  5   slide 22, please.
10:53:49  6        What are we looking at here, Dr. Willson?
10:53:52  7   A.    Yes.  Those are the peaks I was talking about.  So
10:53:55  8   this is a composite figure.  So each of these peaks is a
10:54:00  9   separate experiment, and what has happened here is that the
10:54:04  10  same protein has been loaded onto columns containing
10:54:08  11  different HIC material.  So, you know, the sepharose and
10:54:16  12  toyopearl are support.  They are the little balls decorated
10:54:20  13  through the hydrophobic stuff, and then the hydrophobic
10:54:23  14  things are octyl, right.  That's the CH chain.  Butyl, like
10:54:30  15  butane.  Phenyl is the phenyl ring like benzene.  And so
10:54:34  16  these are different hydrophobic things on a couple of
10:54:37  17  different classes of what are called supports or resins or
10:54:40  18  patents.
10:54:40  19       And so if we just take the first column --
10:54:43  20  sorry, the first peak on the left, what has happened to
10:54:48  21  produce that red peak that's high under five is that protein
10:54:53  22  was loaded in that salt environment that corresponds to the
10:54:59  23  orange line, which has the right Y axis, so it's ammonium
10:55:04  24  sulfate concentration.
10:55:07  25       So you load -- a little bit, not a vast amount,

77

10:55:12 1 but a little bit of the protein into the column at an
10:55:15 2 ammonium sulfate concentration that's represented by the
10:55:18 3 number by about 90 on this and then you gradually decrease
10:55:22 4 it. And so remember that higher salt concentrations promote
10:55:27 5 proteins sticking onto these things. Here, the hydrophobic
10:55:31 6 parts of the protein are interacting with that C8 octyl
10:55:34 7 hydrophobic group that was appended onto sepharose.
10:55:37 8         Sepharose is polymerized sugar. It's very, very
10:55:41 9 non-molar, but you add these long chains, alpha chains. If
10:55:46 10 you add enough of them, then you have an absorbent that will
10:55:50 11 grabs these things. And si it grabs it and holds onto it
10:55:53 12 until ammonium sulfate falls down to roughly 80. Right?
10:55:57 13         You can argue about where you should say
10:56:00 14 solution is beginning, but the peak is around -- I'm sorry,
10:56:04 15 80 on the left axis, no numbers on the right side, but I
10:56:09 16 will speak about the 80 just to make it clear. So that
10:56:12 17 comes off of octyl sepharose at that level.
10:56:14 18         Now, let's go to the far end, the other case,
10:56:16 19 hexyl 650C. That's a more hydrophobic backbone. And also I
10:56:22 20 should emphasize that some of the nature, how much of it we
10:56:27 21 put, on a lot of octyl or little bit of hexyl can be quite
10:56:32 22 different. The last peak that peaks around 15 or 14, you
10:56:38 23 injected the protein onto this hexyl 65 C material. The
10:56:42 24 ammonium sulfate gradient as it's called, the time variant
10:56:47 25 issue was kind of flat, then falls down and is flat again.

78

10:56:51 1 You're on the same gradient.
10:56:52 2         And what you see is that the protein stays on
10:56:55 3 hexyl 650C a lot longer and length of time here is not just
10:57:01 4 time, it's also until ammonium sulfate has fallen down a
10:57:04 5 good deal lower.
10:57:05 6         And so what we can -- what's clear from
10:57:10 7 something like this and there's a bunch of others in the
10:57:12 8 middle, is depending on the packing, depending on the
10:57:13 9 hydrophobic interaction, chromatography packing that's used,
10:57:17 10 proteins will stick to it with more or less salt. This all
10:57:21 11 could be run backwards, by the way. It's just easier to do
10:57:26 12 it this way.
10:57:26 13         But, you know, this protein will stick to hexyl
10:57:30 14 650C at a much lower protein, or salt -- much lower salt
10:57:34 15 concentration than it will stick to octyl sepharose.
10:57:40 16 Q.    So let me turn to the patent here and I would like to
10:57:48 17 ask you some questions about that.
10:57:50 18         You had a chance to study the '707 patent?
10:57:56 19 A.    Yes.
10:57:56 20 Q.    And reading the patent, Doctor, what does it tell you
10:58:02 21 as a skilled person regarding the lower bound of
10:58:07 22 concentration in the salt pair to be used?
10:58:11 23 A.    You know, it contains teachings that will drive you to
10:58:15 24 what's best for your particular, your particular case. It
10:58:20 25 does at the top answer to say here there would be monsters,

79

10:58:24 1 bad things would be bad to you if you go too high. At the
10:58:27 2 bottom, it doesn't say that. It doesn't warn you off of the
10:58:31 3 low end at all except your hydrophobic interaction
10:58:36 4 chromatography may not work too well. That's the only
10:58:39 5 warning.
10:58:39 6 Q.    And let's take a look at column 3 and.
10:58:43 7         MR. GROOMBRIDGE:  Mr. Weir, could you put up --
10:58:46 8 this is Plaintiffs' Exhibit 1 at page 8, please, and let's
10:59:01 9 enlarge the text from about line 19 to about line 36.
10:59:01 10 BY MR. GROOMBRIDGE:
10:59:11 11 Q.    Now, Dr. Willson, are you familiar with this portion
10:59:16 12 of the patent specification?
10:59:17 13 A.    Yes, I am.
10:59:19 14 Q.    And looking there, with respect to the Nau reference,
10:59:28 15 it says, for example, 1.4 molar ammonium sulfate added to a
10:59:36 16 0.024 molar phosphate buffer.
10:59:39 17         What is the significance there of added to as
10:59:43 18 you read it?
10:59:44 19 A.    So, first, of course, this is not the mixture of the
10:59:48 20 claim language. Right? These are ingredients for such a
10:59:51 21 mixture, although it is possible with Nau to calculate each
10:59:54 22 result.
10:59:55 23         Each of them dilutes the other. Right? So both
10:59:58 24 the ammonium sulfate listed here and the phosphate buffer
11:00:02 25 here will be at a lower concentration because it was blended

80

11:00:05 1 with something that contained water as well as the other
11:00:08 2 salt.
11:00:09 3 Q.    All right. And does this tell you what is the
11:00:15 4 ultimate concentration of the phosphate buffer?
11:00:19 5 A.    You can't tell this from here because they don't tell
11:00:22 6 you the volumes, but if you look at the paper.
11:00:27 7 Q.    And similarly, with respect to the language about the
11:00:32 8 Singleton reference, the 1.7 molar ammonium sulfate in 50
11:00:37 9 millimolar sodium phosphate, does that tell you the
11:00:41 10 concentration of the sodium phosphate in the mixture as that
11:00:47 11 term would be used in the claims of the '707 patent?
11:00:51 12 A.    You can't calculate it because they don't give you the
11:00:55 13 volumes used. You know it will be less than 50, but you
11:00:58 14 don't know how much.
11:01:05 15 Q.    And let me ask you this: Did you look at the Nau
11:01:04 16 reference in order to calculate what would be the
11:01:01 17 concentration of the phosphate in the mixture as that term
11:01:14 18 is used in the claims of the '707 patent?
11:01:18 19 A.    Yes, I did.
11:01:19 20         MR. GROOMBRIDGE:  And let's please put up the
11:01:23 21 Nau reference, which is Exhibit 2, Mr. Weir. And let's just
11:01:30 22 go, first of all, to page 3 and look at the title.
11:01:30 23 BY MR. GROOMBRIDGE:
11:01:40 24 Q.    And, Dr. Willson, can you confirm that this is,
11:01:40 25 indeed, the Nau prior art reference that's mentioned in

81

| | |
|---|---|
| 11:01:42 1 | column 3 of the '707 patent? |
| 11:01:44 2 | A.   Yes, it is. |
| 11:01:45 3 | MR. GROOMBRIDGE:  And now let's turn, please, |
| 11:01:51 4 | Mr. Weir, to page 9 and look at the text that appears under |
| 11:01:55 5 | Figure 8. |
| 11:01:56 6 | BY MR. GROOMBRIDGE: |
| 11:01:59 7 | Q.   Dr. Willson, what is the significance of this portion |
| 11:02:02 8 | of the Nau prior art reference as it pertains to the '707 |
| 11:02:06 9 | patent? |
| 11:02:06 10 | A.   So this is a caption describing some experimental |
| 11:02:12 11 | results, and it is -- it is a source for the numbers that |
| 11:02:16 12 | are referenced in the '707 patent text, and here they give |
| 11:02:25 13 | you enough of a recipe of what they are preparing that you |
| 11:02:27 14 | can calculate what's in the final mixture. |
| 11:02:31 15 | It's -- it's a bit complicated, but it is -- you |
| 11:02:36 16 | know, it's perfectly possible to figure out what is in the |
| 11:02:38 17 | final mixture from this text. |
| 11:02:40 18 | Q.   And how do you know that this is the source for what |
| 11:02:43 19 | is referenced in the '707 patent? |
| 11:02:45 20 | A.   Because the numbers match.  So you see roughly midway |
| 11:02:53 21 | 1.4 molar ammonium sulfate being diluted with a buffer, and |
| 11:02:58 22 | above a buffer is -- my eyes are not quite good enough for |
| 11:03:04 23 | this.  A buffer is defined about five lines above as |
| 11:03:07 24 | containing 700 millimolar ammonium sulfate and 25 millimolar |
| 11:03:07 25 | sodium phosphate. |

82

| | |
|---|---|
| 11:03:17 1 | Q.   And did you do the calculation to determine the |
| 11:03:20 2 | concentration of the phosphate on the basis that would be |
| 11:03:25 3 | comparable to what which is described in the claims of the |
| 11:03:29 4 | '707 patent? |
| 11:03:29 5 | A.   I did.  Just for clarity, let me emphasize that if you |
| 11:03:33 6 | go down to the second yellow highlighting there, the word |
| 11:03:37 7 | before it say, plus an equal volume of.  So if you go to the |
| 11:03:41 8 | previous line, it's 0.2 mls or 0.4 mls of ascites fluid. |
| 11:03:52 9 | That's the protein containing the material in which they mix |
| 11:03:55 10 | the salt.  There's a .2 case and a .4 case.  That's an |
| 11:03:58 11 | additional layer. |
| 11:04:00 12 | Ascites is tumor juice from a mouse.  It's a way |
| 11:04:08 13 | to make antibodies, but it is a protein-containing material. |
| 11:04:12 14 | And so they mix it with two different things and they do |
| 11:04:15 15 | this in two different volumes of ascites.  But you can track |
| 11:04:21 16 | the calculation. |
| 11:04:23 17 | THE COURT:  Okay.  Stop for a minute, please. |
| 11:05:09 18 | Just so I can understand, I've got to step back |
| 11:05:12 19 | here.  You heard Mr. Groombridge's opening talk about the |
| 11:05:15 20 | matrix that was in the column? |
| 11:05:18 21 | THE WITNESS:  Mm-hmm. |
| 11:05:19 22 | THE COURT:  What's the matrix that's here? |
| 11:05:22 23 | THE WITNESS:  Is the second line at the end, it |
| 11:05:29 24 | talks about purification of monoclonal.  So I'm talking |
| 11:05:34 25 | about the black text at the top. |

83

| | |
|---|---|
| 11:05:36 1 | THE COURT:  So we're at the top now, not the |
| 11:05:39 2 | bottom.  Okay. |
| 11:05:39 3 | THE WITNESS:  Correct. |
| 11:05:40 4 | THE COURT:  All right. |
| 11:05:41 5 | THE WITNESS:  The second line is purification of |
| 11:05:44 6 | monoclonal antibodies from mouse ascites fluid on, and then |
| 11:05:48 7 | it names Bakerbond Hi-Propyl.  So that will be subject to |
| 11:05:53 8 | Baker and it will have propyl groups on it.  That's a |
| 11:05:57 9 | three-carbon chain, some amount of that per volume. |
| 11:05:59 10 | THE COURT:  So you said Bakerbond Hi-Propyl. |
| 11:06:06 11 | THE WITNESS:  Hi-Propyl. |
| 11:06:06 12 | THE COURT:  Hi-Propyl.  That's the matrix? |
| 11:06:06 13 | THE WITNESS:  Yes. |
| 11:06:13 14 | THE COURT:  Okay.  What's the -- |
| 11:06:18 15 | THE WITNESS:  I have something I missed saying. |
| 11:06:19 16 | THE COURT:  Go ahead. |
| 11:06:21 17 | THE WITNESS:  So I'm looking for the place where |
| 11:06:28 18 | they say it's a two ml sample.  There you go.  The lowest |
| 11:06:32 19 | yellow, the line above it, the injection volume was two mls. |
| 11:06:37 20 | MR. GROOMBRIDGE:  Your Honor, would it help if I |
| 11:06:41 21 | gave Dr. Willson a pointer? |
| 11:06:42 22 | THE COURT:  Yes, it would help. |
| 11:06:44 23 | THE WITNESS:  Thank you.  It can be done, but |
| 11:06:44 24 | it's a bit of a thicket. |
| 11:06:51 25 | So I have not told you how you can figure out |

84

| | |
|---|---|
| 11:06:55 1 | how much A buffer is used, and the way you can figure out |
| 11:06:58 2 | how much A buffer is used is by the fact that it has to add |
| 11:07:02 3 | the two mls.  Right? |
| 11:07:05 4 | So you have -- you know your final volume is |
| 11:07:08 5 | going to be two mls and then you're going to have either .2 |
| 11:07:13 6 | mls or .4 mls of ascites fluid with an equal volume of this |
| 11:07:22 7 | and then the balance is going to be A buffer.  Right? |
| 11:07:26 8 | So take the .2 mls ascites with an equal volume |
| 11:07:38 9 | of this 1.4 molar ammonium sulfate, so that takes up .4 mls |
| 11:07:47 10 | total.  And then the rest of the two ml final is two minus |
| 11:07:57 11 | .4 is 1.6 mls of that.  And so A buffer is going to be 1.6 |
| 11:08:09 12 | mls of the two mls or .8 of the total.  And so the final |
| 11:08:13 13 | concentration in that case will be .8 of the original |
| 11:08:19 14 | materials in the A buffer, and specifically, that means that |
| 11:08:25 15 | it will be 80 percent of the 25 ml molar phosphate buffer, |
| 11:08:31 16 | which is described in the composition of the A buffer where |
| 11:08:34 17 | I have the green pointer on line 5. |
| 11:08:38 18 | It started out .5, but if you are only going to |
| 11:08:40 19 | put 1.6 mls, you're only going to get .1.6 mls in the final |
| 11:08:54 20 | two.  It's going to be 80 percent of that.  So in this |
| 11:08:54 21 | case -- sorry, Your Honor.  What's .8 times two? |
| 11:09:02 22 | MR. GROOMBRIDGE:  Would that be 20? |
| 11:09:03 23 | THE WITNESS:  Exactly.  Thank you. |
| 11:09:05 24 | Now, the other cases, you use .4 mls of ascites, |
| 11:09:12 25 | and you're going to dilute that with an equal volume of |

85

| | |
|---|---|
| 11:09:16 | 1 |
| 11:09:22 | 2 |
| 11:09:26 | 3 |
| 11:09:32 | 4 |
| 11:09:36 | 5 |
| 11:09:44 | 6 |

1  the 0.4.  That would make it a total of .8 mls of non-A

2  buffer stuff in two.  So you're going to be left with 1.2

3  mls of A buffer going into the two mls if you can.  So then

4  you'll be at 60 percent of where you used to be, of where

5  you started out, and 60 percent of 25 millimolar, 15

6  millimolar.  Right?

11:09:47  7        I hate to do mathematical calculations off the

11:09:50  8  top of my head for a crowd, but I think that's correct.  But

11:09:53  9  that's the flow.  Right?  And there are a lot of parts that

11:09:56  10  we're putting together.

11:09:57  11        But you can understand from Nau what it did and

11:09:59  12  you can calculate a phosphate concentration in their mixture

11:10:05  13  as the claim uses it.

11:10:08  14  Q.     And --

11:10:09  15        THE COURT:  All right.  Hold on.  So where is

11:10:12  16  the mixture in Figure 8?  It is defined where and what is

11:10:19  17  it?

11:10:19  18        THE WITNESS:  So the mixture is the protein

11:10:21  19  containing material, that's the ascites fluid here.

11:10:25  20        THE COURT:  Hold on a second.  The protein

11:10:28  21  containing fluid?

11:10:29  22        THE WITNESS:  Yes.  Fluid that contains the

11:10:31  23  protein and it has other stuff.  Right?  Anyway, but it does

11:10:37  24  contain the protein of interest, the monoclonal antibody

11:10:41  25  which is desired.

86

11:10:44  1        THE COURT:  Okay.

11:10:45  2        THE WITNESS:  And then to that you add an equal

11:10:52  3  volume that is a volume equal to the volume of the protein,

11:10:56  4  of the protein containing ascites fluid.  You start with --

11:11:01  5  let's just do the .2 case, because there are two of them.

11:11:05  6        So in one case, you start with .2 mls of ascites

11:11:09  7  and you add .2 mls of the 1.4 molar ammonium sulfate.

11:11:14  8        THE COURT:  All right.  Just slow down.  I've

11:11:15  9  got to read it.

11:11:17  10        THE WITNESS:  Okay.

11:12:19  11        THE COURT:  All right.  I'm seeing this for the

11:12:21  12  first time, too, so I just want to read the second sentence

11:12:25  13  there.  HIC of two mouse ascites fluids (chromatograms A and

11:12:36  14  B) and purified mouse serum polyclonal IgG (chromatogram C)

11:12:45  15  was conducted on a column.  All right?

11:12:46  16  A.     Mm-hmm.

11:12:47  17  Q.     Are those three separate batches?  Is that one batch

11:12:50  18  containing three chromatograms?

11:12:53  19  A.     It's three different experiments.

11:12:54  20  Q.     So three separate?

11:12:55  21  A.     Can I define a couple of terms?

11:12:58  22  Q.     Yes.

11:12:58  23  A.     IgG is a synonym for antibody.  So monoclonal antibody

11:13:04  24  and IgG -- well, polyclonal is a single, they're all

11:13:13  25  antibodies.  These are three separate experiments run

87

11:13:17  1  differently with examples.

11:13:18  2        THE COURT:  Okay.

11:13:19  3        THE WITNESS:  And we focused I think only on the

11:13:21  4  first one.

11:13:21  5        THE COURT:  All right.  Give me a second.  Okay.

11:13:33  6  So we're doing the first experiment only.  Right?

11:13:36  7        THE WITNESS:  Yes.

11:13:37  8        THE COURT:  And that is chromatogram --

11:13:44  9        THE WITNESS:  I apologize.  Chromatogram is

11:13:47  10  color writing.

11:13:48  11        THE COURT:  Okay.

11:13:48  12        THE WITNESS:  If you've ever seen kids put pens

11:13:51  13  on a paper towel and run water through it, you see the

11:13:54  14  colors separate.  So what it means is it's these shapes.

11:14:01  15  Right?

11:14:02  16        So over time, different things come out.  And so

11:14:06  17  this is called a chromatogram.

11:14:09  18        THE COURT:  All right.  So you're going to look

11:14:11  19  at the experiment involving chromatogram A.  Is that right?

11:14:17  20        THE WITNESS:  Yes.  Mr. Groombridge will correct

11:14:22  21  me -- I'm really having trouble reading it.  Yes.  Yes, that

11:14:26  22  is right.

11:14:27  23        THE COURT:  Okay.  Now, that experiment -- you

11:14:33  24  know, let's try to make this understandable by referencing

11:14:38  25  back to the illustration in Mr. Groombridge's opening slide.

88

11:14:46  1  You've got the HIC and you've got things being poured in.

11:14:49  2  Right?

11:14:50  3        THE WITNESS:  Yes.

11:14:51  4        THE COURT:  You end up with a mixture from which

11:14:53  5  we're going to do the measurement to see if the last claim

11:14:57  6  limitation in the claim is satisfied.  So far, so good?

11:15:01  7        THE WITNESS:  Yes.

11:15:02  8        THE COURT:  So get me there.  We're adding to

11:15:05  9  that mixture or we're adding to the column, right, what?

11:15:10  10        THE WITNESS:  Mr. Groombridge I think has a

11:15:12  11  picture that illustrates the flow of materials that might be

11:15:15  12  useful.

11:15:16  13        THE COURT:  And keep in mind, I want to know

11:15:18  14  what it is when we're looking at the chromatogram A

11:15:20  15  experiment.

11:15:21  16        THE WITNESS:  Right.

11:15:22  17        THE COURT:  Figure A.

11:15:24  18        THE WITNESS:  Yes.

11:15:24  19        THE COURT:  Okay.

11:15:25  20        THE WITNESS:  I will just note they're these two

11:15:27  21  cases where you use either .2 mls, that's chromatogram A, or

11:15:32  22  .4 mls, which is chromatogram B, which is ascites.  I've

11:15:36  23  spoken about both of them.  They're identical except for the

11:15:40  24  amount of protein containing materials.

11:15:41  25        THE COURT:  I just want you to stick with one.

**105**

1    THE COURT:  Okay.  You're going to say then that
2  actually, even if you read Nau --
3    MS. HANSTEAD:  Right.
4    THE COURT:  -- that a POSITA, i.e., your expert,
5  would say that this disclosure in column 3 is talking about
6  the mixture that is the nature of the claim limitation?
7  Right?  That's what your expert is going to say?
8    MS. HANSTEAD:  Correct, Your Honor.
9    THE COURT:  Okay.  But is it fair to say your
10  expert would admit though that this disclosure in column 3
11  does not come from Figure 8?
12    MS. HANSTEAD:  I think no one can say for sure
13  that it does or does not.
14    THE COURT:  All right.  We can't get a
15  stipulation.  Let's go.  Go ahead, Mr. Groombridge.
16  BY MR. GROOMBRIDGE:
17  Q.  Dr. Willson, let's just step back.  Is there anything
18  more that you feel you need to explain with regard to the
19  concentrations in what was loaded onto the column in this
20  Figure 8 of the Nau reference?
21  A.  I won't belabor it, but the reason think Figure 8 is
22  the relevant one is it describes mixing a 1.4 molar ammonium
23  sulfate with the appropriate concentration of phosphate.  I
24  don't think anything else in Nau does.
25    THE COURT:  Now, wait.  And you said the

**106**

1  appropriate amount of what?
2    THE WITNESS:  Of phosphate.
3    THE COURT:  In other words, the appropriate
4  amount of the phosphate buffer that is disclosed in column
5  3?
6    THE WITNESS:  Yes.
7    THE COURT:  And show me now, the disclosure in
8  column 3 is .024 molars of the phosphate buffer.  Since you
9  said it's disclosed in Figure 8, where is it described in
10  Figure 8?
11    THE WITNESS:  Right.  .024 and .025.
12    THE COURT:  And where is. 025 described?  Do I
13  have to do the math?
14    THE WITNESS:  No.  A buffer is 25 millimolar
15  phosphate.
16    THE COURT:  Yes, okay.
17    THE WITNESS:  And that gets mixed with -- you
18  know, it's equal volume of this stuff.  So the place that
19  you find the two things mentioned in column 3 is here and I
20  don't believe elsewhere in Nau.
21    THE COURT:  Okay.  So you don't believe anywhere
22  else in Nau is there a disclosure of 1.4 molars of the
23  sodium?
24    THE WITNESS:  1.4 molar ammonium phosphate.
25    THE COURT:  Right.  If it call it the ammonium

**107**

1  sulfate, would I call it that?
2    THE WITNESS:  Yes.
3    THE COURT:  The only place in Nau where you see
4  a disclosure of 1.4 molars of ammonium sulfate being
5  combined with --
6    THE WITNESS:  24 or 25.
7    THE COURT:  Well, only 25 nanomolars of
8  phosphate buffer is in Figure 8?
9    THE WITNESS:  Yes.
10    THE COURT:  That's your testimony.  Okay.
11  BY MR. GROOMBRIDGE:
12  Q.  With that, let's turn to the Singleton reference.
13  A.  Mm-hmm.
14    MR. GROOMBRIDGE:  Mr. Weir, could you put up
15  Exhibit 3, looking just at the title section.
16  BY MR. GROOMBRIDGE:
17  Q.  Dr. Willson, can you confirm that this is the
18  Singleton reference that is cited in column 3 of the
19  patent?
20  A.  Yes, it is.
21  Q.  And let's turn, if we would, sir, to page 2.
22    MR. GROOMBRIDGE:  And, Mr. Weir, please enlarge
23  the text in the middle of the left-hand column under the
24  heading Protein Purification and Mass Spectrometry.
25  BY MR. GROOMBRIDGE:

**108**

1  Q.  Now, Dr. Willson, can you explain for us how this
2  pertains to, or what this tells us about the concentration
3  of phosphate that was loaded onto the column in the
4  experiments in the Singleton?
5  A.  Sure.  You can't tell, but let me go through here.
6  All of this first part is breaking open some yeast and
7  making a juice containing broken yeast things, a coffee
8  grinder.  And you've got a slurry of broken-up yeast, which
9  contains the protein.  We can go through in detail if you
10  wish.
11    Then, you know --
12    THE COURT:  This is going to be the protein in
13  the mixture that's going to be injected?
14    THE WITNESS:  Right.
15    THE COURT:  Okay.
16    THE WITNESS:  Yes.  There's a path, of course,
17  here.  So it has some soluble material from broken cells.
18  So they centrifuge that out.  So they are going to make a
19  yeast juice that no longer has the soluble material.  Then
20  they add a lot of ammonium sulfate.  And, you know, we've
21  talked earlier.  These salts are capable of causing proteins
22  to precipitate, which in a HIC column is a bad thing, but
23  here it's a useful purification thing.
24    It's long established.  People have been doing
25  this for decades.  If you add a bunch of ammonium sulfate,

141

13:07:04 1 lower limit appears in the claims.

13:07:06 2 I think, you know, you start right at the

13:07:09 3 beginning of the patent and read it and it tells you what to

13:07:11 4 do and that what to do I think will drive you to the good

13:07:14 5 place. I mean, to a place which is a genuine improvement

13:07:18 6 over the prior art.

13:07:19 7 But I do not understand the reason for the --

13:07:25 8 did I answer your question?

13:07:26 9 THE COURT: Well, you did specifically address

13:07:28 10 the lower limit. You said you don't have any idea. As I

13:07:31 11 understood your testimony, you said you had no idea why the

13:07:33 12 patent claim or claims, because there are two claims that

13:07:38 13 have the limit. Right?

13:07:40 14 THE WITNESS: Yes.

13:07:40 15 THE COURT: And you said you don't know why

13:07:42 16 there's a lower limit. Is that correct?

13:07:43 17 THE WITNESS: Yes.

13:07:44 18 THE COURT: Now, what about the upper limit?

13:07:46 19 THE WITNESS: So I understand that there are

13:07:48 20 phenomena which will certainly pose the heart of them, and

13:07:54 21 we've got more --

13:07:54 22 THE COURT: But the patent discloses a number of

13:07:58 23 what? Four, I think. Right?

13:08:04 24 Hold on a second. Yes. In column 3, isn't

13:08:10 25 there a disclosure of --

142

13:08:12 1 THE WITNESS: Requirements of between .7 and 2

13:08:16 2 and 1 and 4.

13:08:17 3 THE COURT: Right. So there's a disclosure of

13:08:19 4 four, but the number it depicts is one. Do you know why?

13:08:23 5 THE WITNESS: I don't. I think what really

13:08:25 6 constrains me about this is at the bottom, it doesn't do

13:08:28 7 you any good. You don't enhance your dynamic binding

13:08:35 8 capacity if you go too low. If you go too high, there's

13:08:37 9 a list of horrors. Right? You do this if you aggregate

13:08:41 10 or precipitate. But that would depend extraordinarily on

13:08:45 11 which salt, the nature of the ligand, the nature of the

13:08:49 12 protein, temperature, and so I don't know why there should

13:08:55 13 be limits.

13:08:56 14 THE COURT: Period. When you say limits, you

13:08:57 15 mean both low and high. Correct?

13:09:00 16 THE WITNESS: Yes.

13:09:01 17 THE COURT: What do you understand the purpose

13:09:02 18 of the invention is?

13:09:03 19 THE WITNESS: So the final purpose is to

13:09:06 20 increase the productivity of HIC chromatography.

13:09:10 21 THE COURT: By productivity, do you mean dynamic

13:09:15 22 capacity?

13:09:15 23 THE WITNESS: Yes.

13:09:15 24 THE COURT: That's the purpose of the patent, is

13:09:17 25 to increase dynamic capacity. Is that correct?

143

13:09:19 1 THE WITNESS: Yes. And also to avoid the use of

13:09:22 2 the very high salt concentrations.

13:09:25 3 THE COURT: Right, because that would compromise

13:09:27 4 the protein separation?

13:09:28 5 THE WITNESS: It could, it could, and also it's

13:09:31 6 just costly.

13:09:32 7 THE COURT: Oh, so it's cost, too?

13:09:34 8 THE WITNESS: You have to buy the salt, you've

13:09:36 9 got to dispose of the salt. If you could increase the

13:09:40 10 dynamic capacity of your HIC chromatography, a lower salt,

13:09:43 11 that's a win and it's a meaningful thing.

13:09:45 12 THE COURT: And that actually is a point I

13:09:47 13 wanted to ask you about, the lowering of the salt, because

13:09:53 14 is it fair to say that a purpose, if not the purpose of the

13:09:57 15 patent is to increase dynamic capacity using lower

13:10:03 16 concentrations of salt to save money?

13:10:07 17 THE WITNESS: Yes. I mean, there are other

13:10:09 18 benefits, but, yes.

13:10:10 19 THE COURT: And the thought was that by using

13:10:14 20 two salts, you could have one of the salts be done, be used

13:10:21 21 at a reduced volume?

13:10:21 22 THE WITNESS: Yes.

13:10:21 23 THE COURT: And that's how you save money?

13:10:23 24 THE WITNESS: Yes. It's surprisingly effective.

13:10:29 25 THE COURT: But you can't come up with any

144

13:10:30 1 rationale for why the patentee put numbers in the claim, can

13:10:37 2 you?

13:10:37 3 THE WITNESS: No, not that I would be

13:10:40 4 comfortable really talking about.

13:10:44 5 THE COURT: And you can't come up with a reason

13:10:54 6 why the patentee picked the particular numbers, can you?

13:10:57 7 THE WITNESS: No. Can I expound just a little

13:11:08 8 bit?

13:11:08 9 THE COURT: Sure.

13:11:09 10 THE WITNESS: In the text that you pointed us to

13:11:11 11 a moment ago, they talked about in the old way, generally

13:11:14 12 requirements of about .7 to 2 molar ammonium sulfate were

13:11:17 13 used and about 1 in 4 sodium chloride. So there's a pretty

13:11:21 14 substantial range there and that illustrates this difference

13:11:24 15 in salt potencies. So it wouldn't be as potent as

13:11:31 16 increasing the higher capacity as it is ammonium sulfate.

13:11:33 17 In general, that's true.

13:11:34 18 THE COURT: You've got to slow down.

13:11:39 19 THE WITNESS: I apologize.

13:11:40 20 THE COURT: Hold on a second. I can't increase

13:11:48 21 it very much more. Do you want to repeat what you just

13:11:51 22 said.

13:11:51 23 THE WITNESS: Yes. So looking back at column 3

13:11:53 24 around line 21, which you pointed us to a minute ago, it

13:11:58 25 says that in the prior art and the old ways of doing these

145

13:12:02  1   things, typically, up to about two molar ammonium sulfate or
13:12:07  2   up to about four molar sodium chloride salt concentration
13:12:11  3   would be considered useful.  And what I said was that first
13:12:17  4   that illustrates that ammonium sulfate is more potent than
13:12:20  5   sodium chloride in increasing dynamic binding capacity.  In
13:12:24  6   general, people know that.  That's an understood thing in
13:12:27  7   the field.  But also it just illustrates, you know, with the
13:12:31  8   tremendous variability among salts and protein dynamic,
13:12:36  9   picking a single number doesn't seem like a very reasonable
13:12:38 10   thing to do, frankly.
13:12:40 11        I do not understand -- I mean, you can't say
13:12:42 12   this works out to one molar salt because, you know, if you
13:12:48 13   use a less hydrophobic protein, a less hydrophobic packing,
13:12:52 14   a different salt that's less potent, then you might well
13:12:56 15   find that the best place to operate is significantly higher
13:12:58 16   than that, and it works the other way at the lower end.  You
13:13:01 17   know, you shouldn't say that you're only going to do this
13:13:04 18   down to X because if the protein in question is more
13:13:08 19   hydrophobic than the previous case, if the salt is less
13:13:12 20   potent than the previous case, if the packing is less
13:13:16 21   hydrophobic than the previous case -- sorry, more
13:13:20 22   hydrophobic than the previous case, then you're going to go
13:13:23 23   lower salt.
13:13:24 24        THE COURT:  All right.  Now, I want you to look
13:13:25 25   at column 3, the sentence that we've been paying a lot of

146

13:13:29  1   attention to, which begins with, "The practice was to add a
13:13:31  2   high concentration of salt to a low concentration buffer
13:13:35  3   solution."
13:13:36  4        Do you see that sentence?
13:13:37  5        THE WITNESS:  Yes.
13:13:37  6        THE COURT:  Now, the part that I read so far,
13:13:40  7   you've been, I think, absolutely unambiguous about this,
13:13:44  8   that this sentence, the practice that is referred to in the
13:13:48  9   sentence, I should say, is referring to a practice of adding
13:13:53 10   a mixture to the HCL, is that correct, to the column, to the
13:13:59 11   column.  Right?  It's ultimately referring to -- let me step
13:14:07 12   back.  Okay.
13:14:09 13        THE WITNESS:  I would invite you to look at the
13:14:11 14   previous sentence.
13:14:13 15        THE COURT:  No.  And just scratch everything
13:14:14 16   I've said.  Let's be clear.
13:14:16 17        When the sentence is referring to this practice
13:14:18 18   of adding the two different concentrations.  Right?
13:14:23 19        THE WITNESS:  Mm-hmm.
13:14:24 20        THE COURT:  It's referring to adding them to the
13:14:26 21   mixture and prior to the introduction of the mixture to the
13:14:30 22   column.  You are unambiguous about that.  Correct?
13:14:34 23        THE WITNESS:  Yes, and I take that from the
13:14:35 24   sentence that says, a protein preparation is conditioned in
13:14:39 25   preparation for HIC by mixing the high salt buffers to

147

13:14:43  1   prepare the load to be loaded on the column.  A couple
13:14:46  2   sentences earlier.
13:14:47  3        THE COURT:  Right.  That's fair.  But I just
13:14:49  4   want to make sure so far in this sentence I've been reading
13:14:52  5   from, you think it's unambiguous that this written
13:14:56  6   description that we're reading is referring to a practice of
13:14:59  7   adding concentrations of salt to a mixture before it's put
13:15:04  8   in the column.  Correct?
13:15:05  9        THE WITNESS:  Yes.
13:15:07 10        THE COURT:  All right.
13:15:07 11        THE WITNESS:  Yes.
13:15:08 12        THE COURT:  Now, and what it's referring to is
13:15:19 13   the addition of these two salts to a mixture.  Correct?
13:15:26 14        THE WITNESS:  To create a mixture.
13:15:28 15        THE COURT:  To create a mixture?
13:15:29 16        THE WITNESS:  Yes.
13:15:30 17        THE COURT:  And you are saying, however, that
13:15:45 18   this sentence is not referring to the mixture in the claim
13:15:50 19   limitation.
13:15:53 20        THE WITNESS:  Do you mean the Nau and Singleton
13:15:58 21   references?
13:15:59 22        THE COURT:  No.  I want to get clarity on the
13:16:02 23   sentence.
13:16:02 24        THE WITNESS:  I see.
13:16:03 25        THE COURT:  In other words, pretend there's no

148

13:16:04  1   reference to Nau in the sentence or any reference to
13:16:07  2   Singleton.
13:16:07  3        THE WITNESS:  And the sentence is limited to
13:16:10  4   general requirements of?
13:16:11  5        THE COURT:  No.  The sentence that begins with
13:16:13  6   the practice was to add a high concentration of salt to a
13:16:16  7   low concentration buffered solution such as, for example,
13:16:20  8   1.4 molars and then it says .5 molars.
13:16:25  9        THE WITNESS:  Okay.
13:16:25 10        THE COURT:  It didn't reference Nau or it
13:16:27 11   didn't reference Singleton.  What is the sentence referring
13:16:31 12   to?
13:16:31 13        THE WITNESS:  So the numbers will be similar in
13:16:46 14   the equilibration elution as well, but because this is
13:16:52 15   prefaced by, you know, an introduction to how you prepare
13:16:55 16   the mixture, the sample, I think it's talking about
13:16:58 17   preparing the mixture.
13:16:59 18        THE COURT:  Preparing the mixture?  All right.
13:17:04 19        So is it fair to say then if the word Nau,
13:17:10 20   because the article wasn't mentioned, is it fair to say you
13:17:13 21   would understand from that statement that in this particular
13:17:25 22   embodiment, there was a mixture that contained 1.4 molars of
13:17:32 23   the sodium, or the NH4 SO4 and .24, or 0 -- .024, rather,
13:17:42 24   molars of the phosphate buffer.  Correct?
13:17:47 25        THE WITNESS:  Yes.

---

177

13:56:50 **1** precipitation where you're falling significantly below

13:56:53 **2** 100 percent.

13:56:53 **3** **Q.** Let's go to the next, 0.1. Would you expect to see

13:57:01 **4** an increase in dynamic capacity at the low end of this

13:57:04 **5** scale?

13:57:04 **6** **A.** I wouldn't. You're scratching your head here because

13:57:09 **7** the reporting values above 100 percent, potentially above

13:57:12 **8** 100 percent solubility. It was really soluble up here.

13:57:15 **9** It's probably more soluble. You don't want to look there

13:57:19 **10** because you're going to have less dynamic binding capacity.

13:57:21 **11** **Q.** Well, just to summarize, what do these three figures,

13:57:26 **12** 1C, 1D and 1E, what do they convey to a person of skill in

13:57:30 **13** the art in terms of the range that the inventors claimed

13:57:33 **14** here in the patent?

13:57:34 **15** **A.** All right. So, you know, in the legend, you'll see

13:57:37 **16** one salt concentration has been picked and you look at the

13:57:40 **17** knee of the curve to determine what the second salt

13:57:42 **18** concentration should be, and all of those values -- well,

13:57:46 **19** clearly, between .1 and 1 molar and more narrowly, they all

13:57:52 **20** fall within the narrower scope of .3 to .7 molar. So, you

13:57:56 **21** know, for this system, it's a very narrow range, kind of in

13:58:00 **22** the center of that tenfold broader range.

13:58:05 **23** **Q.** Now, do you agree that the term about can be construed

13:58:09 **24** being approximately? Is that fair?

13:58:11 **25** **A.** Yes.

---

178

13:58:11 **1** **Q.** What type of scope would you give that term in the

13:58:16 **2** context of this patent?

13:58:18 **3** **A.** Again, I'm trying to look at this through the eyes of

13:58:20 **4** a POSA, but this is under your control. You can scan the

13:58:26 **5** balance and weigh out a certain amount of material

13:58:29 **6** accurately. You know, you can determine volumes very

13:58:31 **7** accurately when you are making solutions. Indeed, you're

13:58:35 **8** directed to, there are a couple places in the patent where

13:58:37 **9** you're directed to make solutions precisely.

13:58:42 **10** So I'm associating that about statement with the

13:58:46 **11** precision to which a POSA can meet the target and in my

13:58:50 **12** experience, both industry and the academic research we do,

13:58:55 **13** you know, if I want a solution that's a hundred millimolar,

13:58:59 **14** I would expect to be able to make that, or my students or

13:59:03 **15** staff to be able to make that. Would it be 101? Would it

13:59:06 **16** be 99 millimolar? It's going to be pretty darn close

13:59:10 **17** because that's under your control. Will it be exact, so

13:59:13 **18** many decimal points? No, because there's always a little

13:59:16 **19** bit of experimental variation. But you can control this

13:59:18 **20** very precisely because this is something that you're

13:59:21 **21** composing yourself.

13:59:22 **22** **Q.** Now, you mentioned that there's some reference of this

13:59:26 **23** in the patent. Where is that?

13:59:28 **24** **A.** There are a couple different places I believe in

13:59:32 **25** column 6 and column 11. So, yes, where they call out exact

---

179

13:59:37 **1** ion concentration. I mean, this is important because of the

13:59:41 **2** composition of the solution that's used and that's applied

13:59:44 **3** on the column determines the chromatographic behavior. So

13:59:47 **4** if you can't be precise in what you're doing, the

13:59:50 **5** chromatographic behavior is not going to be precise, and now

13:59:53 **6** the results will vary and that's -- the agencies, FDA, for

14:00:00 **7** example, or other regulatory bodies, they want to know that

14:00:03 **8** you can produce the same thing every time, so you need to be

14:00:06 **9** precise in how you prepare your solutions, how you operate

14:00:08 **10** your chromatography.

14:00:10 **11** So, again, I'm looking at this and I'm reading

14:00:12 **12** this through the ice of a POSA saying, look, if I need to be

14:00:16 **13** between about .1 and about 1, that means I'm not going to

14:00:23 **14** make a solution that's two molar by accident. I'm not going

14:00:26 **15** to make a solution that's 50 millimolar by accident. I'm

14:00:35 **16** going to be there.

14:00:35 **17** **Q.** Now, do you agree that the concentration range can be

14:00:39 **18** brought in to account for different proteins, for example,

14:00:42 **19** or different columns as we've been discussing today?

14:00:45 **20** **A.** The patent does claim a very broad range of proteins

14:00:50 **21** and a very broad range of media. All of the examples fall

14:00:57 **22** within a narrow slice of that range, and the way I view it

14:01:00 **23** is that narrow range has already been broadened by the

14:01:03 **24** tenfold point, about .1 to about 1 to encompass the

14:01:07 **25** variation that you might expect to see with the different

---

180

14:01:10 **1** combinations of different proteins and different media that

14:01:14 **2** you would use, different chromatographic media.

14:01:16 **3** **Q.** And the patent provides various examples of different

14:01:19 **4** proteins: is that correct?

14:01:20 **5** **A.** A very long list of different proteins, yes.

14:01:24 **6** **Q.** And I think we have that on the next slide. What is

14:01:30 **7** this disclosure here at column 10? What does that indicate

14:01:34 **8** to you or what does that suggest in terms of the proteins

14:01:37 **9** that are covered by these claims?

14:01:40 **10** **A.** It's running through a very long list of proteins,

14:01:45 **11** because I'm presuming that Amgen would have very high

14:01:47 **12** familiarity with. They call out PCSF, the protein at issue

14:01:54 **13** here, but numerous other proteins here that we're very

14:02:00 **14** familiar with, things like erythropoietin are called out,

14:02:05 **15** interferons are called out, interleukin, interleukin 2, for

14:02:08 **16** example, are called out.

14:02:09 **17** These are all proteins that are specifically

14:02:11 **18** identified and proteins that Amgen has manufacturing

14:02:14 **19** experience with and some of which actually became products.

14:02:19 **20** It has claimed a very broad range.

14:02:21 **21** **Q.** And do you have an understanding as to whether these

14:02:24 **22** proteins range in terms of hydrophobicity?

14:02:28 **23** **A.** Oh, sure. They do span abroad range of hydrophobicity

14:02:32 **24** and this would be known to Amgen. Amgen has had a

14:02:35 **25** reputation for having a very strong biophysics team -- David

---

181

14:02:41 1  Brems, Margaret Richie Speed.  These are all folks, some of
14:02:45 2  whom I know personally, who are well regarded biophysicists
14:02:49 3  and who have published on stability of many of these
14:02:53 4  different proteins, called out many of them as hydrophobic.
14:02:57 5  There are patents from Amgen that describe formulations to
14:02:59 6  try to overcome the aggregation tendency due to the
14:03:03 7  hydrophobicity of some of these molecules, GCSF and
14:03:08 8  interleukin 2 in particular.  So these are proteins in
14:03:10 9  which they're well familiar and well-known to be
14:03:13 10  hydrophobic.
14:03:13 11  Q.    And so is it your understanding that the claims range
14:03:19 12  about one, with .1 to about 1.0, is intended to cover this
14:03:25 13  type of variety of proteins as disclosed here?
14:03:27 14  A.    It's a broad variety of proteins.  Again, you know, I
14:03:31 15  base it on the fact that what is presented, the examples all
14:03:35 16  fall within the center of that range.  I am looking at that
14:03:39 17  and saying they have claimed a lot here, right, in terms of
14:03:43 18  applicability, so they have claimed a range sufficient to
14:03:47 19  include that, you know, all of these possibilities.
14:03:51 20  Q.    And finally, there's also from column 6 that we have
14:03:56 21  on the slide here.
14:03:57 22        What is the significance of the disclosure here
14:03:59 23  in column 6 on the right-hand side?
14:04:01 24  A.    Well, they're certainly disclosing most of the
14:04:05 25  hydrophobic interaction of chromatography media that I could

182

14:04:08 1  think of that would have been available at the time and
14:04:11 2  they're still available, a whole range of alkyl-based
14:04:15 3  resins, phenyl resins, ether resins.  So this is a very
14:04:18 4  broad collection of resins that are commercially available.
14:04:22 5  Q.    And so in your opinion, the claimed concentration
14:04:25 6  ranges, does that apply to all of these different types of
14:04:30 7  runs that are disclosed in the patent?
14:04:31 8  A.    Again, Amgen has been making proteins commercially for
14:04:34 9  many, many years, would be well familiar with the behaviors
14:04:37 10  of these columns, and I have to presume in picking up this
14:04:41 11  patent and reading it that they set the bounds on what their
14:04:44 12  claims are to encompass all of this variation.
14:04:49 13        MR. THAKORE:  Thank you.  No further questions
14:04:51 14  at this time.
14:04:54 15        THE COURT:  All right.  Thank you.  Cross.
14:05:07 16            CROSS-EXAMINATION
14:05:08 17  BY MR. GROOMBRIDGE:
14:05:09 18  Q.    Good afternoon, Dr. Przybycien.
14:05:10 19  A.    Good afternoon.
14:05:10 20  Q.    Now, you've spent a fair amount of time studying the
14:05:24 21  '707 patent; is that correct?
14:05:25 22  A.    I have, yes.
14:05:26 23  Q.    Where in the patent does it tell the skilled person
14:05:34 24  what is the detrimental consequence of having too little of
14:05:38 25  the second salt?

183

14:05:39 1  A.    The only detriment that I can see is that if you
14:05:44 2  happen to run into some unusual stability region, that's a
14:05:48 3  detriment that's called out.
14:05:49 4  Q.    Where is that?
14:05:51 5  A.    I would have to have the patents in front of me.
14:05:55 6  Q.    I'm sure we could come to that if it becomes
14:06:00 7  important.
14:06:02 8        Now, did I hear you say in the direct that there
14:06:05 9  was a so-called salting in effect at very low salt
14:06:09 10  concentration?
14:06:10 11  A.    Yes.  That is correct.  As a matter of fact, I believe
14:06:13 12  you showed that in your presentation when you put an excerpt
14:06:17 13  up from the A.A. Green article, classical data which people
14:06:21 14  that work in the precipitation field like myself have
14:06:24 15  referred to for many years.  And you saw that, I don't know,
14:06:27 16  the six or seven different solubility curves that were
14:06:30 17  shown.  Every one marked and then marked back down.  That's
14:06:35 18  a logarithmic scale, and every one ever those, including
14:06:38 19  salts, it included ammonium sulfate, a precipitating salt.
14:06:42 20  The increase in a logarithmic scale was a half order of
14:06:46 21  magnitude.
14:06:46 22        So if you look at hemoglobin, it goes from
14:06:50 23  125 grams per liter solubility up to over 400 and then turns
14:06:55 24  back down.  And where it turns back down on that plot, you
14:06:55 25  plot an ionic strength, but that happens if you convert

184

14:07:05 1  ionic strength salt to molarity for ammonium sulfate.  It's
14:07:07 2  about .333 molar.  But there is a big region that are
14:07:11 3  salting in.
14:07:11 4        The forces that are driving precipitation
14:07:13 5  behavior or solubility behavior are the same forces that are
14:07:15 6  driving absorption behavior on hydrophobic interaction
14:07:18 7  media.  So if the proteins tend to salt out or precipitate,
14:07:22 8  you get more binding, but if it's tending to be more
14:07:26 9  soluble, you get less bonding.  The same forces that are
14:07:26 10  done.
14:07:29 11  Q.    Just so I'm clear then, so would you agree that at
14:07:31 12  very low salt concentrations you can find a salting in
14:07:36 13  effect that would cause dynamic binding capacity to
14:07:40 14  decrease?
14:07:40 15  A.    Yes, I do.
14:07:40 16  Q.    And so in your view then, there is at least some
14:07:44 17  scientific reason why there might be a low end to the
14:07:49 18  appropriate concentration for the second salt?  Fair?
14:07:53 19  A.    There's a scientific reason, presuming that that low
14:07:57 20  end was put there also to demarcate from prior art.
14:08:01 21  Q.    Right.  For the moment let's focus on the scientific
14:08:05 22  reasons and then I will let you know if we get to prior art.
14:08:07 23  All right?
14:08:08 24        Now, would you agree that when we're looking at
14:08:15 25  HIC, hydrophobic interaction chromatography in any given

185

14:08:19 1 system, that the concentration of salt required will vary
14:08:25 2 depending on which salt you choose?
14:08:27 3    A.   I do agree, yes.
14:08:31 4    Q.   And would you agree in HIC that the concentration of
14:08:38 5 salt will or at least may vary depending upon the nature of
14:08:43 6 the HIC medium that you choose to use?
14:08:46 7    A.   I do, yes.
14:08:47 8    Q.   And would you agree that the concentration of salt
14:08:52 9 that is required would vary depending upon the degree of
14:08:57 10 hydrophobicity of the protein?
14:08:59 11    A.   I would agree, yes.
14:09:00 12    Q.   Now, I think in your direct examination you talked
14:09:09 13 about the two functions that salts performed in the prior
14:09:14 14 art.  Is that fair?
14:09:15 15    A.   Yes.
14:09:16 16    Q.   And one of those was the salt that was present at the
14:09:19 17 greater concentration had the function of driving the
14:09:24 18 binding to the column, if I heard you correctly.  Is that
14:09:27 19 right?
14:09:27 20    A.   That's correct, yes.
14:09:28 21    Q.   And in this prior art world, the salt that was present
14:09:32 22 at a lower concentration had the function to maintain pH; is
14:09:37 23 that correct?
14:09:37 24    A.   That would be your pH buffer, yes.
14:09:39 25    Q.   And one of the things that underlies this patent is

186

14:09:44 1 the idea that the second salt can assist with the function
14:09:48 2 of driving the binding to the column.  Fair?
14:09:50 3    A.   Agreed.  At that intermediate concentration range,
14:09:54 4 yes.
14:09:54 5    Q.   And now did I hear you say when you were talking about
14:10:01 6 the pH buffering function in the prior art that in
14:10:05 7 commercial processes, it was very common to use
14:10:10 8 concentrations such as 10 millimolar, 20 millimolar or 50
14:10:15 9 millimolar?
14:10:15 10    A.   Right.  And 25.  The processes that I'm familiar with
14:10:19 11 and that I've worked on, yes.
14:10:21 12    Q.   So you would agree then that in the prior art
14:10:24 13 commercial processes, 10 millimolar of salt, of a salt might
14:10:29 14 be sufficient to maintain the pH buffering function?
14:10:33 15    A.   Depending on the concentration of your protein, it
14:10:35 16 might.  It also depend on, you know --
14:10:39 17    Q.   And likewise, depending on your system, 20 millimolar
14:10:43 18 concentration might be sufficient to perform just that pH
14:10:46 19 buffering function.  Fair?
14:10:49 20    A.   Yes, and it would still buffer.  It would have
14:10:51 21 increased buffering capacity.
14:10:52 22    Q.   And now that, those, the concentrations that we would
14:10:55 23 care about for the pH buffering, that would actually be in
14:10:58 24 the mixture with the protein.  Fair?
14:11:01 25    A.   That's correct, yes.

187

14:11:04 1    Q.   Because that's where it would have to be doing that
14:11:06 2 work; right?
14:11:07 3    A.   Yes, that's correct.
14:11:09 4    Q.   Now, so we might -- if we were going to combine
14:11:14 5 certain things in order to get the mixture with the protein,
14:11:20 6 we might very well start with something, one of those
14:11:23 7 ingredients that had a concentration higher than 10
14:11:26 8 millimolar or 20 millimolar in order to end up in the
14:11:30 9 protein with 10 or 20.  Fair?
14:11:32 10    A.   It depends on how the protein itself was prepared.
14:11:36 11 It's unusual to have a protein that by itself neats in
14:11:42 12 solution without any buffering capacity.  If a protein was
14:11:45 13 produced as the result of some fermentation process or cell
14:11:49 14 culture process, that is conducted in a medium that's
14:11:52 15 buffered, so that has buffer in it.  It's unusual to start
14:11:56 16 with a neat protein solution that has no buffering capacity
14:12:01 17 and then go from there.
14:12:01 18    Q.   All right.
14:12:03 19    A.   So it's not likely that you are going to have a
14:12:06 20 significant change in buffering capacity, because usually
14:12:09 21 you want to maintain the pH constant so you avoid stability
14:12:11 22 effects and problems with your protein.
14:12:14 23    Q.   But that's a very fair point, that whatever liquid the
14:12:18 24 protein is sitting in may have with it other things apart
14:12:21 25 from just water in the protein.  Right?

188

14:12:23 1    A.   It would be very typical to have buffering capacities
14:12:26 2 or buffer salts, yes.
14:12:27 3    Q.   If we then mix that with a stock solution of say 25
14:12:32 4 millimolar buffer, we would have the effect of reducing the
14:12:36 5 25 millimolar concentration.  Fair?
14:12:39 6    A.   25 millimolar would be a very weak stock solution, so
14:12:43 7 you're likely to use a higher stock solution.  Typically, if
14:12:47 8 you are going to mix weak solutions of buffers, the two
14:12:49 9 solutions you're mixing are already both buffered and both
14:12:53 10 either similar or have the identical buffer concentration
14:12:57 11 already.  There's not a typical solution.
14:12:59 12         If you are going to start with a stock solution,
14:13:03 13 you have to move that down so you don't become overly
14:13:05 14 concentrated.
14:13:06 15    Q.   Just as a general proposition, if I take a liquid with
14:13:09 16 a certain concentration of salt in it and I add to it
14:13:11 17 another liquid that doesn't have the same salt in it, the
14:13:14 18 concentration or the resulting mixture of the salt will be
14:13:17 19 lower than in the liquid with which I started; is that
14:13:20 20 correct?
14:13:20 21    A.   If they both didn't have the same component.  It's
14:13:24 22 unusual again not to have the same buffering component in
14:13:26 23 the solution.
14:13:28 24         THE COURT:  You said one of them didn't have
14:13:32 25 any?

201

14:31:31  1   think you will admit, there's no detailed discussion now
14:31:35  2   whatsoever for Singleton.  Right?
14:31:37  3          MR. GROOMBRIDGE:  There's certainly no detailed
14:31:38  4   discussion, but in our view, Your Honor, what we would say
14:31:41  5   here is these -- given the centrality of this issue, I can
14:31:46  6   certainly imagine and no one would suggest that in every
14:31:50  7   District Court in the country the Court is required to
14:31:54  8   treat as intrinsic evidence every last thing that was
14:31:57  9   referenced.
14:31:57  10         THE COURT:  Well, I think if you read the
14:31:59  11  statement you just read from Powell against Home Depot,
14:32:02  12  that's the standard, then the answer is, yes, that's the
14:32:04  13  standard and it can't be.
14:32:05  14         MR. GROOMBRIDGE:  I think as a practical matter
14:32:07  15  that the issue would be if those things are the subject of
14:32:12  16  the claim construction proceedings, then they qualify as
14:32:14  17  intrinsic evidence.  The great majority of times they will
14:32:17  18  not be the subject of the claim construction proceedings.
14:32:21  19         THE COURT:  I'm not sure that's a helpful way to
14:32:23  20  differentiate, but, all right.
14:32:32  21         Why don't we break until quarter of.  Is that
14:32:35  22  going to give you enough time to hit the restroom?  Do you
14:32:38  23  want more time than that?  What do you want?  What would be
14:32:40  24  helpful?
14:32:41  25         MR. GROOMBRIDGE:  Ten till the hour?

202

14:32:44  1          THE COURT:  Sure, or do you want to more time?
14:32:47  2   What would be helpful to you all?  I'm just curious.  Would
14:32:51  3   it be helpful for the parties to discuss what to do next?
14:32:54  4          MR. GROOMBRIDGE:  My suspicion, Your Honor, is
14:32:57  5   probably not.  They probably want -- each side probably
14:33:01  6   wishes to caucus.
14:33:02  7          THE COURT:  That's fine.  Is that enough?
14:33:05  8          MS. HANSTEAD:  That's fine, Your Honor.
14:33:06  9          THE COURT:  All right.  We'll be back at ten of.
14:33:25  10  Thank you.
14:33:25  11         (Short recess taken.)
14:43:03  12              - - -
14:43:03  13         (Proceedings resumed after the short recess.)
14:49:57  14         THE COURT:  All right.  Please be seated.
14:50:01  15         All right.  Well, thank you, first of all, for
14:50:05  16  being patient throughout this.  I want to commend both
14:50:08  17  experts.  I thought they were excellent, just excellent,
14:50:10  18  both of them.
14:50:11  19         This is one of the nicest parts of the job, to
14:50:14  20  kind of see, you know, people with that kind of experience
14:50:16  21  and knowledge testify and do so very credibly, so I commend
14:50:23  22  you for that.  And the lawyers did a great job.  I'm not
14:50:25  23  trying to take away from them.
14:50:25  24         I want to though, I want to explore -- I mean,
14:50:29  25  this is one of those, it always strikes me it's funny in

203

14:50:33  1   patent cases people taking different sides of an issue that
14:50:39  2   I might expect coming from the other side.
14:50:43  3          I came into the hearing with an expectation that
14:50:49  4   it would be very likely that I would construe the terms as I
14:50:55  5   had said, which is very consistent with what Pfizer had
14:50:59  6   proposed, and that was because I think I made it clear if
14:51:05  7   not in the motion-to-dismiss argument, subsequent calls, but
14:51:09  8   I made it clear that it looked to me like there was a clear
14:51:12  9   and unequivocal disclaimer.  I still think that argument is
14:51:16  10  better than the prosecution history argument Pfizer raised
14:51:19  11  in the motion to dismiss.  But where I am now is I don't
14:51:24  12  think I can look at the language in column 3 and the
14:51:29  13  sentence in particular that refers to the practice in
14:51:33  14  existence and references Nau and Singleton as a clear and
14:51:38  15  unequivocal disclaimer, and the reason is because I think
14:51:41  16  there's ambiguity at least about when the concentration
14:51:46  17  levels that are recited in the sentence would be measured.
14:51:50  18  Would they be measured before or after the two salts were
14:51:55  19  added to the mixture, and so I can't do that.
14:52:04  20         Now, I'm still not sure what I should do, and I
14:52:09  21  thought you would benefit, I would benefit if I shared with
14:52:11  22  you some thoughts and then let's hear from counsel and then
14:52:15  23  maybe I make a ruling.
14:52:22  24         So I start with Dr. Willson, and I'm thinking to
14:52:31  25  myself, again, both witnesses, very credible.  Some

204

14:52:36  1   takeaways I had from his testimony were that, well, number
14:52:40  2   one is we don't know why the patentee put the range in the
14:52:44  3   patent, and frankly, it doesn't make a lot of sense, you
14:52:50  4   know, to a certain extent why they would put it in there.
14:52:56  5          Another takeaway is that the identity of the
14:53:06  6   particular salt at issue is very important and that these
14:53:09  7   numbers can vary significantly based on what the particular
14:53:14  8   salt is, which in my mind raises real indefinite issues for
14:53:20  9   the patent, but Pfizer has waived its indefiniteness issue
14:53:25  10  and I asked that specifically during one of the calls.  I
14:53:27  11  said we need to tee up indefiniteness today if that were
14:53:31  12  going to be an issue, and I know in the joint claim
14:53:33  13  construction brief, initially Pfizer had raised
14:53:36  14  indefiniteness, and then it proffered a construction which I
14:53:41  15  have -- as people practice, and you all do in front of me,
14:53:45  16  know, I have never said that the fact that you offer a
14:53:48  17  construction means you waive indefiniteness.  I have made a
14:53:51  18  point to say you don't.  And I made the point explicitly in
14:53:54  19  this case to say to Amgen when we planned this hearing what
14:53:59  20  is going to happen with indefiniteness and Pfizer said we're
14:54:02  21  not.  We're only going to raise indefiniteness with respect
14:54:05  22  to other limitations.
14:54:06  23         And there's some irony to me because I actually
14:54:10  24  think that the plaintiffs' witness really called into
14:54:12  25  question whether this claim limitation could meet the

205

14:54:18 1 requirements of indefiniteness.

14:54:25 2 I don't also see though how -- what Amgen really

14:54:32 3 wants is this limitation to be construed as a functional

14:54:35 4 limitation and I don't see how it can be given the testimony

14:54:43 5 I just cited, which is that, you know, A, there's no

14:54:47 6 explanation for why there's a number or numbers in the

14:54:51 7 limitation, and then, B, it's so independent or, rather, so

14:54:57 8 dependent on what salts are used, and so it makes much more

14:55:05 9 sense to me to understand the limitation is essentially

14:55:13 10 referring to measurement error.  And I found very credible

14:55:23 11 Dr. Przybycien, his testimony that about means about and

14:55:33 12 that an artisan of ordinary skill would know if what they

14:55:38 13 had when they were faced with the limitation in question,

14:55:42 14 and that situation would be I've got to have a concentration

14:55:48 15 of about 0.1 to 1.

14:55:54 16 And, you know, again, with the experts I find

14:55:58 17 credible, I don't think Dr. Willson disagrees with that when

14:56:02 18 push comes to shove because he says it's approximately, and

14:56:05 19 that makes sense, it's approximately.

14:56:10 20 And so that's where I am right now, but I want

14:56:13 21 to hear from folks as I'm inclined to say, I don't need to

14:56:17 22 construe this term.  It's "about" and it's not functional.

14:56:22 23 I mean, to the extent I have to construe it, it means

14:56:26 24 "about," and I fully expect that that means measurement

14:56:31 25 error.

206

14:56:36 1 So what is the parties' reaction to that

14:56:38 2 proposed construction?

14:56:47 3 MR. GROOMBRIDGE:  Your Honor, our reaction I

14:56:51 4 think would be that we would still think that Cohesive is

14:56:56 5 applicable, so we would, you know, want to at least preserve

14:57:00 6 that as a, to make clear that --

14:57:03 7 THE COURT:  Well, and I don't dispute it's

14:57:06 8 applicable.

14:57:06 9 MR. GROOMBRIDGE:  Yes.

14:57:07 10 THE COURT:  And, in fact, what its application

14:57:09 11 is is that the function here is to maximize dynamic capacity

14:57:17 12 without detriment to the protein and the process.  That's

14:57:25 13 the function.

14:57:25 14 MR. GROOMBRIDGE:  But I guess we would say to

14:57:27 15 increase dynamic capacity.

14:57:32 16 THE COURT:  Well, you know, so how do you have a

14:57:38 17 purpose of increase without saying the real purpose is to

14:57:42 18 maximize?  I mean, this is all about the end of the day

14:57:44 19 making money and so you want to increase it to the point, to

14:57:49 20 the maximum point you can get, you know, and that's why I

14:57:53 21 say I don't know that it really matter much.

14:57:57 22 If you want to increase versus maximize, I think

14:57:59 23 it's the same principle, is you're trying to get as much as

14:58:01 24 you can in terms of dynamic capacity but you don't want to

14:58:04 25 do it such that you lose overall in terms of the protein.

207

14:58:07 1 That's fine.  You can preserve that issue.  I actually think

14:58:11 2 that Cohesive is consistent with what I've offered so far

14:58:15 3 and I have not ruled, but go ahead.

14:58:17 4 MR. GROOMBRIDGE:  No.  And again, as one does,

14:58:22 5 so to speak, if we can come up with anything.  You know, is

14:58:25 6 there some way that results in this way and one thing that

14:58:30 7 we came up with was between approximately or for that matter

14:58:34 8 about .1 molar to approximately one molar concentrations

14:58:38 9 that perform the same function in the same way.

14:58:40 10 THE COURT:  Yes, but I'm not giving you that

14:58:42 11 last part.

14:58:43 12 MR. GROOMBRIDGE:  I was pretty sure that was the

14:58:45 13 case, but that was sort of the best that we were -- you

14:58:48 14 know, that we bounced this around.

14:58:50 15 So I think if Your Honor construes the claim

14:58:53 16 that way, I think what will happen is we'll go back, and at

14:58:58 17 least on the Amgen side we'll sort of take stock of the

14:59:01 18 evidence and say do we think, you know, there's an

14:59:05 19 infringement case going forward.

14:59:06 20 THE COURT:  Right.  I do want to say just for

14:59:07 21 the record because, you know, de novo review, and so I don't

14:59:13 22 feel like I have to always say very much into the record,

14:59:16 23 and then, you know, there are probably Federal Circuit

14:59:20 24 judges who -- well, they have said on occasion, well, you do

14:59:25 25 have to say a lot and I think just ignores the reality.

208

14:59:27 1 I've asked a lot of questions today and I've also just

14:59:32 2 articulated for you why I kind of come out.

14:59:35 3 Let me just also add though, I think there is

14:59:37 4 intrinsic evidence that supports that we're talking about a

14:59:40 5 measurement error.  You know, I look at column 11, line 66

14:59:49 6 to column 12, line 3 that are talking about achieving "exact

14:59:56 7 ion concentration," and that's intrinsic evidence.  I also

15:00:05 8 think when you read the totality, you've got to give meaning

15:00:09 9 to the claim, and yet the patentee itself can't explain why

15:00:13 10 it's there.  So there has to be real significance to those

15:00:16 11 two numbers.  And then we've got the, what I say is not

15:00:24 12 clearly and unequivocally disclaiming in column 3.  So I'm

15:00:33 13 not with that anymore.

15:00:34 14 But you take the fact that we've got numbers and

15:00:40 15 we begin with the claims.  You take the fact that there is

15:00:44 16 intrinsic evidence which talked about the importance of

15:00:47 17 achieving a "exact ion concentration," and then you talk

15:00:51 18 about credible witness testimony from both sides.  In

15:00:56 19 particular, Dr. Przybycien's statement that he knows what

15:01:01 20 about means and he can get that as an expert.  That all in

15:01:06 21 my mind supports rejection of the functional approach and

15:01:11 22 construction of what I've suggested.

15:01:15 23 Do you have any other objections though?  I

15:01:17 24 thought you might agree.  You are not going to agree to it,

15:01:20 25 but you're going to preserve that objection.  Any other

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMGEN INC. and AMGEN MANUFACTURING, LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> HOSPIRA, INC. and PFIZER INC., <br><br> Defendants. | C.A. No. 20-201-CFC <br><br> ██████████████ <br> ██████████████ |

**AMGEN'S INITIAL DISCLOSURE OF ASSERTED CLAIMS
AND INFRINGEMENT CONTENTIONS**

Pursuant to Paragraph 3 of the Scheduling Order in this case (D.I. 33), Plaintiffs Amgen Inc. and Amgen Manufacturing, Limited (collectively, "Amgen"), by and through their undersigned attorneys, hereby submit their Initial Disclosure of Asserted Claims and Infringement Contentions to Defendants Hospira, Inc. and Pfizer Inc. (collectively, "Pfizer") with respect to U.S. Patent No. 8,273,707 (the "'707 Patent").

This is a case arising under the Biologics Price Competition and Innovation Act of 2009 ("BPCIA"). Discovery is ongoing in this case. Before this action was filed, Pfizer notified Amgen that FDA had accepted its abbreviated Biologics License Application (the "Pfizer aBLA") for its PEG-FILGRASTIM BIOSIMILAR (henceforth referred to by its brand name "NYVEPRIA™") for which Amgen's innovative NEULASTA® product is the reference product. On August 15, 2019 and allegedly under 42 U.S.C. § 262(*l*)(2)(A), Pfizer produced black-and-white tiff images of its aBLA submission without usable hyperlinks. On September 4, 2019, Amgen further notified Pfizer that fewer documents were provided to Amgen (938) than were listed on "FDA's Acknowledgement of Submission" (1134). After a meet-and-confer on September 9, 2019, Pfizer indicated that it would provide additional documents that it

characterized as "additional file types that are merely artifacts of submission [to the FDA] from [Pfizer's] prior [computer] system." *See* Sept. 17, 2019 Email from C. Fundakowski to J. Wu. Pfizer also stated that "[a]s we indicated during our call on August 26, 2019, Pfizer's aBLA production includes fields and metadata that would allow Amgen to readily review the aBLA in a standard document review database." *Id.*

Despite Pfizer's untimely and deficient disclosure of its aBLA, on October 14, 2019, Amgen identified, "[p]ursuant to 42 U.S.C. § 262(*l*)(3)(A) and 35 U.S.C. § 271(e)(2)(C)," the '707 Patent "for which Amgen believes a claim of patent infringement could reasonably be asserted with respect to the making, using, offering to sell, selling, or importing into the United States of the biological product that is the subject of [the Pfizer Pegfilgrastim] aBLA." Oct. 14, 2019 Letter from J. Wu to J. Wong. Amgen also indicated that it is prepared to license the '707 Patent. *Id.* On October 30, 2019, Pfizer served its statement under 42 U.S.C. § 262(*l*)(3)(B). Amgen then served its statement under 42 U.S.C. § 262(*l*)(3)(C) on December 27, 2019. On January 13, 2020, the parties engaged in a good-faith negotiation under 42 U.S.C. § 262(*l*)(4)(A) and agreed that the '707 Patent would be the subject of an action for patent infringement pursuant to 42 U.S.C. § 262(*l*)(5). On February 11, 2020, Amgen filed this action pursuant to 42 U.S.C. § 262(*l*)(6).

Amgen's disclosures herein, including the identification of the '707 Patent and the asserted claims of the '707 Patent, are based solely on the information provided by Pfizer to date. These disclosures are subject to revisions based on additional information that Pfizer provides, including about its manufacturing process. Pfizer has an obligation to update Amgen if and when its manufacturing process changes in any way, particularly as Amgen is relying on such information to be current and accurate. Should Pfizer's representations prove to be inaccurate,

incomplete or should its manufacturing process change in any way, Amgen reserves the right to supplement and amend these disclosures with respect to any additional patents Amgen chooses to assert as discovery proceeds, including the right to assert additional claims, and to identify additional products, processes, and instrumentalities believed to infringe any such additional patents. Moreover, Amgen, respectfully reserves the right to supplement and amend these disclosures as discovery progresses, including the right to assert additional claims, and to identify additional products, processes, and instrumentalities believed to infringe the '707 Patent. Furthermore, to the extent the identification of asserted claims and Amgen's infringement contentions relating to those claims depend on Pfizer's proposed claim constructions and/or the Court's future opinion and/or Order on claim construction in this action, Amgen respectfully reserves the right to seek leave to amend and/or supplement these contentions after any constructions are proposed by Pfizer and/or after any claim construction ruling by the Court.

## I.    Pfizer's Pegfilgrastim Biosimilar Product

The biologic product described by Pfizer's aBLA, NYVEPRIA™ is an approved biosimilar to Amgen's NEULASTA® (pegfilgrastim) product. The Pfizer aBLA sought approval of NYVEPRIA™ to decrease the incidence of infection, as manifested by febrile neutropenia, in patients with nonmyleoid malignancies receiving myelosuppressive anti-cancer drugs associated with a clinically significant incidence of febrile neutropenia. NYVEPRIA™ Label dated June 2020 at 1. FDA approved NYVEPRIA™ on June 10, 2020.

The active ingredient of NYVEPRIA™ is filgrastim that is pegylated. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████™. *See, e.g.*, aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000032. The filgrastim used to manufacture NYVEPRIA™

3

is █████████████████████████████████████████

██████████████████████████████████████. *See, e.g.*, *id.* at

PFI00000008-9. ████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████™. *See, e.g. id.*, at

PFI00000006.

## II.   U.S. Patent No. 8,273,707

Pfizer manufactures NYVEPRIA™ by a method that infringes asserted claims 1, 2, 4, 8,

10, and 11 of the '707 Patent.  With respect to 35 U.S.C. § 271(e)(2)(C)(i), Pfizer has committed

an act of patent infringement by submitting its subsection (k) application—the Pfizer aBLA—to

FDA seeking approval to engage in the commercial manufacture, use, sale, offer for sale, and/or

importation of NYVEPRIA™ before the expiration of the '707 Patent, which is a patent

identified by Amgen pursuant to 42 U.S.C. § 262(*l*)(3)(A)(i) during the parties' exchanges.  *See,*

*e.g.*, Complaint ¶¶ 56-66 [D.I. 1].  After the filing of Amgen's Complaint, Pfizer received FDA

approval for the Pfizer aBLA for NYVEPRIA™.  *See* FDA's BLA Approval Letter for

NYVEPRIA™ dated June 10, 2020

(https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/761111Orig1s000ltr.pdf).

Assuming that Pfizer launches NYVEPRIA™ in the future, Amgen intends to amend its

Complaint to allege infringement under 35 U.S.C. § 271(g) and seek damages under 35 U.S.C.

§ 284.  The period for damages based on Pfizer's infringement of the '707 Patent under

§ 271(e)(2)(C)(i) and § 271(e)(4)(C) starts on or about June 10, 2019, when Pfizer submitted its

aBLA for NYVEPRIA™ or alternatively on or about June 10, 2020 upon FDA approval of

NYVEPRIA™.  The damages period ends with the expiration of the '707 Patent on September

14, 2024; or, if before the expiration of the '707 Patent, the date upon which Pfizer discontinues

marketing NYVEPRIA™.  Damages for Pfizer's infringement of the '707 Patent under § 271(g)

and § 284 would start on or about June 10, 2020 with the first commercial sale, offer for sale, use, or importation into the United States, of NYVEPRIA™, and the damages period would end with the expiration of the '707 Patent on September 14, 2024; or, if before the expiration of the '707 Patent, the date upon which Pfizer discontinues marketing NYVEPRIA™.

Appendix A identifies on an element-by-element basis how each asserted claim of the '707 Patent is practiced by Pfizer's process for making NYVEPRIA™ as described in the Pfizer aBLA. Each element of each asserted claim is either literally present in the process for making NYVEPRIA™, or present under the doctrine of equivalents because the substitute element matches the function, way, and result of the claimed element, or the difference is insubstantial.

The asserted claims of the '707 Patent are entitled to a priority date of at least January 30, 2004.

## III.    Document Production

Amgen identifies below, if applicable, production numbers of the documents that correspond to each category set forth in Paragraph 4 of the Scheduling Order. Amgen's production of a document as required by Paragraph 4 shall not constitute an admission that such document evidences or is prior art under 35 U.S.C. § 102.

(a) Documents (e.g., contracts, purchase orders, invoices, advertisements, marketing materials, offer letters, beta site testing agreements, and third party or joint development agreements) sufficient to evidence each discussion with, disclosure to, or other manner of providing to a third party, or sale of or offer to sell, or any public use of, the claimed invention prior to the date of application for the asserted patent(s): Not applicable;

(b) All documents evidencing the conception, reduction to practice, design, and development of each claimed invention, which were created on or before the date of application

for the asserted patent(s) or the priority date identified pursuant to paragraph 3(f) of this Order, whichever is earlier: AMGPFIZPEG00000066-2427, AMGPFIZPEG00002926-8722;

(c) A copy of the file history for each asserted patent: AMGPFIZPEG00002428-41, AMGPFIZ00002448-2925;

(d) All documents evidencing ownership of the patent rights by the party asserting patent infringement: AMGPFIZPEG00002442-47;

(e) If a party identifies instrumentalities pursuant to paragraph 3(g) of this Order, documents sufficient to show the operation of any aspects or elements of such instrumentalities the patent claimant relies upon as embodying any asserted claims: Not applicable;

(f) All agreements, including licenses, transferring an interest in any asserted patent: AMGPFIZPEG00000001-65;

(g) All agreements that the party asserting infringement contends are comparable to a license that would result from a hypothetical reasonable royalty negotiation: Not applicable;

(h) All agreements that otherwise may be used to support the party asserting infringement's damages case: Not applicable;

(i) If a party identifies instrumentalities pursuant to paragraph 3(g) of this Order, documents sufficient to show marking of such embodying accused instrumentalities; and if the party wants to preserve the right to recover lost profits based on such products, the sales, revenues, costs, and profits of such embodying accused instrumentalities: Not applicable, and

(j) All documents comprising or reflecting a F/RAND commitment or agreement with respect to the asserted patent(s): Not applicable.

*Of Counsel:*

Nicholas Groombridge
Jennifer H. Wu
Jennifer Gordon
Peter Sandel
Naz E. Wehrli
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000

Wendy A. Whiteford
Kimberlin L. Morley
Eric Agovino
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320-1789
(805) 447-1000

Dated: September 11, 2020

*/s/ Katharine L. Mowery*
Robert W. Whetzel (#2288)
Katharine Lester Mowery (#5629)
Tyler E. Cragg (#6398)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7634
whetzel@rlf.com
mowery@rlf.com
cragg@rlf.com

*Attorneys for Amgen Inc. and Amgen
Manufacturing, Limited*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 11, 2020, a true and correct copy of the

foregoing document was caused to be served on the following counsel as indicated:

<u>**VIA ELECTRONIC MAIL:**</u>

Dominick Gattuso
Heyman Enerio Gattuso & Hirzel LLP
300 Delaware Avenue
Suite 200
Wilmington, DE  19801
302-472-7311
dgattuso@hegh.law

<u>**VIA ELECTRONIC MAIL:**</u>

Charles B. Klein
Jovial Wong
Claire A. Fundakowski
Winston & Strawn LLP
1700 K Street, N.W.
Washington DC 20006
202-282-5000
cklein@winston.com
jwong@winston.com
cfundakowski@winston.com

Alison M. Heydorn
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
312-558-5600
aheydorn@winston.com

*/s/ Katharine L. Mowery*
Katharine L. Mowery (#5629)

8

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO THE PROTECTIVE ORDER

# Appendix A:

# Infringement of U.S. Patent No. 8,273,707

**CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

| Element | Claim Language | Pfizer's Infringement |
|---|---|---|
| Claim 1 | | |
| 1-A | A process for purifying a protein on a hydrophobic interaction chromatography column | **The accused process, Pfizer's process for purifying the Filgrastim Intermediate used to produce its Pegfilgrastim Product, includes the use of a hydrophobic interaction chromatography column.**<br><br>██████████████████████<br>████████████████████████<br>██████████████████████<br>███████████████████████<br>█████████████████████<br>███████████████████████s." *See, e.g.*, Pfizer aBLA Module 3.2.S.2.6 Manufacturing Process Development, PFI00003924-3966, at PFI00003948. ██████<br>██████████████████████████<br>███████████." *See, e.g.*, Pfizer aBLA S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI-00000032. ███████████<br>████████████████████████<br>████████████████████. This process thus meets the '707 Patent's definition of a HIC column. *See, e.g.*, '707 Patent at col. 3:53-61.[1] |
| 1-B | such that the dynamic capacity of the column is increased for the protein comprising | **Upon information and belief, the accused process uses a combination of salts with** ███████████ ██████<br>██████ |

---

[1] Pfizer's pegylated filgrastim product is not materially different from filgrastim for purposes of determining infringement under 35 U.S.C. § 271(g).

**CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|----------------------|
| | | ████████████████████████████ ████████<br><br>In the step preceding the HIC chromatography in Pfizer's process, the Filgrastim Intermediate protein used to manufacture the Pfizer Pegfilgrastim Product ████████████ ████████████████████. *See, e.g.,* Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000031. ████████████ ████████████████████████████████████ ████████████████████████. *Id.* at PFI00000029. ███ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████. *Id.* at PFI00000032. ████████████ ████████████████████████████████████ ████████████████████████████████ ██ *See, e.g.,* MBR-24357: Manufacturing Instructions and Batch Record for PFH Filgrastim Intermediate – Refold Batch records, PFI00007466-7793 at PFI00007594, PFI00007639. ████ ████████████████████████████████████. *See, e.g.,* Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000032 and PFI00000035. ████████████████████████ ████████████. *Id.*<br><br>The inventors of the '707 Patent showed that "combining two different salts having different lyotropic values with a protein preparation" increases the dynamic binding capacity of the column for the protein "compared with higher salt concentrations of each single |

**CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|------------------------|
| | | salt." *See* '707 Patent at col. 4:46-51.  As stated in the '707 Patent, "'lyotropic' refers to the influence of different salts on hydrophobic interactions, more specifically the degree to which an anion increases the salting[-]out effect on proteins, or for cations, increases the salting-in effect on proteins according to the Hofmeister series." *Id.* at col. 4:33-42.  For anions, the Hofmeister series in order of decreasing salting-out effect is:  $PO_4^{3-} > SO_4^{2-} > CH_3COO^- > Cl^- > Br^- > NO_3^- > ClO_4^- > I^- > SCN^-$.  *Id.* at col. 4:42-46, 5:5-10.  <br><br> ███████████████████████████████████, ████████████████ ████ ████████████████████ ████████████████████████████████████████ "acts together to increase the dynamic capacity of the HIC column for a particular protein," in this case, Filgrastim Intermediate.  *See id.* at col. 5:25-33; *see also id.* at 10:15 (identifying granulocyte-macrophage colony stimulating factor (also known as filgrastim) as a protein capable of purification by the methods claimed in the '707 Patent). |
| 1-C | mixing a preparation containing the protein with a combination of a first salt and a second salt, | **In the accused process,** ████████████████████████ ████████████████████████████████████ ████████████ ████████████████████████. <br><br> ████████████████████████ ████████████████████████████, ████████████████████████. *See supra* Claim 1-B.  Pfizer █████████████████████ ████████████████████████████ ████████████████"—████████████████████ ████████████. ████████████████" |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---|---|---|
|  |  | to herein as element 1-F of claim 1 of the '707 Patent. *See, e.g.*, Pfizer Pegfilgrastim aBLA Module 3.2.S.2.2 (PFI00000001-58) at PFI00000032; Batch Record MBR-24357 (PFI00007466-7793) at PFI00007608. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Pfizer Pegfilgrastim aBLA Module 3.2.S.2.2 (PFI00000001-58) at PFI00000032; Batch Record MBR-24357 (PFI00007466-7793) at PFI00007645-50. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The specification of the '707 Patent states that the purification method of the invention "applies to protein preparations at any stage of purification." *See* '707 Patent, col. 7:13-19. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ <br><br> Pfizer incorrectly argues that it uses the same or a similar combination of salts as the Holtz prior art reference distinguished by Amgen during the prosecution of the '707 Patent.  Unlike the accused Pfizer accused process, Holtz mixed its preparation containing the IGF-1 protein with a solution of sodium chloride, sodium acetate, sodium phosphate, and ammonium sulfate to prepare it for loading onto a HIC column.  That solution of sodium chloride, sodium acetate, sodium |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|----------------------|
| | | phosphate, and ammonium sulfate is not "a combination of a first and second salt, . . . wherein the first and second salts are selected from the group consisting of citrate and sulfate, citrate and acetate, and sulfate and acetate, respectively." Thus, the Holtz process does not meet the claim limitation and the Pfizer process does.<br><br>Further, Pfizer incorrectly argues disclaimer based on Amgen's statement during the prosecution of the '707 Patent's parent, U.S. Patent No. 7,781,395 (the "'395 Patent") that "more than two salts are used in the protein solutions for every HIC column described in Holtz." '395 Patent FH, July 14, 2008 Response to Office Action, at 8. Pfizer misreads the claim and the prosecution history. Amgen distinguished Holtz, *inter alia*, based on what components Holtz added to prepare the solution for the HIC column. Amgen did not distinguish Holtz based on what other components may be present in the solution from preceding purification steps. |
| 1-D | loading the mixture onto a hydrophobic interaction chromatography column, and | ████████████████████████████████<br>████████████████████████████████████<br>██████████████████████, ███████████████<br><br>████████████████████████████<br>████████████████████████████████████████ *See supra* Claim 1-A; Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000032 and PFI00000035; Batch Record MBR-24357 (PFI00007466-7793) at PFI00007594, PFI00007632-7705. |
| 1-E | eluting the protein, | ████████████████████████████████<br>████████████████████████████████████ |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---|---|---|
| | | ▮▮▮▮▮▮▮. ▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮. *See, e.g.*, Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000032 and PFI00000035. ▮▮▮▮ ▮▮▮▮▮▮. *Id.* ▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. *See, e.g.*, Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000032. ▮▮hat▮▮▮▮ ▮▮▮▮▮▮. *See* MBR-24357: Manufacturing Instructions and Batch Record for PFH Filgrastim Intermediate – Refold Batch records, PFI00007466-7793 at PFI00007739. ▮▮▮▮▮▮▮▮. *Id.* |
| 1-F | wherein the first and second salts are selected from the group consisting of citrate and sulfate, | As discussed above, Pfizer's process uses a first and second salt comprising ▮▮▮▮▮▮. *See supra* Claim 1-C. |

**CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|------------------------|
| | citrate and acetate, and sulfate and acetate, respectively, | |
| 1-G | and wherein the concentration of each of the first salt and the second salt in the mixture is between about 0.1 M and about 1.0. | ████████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████. <br><br> ██████████████████████████ ██████████████████████████ █████████████████████████████ ███████████████████████████ ████████████████████████████ ████████████████████████ ██████████████████████████) █ ███████████████████████████████ ████████████████████ <br><br> ██████████████████████████ ████████ The '707 Patent teaches that "[t]he present invention can be used with any type of HIC stationary phase" and "is directed to all types of proteins," particularly "for purifying protein-based drugs, also known as biologics." *Id.*, col. 6:19-37, 7:55-58.  Moreover, "[t]he appropriate concentrations of the salts are determined for a particular protein" and a person of ordinary skill in the art would understand that hydrophobicity of both the protein and HIC stationary phase will influence the salt concentrations to use.  *See id.*, col. 5:35-58.  A person of ordinary skill in the art also would understand that, generally, the more hydrophobic the protein and/or the HIC matrix, the lower the |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|----------------------|
| | | concentration of salts necessary for increasing the dynamic capacity of the HIC column for the protein in the claimed invention.  Filgrastim is a relatively hydrophobic protein and ██████████████████ is a relatively hydrophobic HIC stationary phase. ████████████ ██████████████████████ ████████████████████████████ ██████████████████████ ████████████████████████████ ████████████████████ ██████████████████████████ ████████████████████ ████████████████████████████ ██████████████████████████ ████████████████ <br><br>            Pfizer incorrectly argues that doctrine of prosecution history estoppel bars Amgen from asserting infringement of this claim limitation under the doctrine of equivalents.  This is incorrect because Amgen did not make a clear and unmistakable surrender of a combination of ███████████ ████████████.  Also, any such argument by Pfizer does not apply to Amgen's literal infringement claim. <br><br>            Further, Pfizer incorrectly argues that Amgen dedicated the use of concentrations lower than those claimed, including ████ █████████████████████, to the public because the '707 Patent specification discloses the use of "0.024 M phosphate buffer."  Amgen never identified unclaimed subject matter as an alternative to a claim limitation as required by the dedication-disclosure doctrine. <br><br>            In the event that Pfizer argues that Amgen cannot assert infringement under the doctrine of equivalents here because doing so |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|----------------------|
|  |  | would vitiate the claim element "wherein the concentration of each of the first salt and the second salt in the mixture is between about 0.1 M and about 1.0 [M]," this is incorrect.  As discussed above, to the extent that Pfizer's use of ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮ to increase the dynamic capacity of the HIC column for filgrastim protein is not literally within the scope of the claims, it is insubstantially different from the claimed range in its ability to increase the dynamic capacity of Pfizer's HIC column.  That is, in the context of this invention, the concentration of the ▮▮▮▮ and ▮▮▮▮ salt combination used in Pfizer's process (even if numerically below the claimed range) increases the dynamic capacity of Pfizer's HIC column for the filgrastim protein.  It therefore functions in the same way to achieve the same result with respect to Pfizer's HIC column and the filgrastim protein as a combination of those salts at concentrations numerically within the claimed range would and it is insubstantially different than the claimed range. |
| Claim 2 |  |  |
| 2-A | The process of claim 1, | *See supra* Claim 1. |
| 2-B | wherein the pH of the mixture loaded onto the column is between about pH 5 and about pH 7. | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ *See, e.g.*, Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000035. |
| Claim 4 |  |  |
| 4-A | The process of claim 1 | *See supra* Claim 1. |

**CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

| Element | Claim Language | Pfizer's Infringement |
|---|---|---|
| | | |
| 4-B | wherein the first and second salts are selected from the group consisting of sodium, potassium and ammonium salts. | **Pfizer uses** ███████████ **and** ███████████ **as its first and second salts.**<br><br>In Pfizer's process, the first and second salts are ████████ ████ *See supra* Claim 1-B.  To prepare its ████████████ <br>█████████████████████████ <br>█████████████████████████ <br>█████████████████████████ <br>████" *See, e.g.,* Pfizer Pegfilgrastim aBLA Module 3.2.S.2.2 (PFI00000001-58) at PFI00000032 |
| Claim 8 | | |
| 8-A | The process of claim 1, | *See supra* Claim 1. |
| 8-B | further comprising formulating the protein. | **Pfizer formulates its Filgrastim Intermediate in polysorbate solution before adding PEG to the protein.**<br><br>In Pfizer's process, its Filgrastim Intermediate ████████ <br>████████████████████████ <br>███████████████████████████ <br>██████████████████████. *See, e.g.,* Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000043. |
| Claim 10 | | |
| 10-A | A method of increasing the dynamic capacity of a hydrophobic interaction chromatography column for a protein, | **Pfizer's process for purifying the Filgrastim Intermediate used to produce its Pegfilgrastim Product includes the use of a hydrophobic interaction chromatography step.  Upon information and belief, Pfizer's use of a combination of salts with anions,** ████ |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|------------------------|
|         |                | ██████████ ██████████████ **that have different lyotropic values and increases the dynamic capacity of the HIC column for the Filgrastim Intermediate.** <br><br> Pfizer's process uses a HIC column ████████████████ ██████████████████████████████████." *See, e.g.*, Pfizer aBLA Module 3.2.S.2.6 Manufacturing Process Development, PFI00003924-3966, at PFI00003948.  Pfizer's process ████████████████████████████████████ ████████████████████████ *See, e.g.*, Pfizer aBLA S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI-00000032. ████████████████████████ ████████████████████████████████████ ████████████████████████████████. This process thus meets the '707 Patent's definition of a HIC column.  *See, e.g.*, '707 Patent at col. 3:53-61. <br><br> In the step preceding the HIC chromatography in Pfizer's process, ████████████████████████████████ ████████████████████████████████. *See, e.g.*, Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000031. ████████████ ████████████████████████████████████ *Id.* at PFI00000029. ████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████ *Id.* at PFI00000032. ████████ ████████████████████████████████████ ████████████████████████████ ████████████████████████████████ |

**CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|------------------------|
| | | ▮ *See, e.g.*, MBR-24357: Manufacturing Instructions and Batch Record for PFH Filgrastim Intermediate – Refold Batch records, PFI00007466-7793 at PFI00007594, PFI00007639. ▮▮▮ ▮▮▮. *See, e.g.*, Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000032 and PFI00000035. ▮▮▮ ▮▮▮ *Id.* |
| | | The inventors of the '707 Patent showed that "combining two different salts having different lyotropic values with a protein preparation" increases the dynamic binding capacity of the column for the protein "compared with higher salt concentrations of each single salt." *See* '707 Patent at col. 4:46-51.  As stated in the '707 Patent, "'lyotropic' refers to the influence of different salts on hydrophobic interactions, more specifically the degree to which an anion increases the salting[-]out effect on proteins, or for cations, increases the salting-in effect on proteins according to the Hofmeister series." *Id.* at col. 4:33-42.  For anions, the Hofmeister series in order of decreasing salting-out effect is:  $PO_4^{3-} > SO_4^{2-} > CH_3COO^- > Cl^- > Br^- > NO_3^- > ClO_4^- > I^- > SCN^-$.  *Id.* at col. 4:42-46, 5:5-10. |
| | | ▮▮▮ ▮▮▮ ▮▮▮, ▮▮▮ "acts together to increase the dynamic capacity of the HIC column for a particular protein," in this case, Filgrastim Intermediate.  *See id.* at col. 5:25-33; *see also id.* at 10:15 (identifying granulocyte-macrophage colony |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|---------------|----------------------|
| | | stimulating factor (also known as filgrastim) as a protein capable of purification by the methods claimed in the '707 Patent). |
| 10-B | comprising mixing a preparation containing the protein with a combination of a first salt and a second salt, and | ██████████████████████ ██████████████████████ ████████████████. ██████████████████████ █████████████████████. *See supra* Claim 10-A. ████████ ██████████████████████ ██████████████████████ ██████████████████████ █████████████████ as claimed in the element referred to herein as element 10-D of claim 10 of the '707 Patent.  *See, e.g.*, Pfizer Pegfilgrastim aBLA Module 3.2.S.2.2 (PFI00000001-58) at PFI00000032; Batch Record MBR-24357 (PFI00007466-7793) at PFI00007608.  According to Pfizer's Pegfilgrastim aBLA, ████ ██████████████████████ ██████████████████████ ████" *See, e.g.*, Pfizer Pegfilgrastim aBLA Module 3.2.S.2.2 (PFI00000001-58) at PFI00000032; Batch Record MBR-24357 (PFI00007466-7793) at PFI00007645-50.  Thus, the first salt and second salt consist of ████████████, as recited in the claim. ██████████████████████ ██████████████████████ ██████████████The |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|------------------------|
| | | specification of the '707 Patent states that the purification method of the invention "applies to protein preparations at any stage of purification." *See* '707 Patent, col. 7:13-19. ███████████████████ ████████████████████████████████ ███████████████████████████████ ██████████████████████████ ████████████████████████████████ ██████████████████████████████ ████████████████████<br><br>    Pfizer incorrectly argues that it uses the same or a similar combination of salts as the Holtz prior art reference distinguished by Amgen during the prosecution of the '707 Patent.  Unlike the accused Pfizer accused process, Holtz mixed its preparation containing the IGF-1 protein with a solution of sodium chloride, sodium acetate, sodium phosphate, and ammonium sulfate to prepare it for loading onto a HIC column.  That solution of sodium chloride, sodium acetate, sodium phosphate, and ammonium sulfate is not "a combination of a first and second salt, . . . wherein the first and second salts are selected from the group consisting of citrate and sulfate, citrate and acetate, and sulfate and acetate, respectively."  Thus, the Holtz process does not meet the claim limitation and the Pfizer process does.<br><br>    Further, Pfizer incorrectly argues disclaimer based on Amgen's statement during the prosecution of the '707 Patent's parent, U.S. Patent No. 7,781,395 (the "'395 Patent") that "more than two salts are used in the protein solutions for every HIC column described in Holtz."  '395 Patent FH, July 14, 2008 Response to Office Action, at 8.  Pfizer misreads the claim and the prosecution history.  Amgen distinguished Holtz, *inter alia*, based on what components Holtz added to prepare the solution for the HIC column.  Amgen did not distinguish Holtz based on |

**CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|------------------------|
| | | what other components may be present in the solution from preceding purification steps. |
| 10-C | loading the mixture onto a hydrophobic interaction chromatography column, | ████████████████████████████ ████████████ ████████████ ███████, █████████████ ████████████████ . *See supra* Claim 10-A; Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000032; Batch Record MBR-24357 (PFI00007466-7793) at PFI00007594, PFI00007632-7705. |
| 10-D | wherein the first and second salts are selected from the group consisting of citrate and sulfate, citrate and acetate and sulfate and acetate, respectively, and | As discussed above, Pfizer's process uses a first and second salt comprising████████. *See supra* Claim 10-B. |
| 10-E | wherein the concentration of each of the first and second salts in the mixture is between about 0.1 M and about 1.0 M. | ████████████████████████████ ████████████████████ ████████ ████████ ████████ ██████ . ████████████████ ████████████████ ██████████████ ████████████████ ████████████████ ████████████████ ████████████ |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|----------------------|
|         |                | ███████████████████████████████<br>███████████████<br><br>███████████████████<br>█████████ The '707 Patent teaches that "[t]he present invention can be used with any type of HIC stationary phase" and "is directed to all types of proteins," particularly "for purifying protein-based drugs, also known as biologics." *Id.*, col. 6:19-37, 7:55-58.  Moreover, "[t]he appropriate concentrations of the salts are determined for a particular protein" and a person of ordinary skill in the art would understand that hydrophobicity of both the protein and HIC stationary phase will influence the salt concentrations to use.  *See id.*, col. 5:35-58.  A person of ordinary skill in the art also would understand that, generally, the more hydrophobic the protein and/or the HIC matrix, the lower the concentration of salts necessary for increasing the dynamic capacity of the HIC column for the protein in the claimed invention.  Filgrastim is a relatively hydrophobic protein and ███████████████ is a relatively hydrophobic HIC stationary phase.  ██████████<br>████████████████████<br>███████████████████████<br>███████████████████████<br>█████████████████████<br>████████████████████████<br>███████████████████████<br>████████████████████████<br>███████████████████████<br>████████████████<br><br>    Pfizer incorrectly argues that doctrine of prosecution history estoppel bars Amgen from asserting infringement of this claim |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|----------------|------------------------|
|  |  | limitation under the doctrine of equivalents.  This is incorrect because Amgen did not make a clear and unmistakable surrender of a combination of ███████ ███████.  Also, any such argument by Pfizer does not apply to Amgen's literal infringement claim.<br><br>Further, Pfizer incorrectly argues that Amgen dedicated the use of concentrations lower than those claimed, ███████ ███████, to the public because the '707 Patent specification discloses the use of "0.024 M phosphate buffer."  Amgen never identified unclaimed subject matter as an alternative to a claim limitation as required by the dedication-disclosure doctrine.<br><br>In the event that Pfizer argues that Amgen cannot assert infringement under the doctrine of equivalents here because doing so would vitiate the claim element "wherein the concentration of each of the first salt and the second salt in the mixture is between about 0.1 M and about 1.0 [M]," this is incorrect.  As discussed above, to the extent that Pfizer's use of ███████ ███████ ███████ to increase the dynamic capacity of the HIC column for filgrastim protein is not literally within the scope of the claims, it is insubstantially different from the claimed range in its ability to increase the dynamic capacity of Pfizer's HIC column.  That is, in the context of this invention, the concentration of the ███████ and ███████ salt combination used in Pfizer's process (even if numerically below the claimed range) increases the dynamic capacity of Pfizer's HIC column for the filgrastim protein.  It therefore functions in the same way to achieve the same result with respect to Pfizer's HIC column and the filgrastim protein as a combination of those salts at concentrations numerically within the claimed range would and it is insubstantially different than the claimed range. |
| Claim 11 |  |  |

CONTAINS DEFENDANTS' CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

| Element | Claim Language | Pfizer's Infringement |
|---------|---------------|----------------------|
| 11-A | The process of claim 10 | *See supra* Claim 10. |
| 11-B | wherein the pH of the mixture loaded onto the column is between about pH 5 and about pH 7. | ███████████████████████ ████████████████████████ ████████████. <br><br> ████████████████████████ ████████████████████████████, which is between pH 5 and pH 7.  *See, e.g.*, Pfizer aBLA Module S.2.2 Description of Manufacturing Process and Process Controls, PFI00000001-58, at PFI00000035. |

EXHIBIT 3

1

2

3

4

5

6

7

8

9 UNITED STATES DISTRICT COURT

10 NORTHERN DISTRICT OF CALIFORNIA

11 SAN JOSE DIVISION

12 PAR PHARMACEUTICAL, INC., and HANDA )     Case No.:     13-CV-01927-LHK
PHARMACEUTICALS, LLC, )

13         )     Consolidated and Related Cases:
              Plaintiffs-Counterdefendants, )             13-CV-02416-LHK

14         )             13-CV-02420-LHK
       v. )

15         )     ORDER CONSTRUING DISPUTED
TAKEDA PHARMACEUTICAL CO., LTD., )     CLAIM TERMS OF U.S. PATENT NOS.

16 TAKEDA PHARMACEUTICALS NORTH )     8,461,187 AND 8,173,158
AMERICA, INC., TAKEDA )

17 PHARMACEUTCALS AMERICA, INC., and )
TAKEDA PHARMACEUTICALS U.S.A. INC., )

18         )
              Defendants-Counterclaimants. )

19

20       These related cases involve patent infringement claims by the Takeda parties against several

21 pharmaceutical companies who filed Abbreviated New Drug Applications under the Hatch-

22 Waxman Act for generic forms of the branded drug Dexilant®. The parties now seek construction

23 of six disputed terms in the claims of the two asserted patents: U.S. Patent Nos. 8,461,187 (the

24 "'187 Patent") and 8,173,158 (the "'158 Patent"). The Court held a technology tutorial and claim

25 construction hearing on June 5, 2014. The Court has reviewed the claims, specifications, and other

26 relevant evidence, and has considered the briefing and arguments of the parties. The Court now

27 construes the terms at issue.

28

United States District Court
For the Northern District of California

1    **I.    BACKGROUND**

2         **A.    The Drug and Asserted Patents**

3         Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda

4    Pharmaceuticals America, Inc., and Takeda Pharmaceuticals U.S.A. Inc. (collectively, "Takeda")

5    manufacture and sell Dexilant®, a drug for treatment of gastroesophageal reflux disease ("GERD")

6    or acid reflux disease.  *See* First Am. Answer and Counterclaims (ECF No. 32[1]) at 15 ¶¶ 18-19.

7    The active ingredient in Dexilant® is dexlansoprazole, which belongs to the class of compounds

8    known as protein pump inhibitors, or "PPIs."  Dexilant® is designed to release dexlansoprazole in

9    two stages, based on different acidity levels in the human intestine, to provide overnight relief from

10   acid reflux.  *See id.*  Takeda owns patents relating to Dexilant® that are listed in the U.S. Food and

11   Drug Administration's Approved Drug Products with Therapeutic Equivalence Evaluations (the

12   "Orange Book").  *Id.* at 14-15.  Takeda asserts two Orange Book patents in these lawsuits.

13        The '187 Patent is entitled "Multiple PPI Dosage Form" and is directed to pharmaceutical

14   dosage forms containing a first and second dose of a PPI, as well as methods of administering those

15   dosage forms.  According to the '187 Patent, "PPIs rapidly degrade in acidic environments and

16   therefore, dosage forms containing PPIs generally are designed to protect the PPI from the acidic

17   environment of the stomach."  '187 Patent col.1 ll.21-24.  The inventors claim to have discovered

18   that combining two doses in a single dosage form taken in the morning can prevent symptoms at

19   night: "Moreover, the first and the second dose can be administered in a single oral dosage form

20   that can be taken once a day to alleviate nocturnal breakthrough events."  *Id.* col.2 ll.19-21.  The

21   '187 Patent issued on June 11, 2013 and claims priority to a provisional application filed on June

22   16, 2004.

23        The '158 Patent is entitled "Methods of Treating Gastrointestinal Disorders Independent of

24   the Intake of Food" and is directed to methods of "treating heartburn, acid reflux or

25   gastroesophageal reflux disease in a patient" by administering a "pharmaceutical composition"

26   with two types of solid particles.  '158 Patent cl.1.  The '158 Patent notes the preexisting problem

27   that giving patients PPIs (such as dexlansoprazole) together with food can reduce the drugs'

28   _____

[1]      All ECF entries correspond to Case No. 13-CV-1927 unless otherwise stated.

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

1    effectiveness: "the administration of such PPIs in conjunction with the intake of food decreases the

2    systemic exposure of the PPI." *Id.* col.10 ll.7-9. To address this problem, the inventors discuss use

3    of a pharmaceutical composition that "comprises at least two solid particles each of which contain

4    at least one proton pump inhibitor," which permits administration "independent of the intake of

5    food." *Id.* col.1 ll.15-20. The '158 Patent issued on May 8, 2012 and claims priority to a

6    provisional application filed on October 12, 2007.

7        **B.      Procedural History**

8        This litigation involves four separate cases filed by Takeda and several generic

9    pharmaceutical companies. Par Pharmaceutical, Inc. ("Par"), Handa Pharmaceuticals, LLC

10   ("Handa"), Impax Laboratories, Inc. ("Impax"), Sandoz Inc., ("Sandoz"), and TWi Pharma-

11   ceuticals, Inc. ("TWi") (collectively, "Defendants") have pursued Abbreviated New Drug

12   Applications ("ANDAs") with the U.S. Food and Drug Administration ("FDA"), seeking to market

13   generic forms of Dexilant®. *See generally Caraco Pharm. Labs., Ltd. v. Forest Labs., Ltd.*, 527

14   F.3d 1278, 1282-86 (Fed. Cir. 2008) (explaining ANDA procedures and patent infringement claims

15   under the Hatch-Waxman Act). Certain Defendants submitted certifications pursuant to 21 U.S.C.

16   § 355(j)(2)(A)(vii)(IV) ("Paragraph IV Certifications"), alleging that the '158 Patent is invalid,

17   unenforceable, and/or not infringed. *See, e.g.*, Compl. (ECF No. 1) ¶ 28. Takeda subsequently

18   listed the '187 Patent in the Orange Book for Dexilant® and asserted it in these cases against

19   Defendants. *See, e.g.*, First Am. Answer and Counterclaims at 15 ¶ 21.

20       On April 26, 2013, Par and Handa sued Takeda (Case No. 13-CV-1927) seeking

21   declaratory judgments under 21 U.S.C. § 355(j)(5)(C) that certain claims of the '158 Patent are

22   invalid and not infringed.[2] *See* Compl. In response, Takeda asserted counterclaims against Par and

23   Handa for infringement of the '158 and '187 Patents. *See* First Am. Answer and Counterclaims.

24   On May 29, 2013, Takeda filed three suits against Impax, Sandoz, and TWi (Case Nos. 13-CV-

25   02416, -02418, and -02420), requesting judgment that each Defendant infringes both asserted

26

27   ────────────────

28   [2]       Par and Handa also sought declaratory judgment that claims of U.S. Patent No. 8,105,626
     are invalid, but all claims involving that patent have been dismissed. *See* ECF No. 46.

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

**United States District Court**
For the Northern District of California

1    patents.  On July 9, 2013, the Court related these four cases.  *See* ECF Nos. 29, 56.[3]  Takeda and

2    Sandoz have since settled their respective claims.  *See* Order, *Takeda Pharms. Co. v. Sandoz, Inc.*,

3    No. 5:13-CV-02418 (N.D. Cal. Oct. 22, 2013).

4         On February 6, 2014, the parties filed a Joint Claim Construction and Prehearing Statement,

5    identifying disputed claim terms, proposed constructions, and citations to supporting evidence.

6    ECF No. 77 ("Joint Statement").  On March 27, 2014, Takeda filed its opening claim construction

7    brief and supporting expert declarations.  *See* ECF No. 79 ("Takeda Br.").  On April 24, 2014, the

8    Defendants filed their responsive claim construction brief and expert evidence.  *See* ECF No. 88

9    ("Defs. Br.").  On May 25, 2014, Takeda filed its reply brief.  *See* ECF No. 90 ("Takeda Reply").

10   The Court held a technology tutorial and claim construction hearing on June 5, 2014.

11   **II.    LEGAL STANDARDS**

12        The Court construes patent claims as a matter of law based on the relevant intrinsic and

13   extrinsic evidence.  *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d

14   1272 (Fed. Cir. 2014) (en banc); *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

15   "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full

16   understanding of what the inventors actually invented and intended to envelop with the claim."

17   *Phillips*, 415 F.3d at 1316 (internal quotation marks and citation omitted).  Accordingly, a claim

18   should be construed in a manner that "stays true to the claim language and most naturally aligns

19   with the patent's description of the invention."  *Id.*

20        In construing disputed terms, a court looks first to the claims themselves, for "[i]t is a

21   'bedrock principle' of patent law that 'the claims of a patent define the invention to which the

22   patentee is entitled the right to exclude.'"  *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari

23   Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Generally, the words of a claim

24   should be given their "ordinary and customary meaning," which is "the meaning that the term[s]

25   would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at

26   1312-13.  In some instances, the ordinary meaning to a person of skill in the art is clear, and claim

27   _____

[3]    The parties have also been involved in separate litigation in this District regarding other
28   Orange Book patents listed for Dexilant®.  *See Takeda Pharm. Co. v. Handa Pharms., LLC*, No.
     11-CV-01609-JCS, 2013 U.S. Dist. LEXIS 187604 (N.D. Cal. Oct. 17, 2013).

United States District Court
For the Northern District of California

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

United States District Court
For the Northern District of California

1    construction may involve "little more than the application of the widely accepted meaning of

2    commonly understood words." *Id.* at 1314.

3        In many cases, however, the meaning of a term to a person skilled in the art will not be

4    readily apparent, and a court must look to other sources to determine the term's meaning. *See id.*

5    Under these circumstances, a court should consider the context in which the term is used in an

6    asserted claim or in related claims, bearing in mind that "the person of ordinary skill in the art is

7    deemed to read the claim term not only in the context of the particular claim in which the disputed

8    term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

9    Indeed, the specification "'is always highly relevant'" and "'[u]sually . . . dispositive; it is the

10   single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v.*

11   *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  Where the specification reveals that the

12   patentee has given a special definition to a claim term that differs from the meaning it would

13   ordinarily possess, "the inventor's lexicography governs." *Id.* at 1316.  Likewise, where the

14   specification reveals an intentional disclaimer or disavowal of claim scope by the inventor, the

15   inventor's intention as revealed through the specification is dispositive.  *Id.*  A court may also

16   consider the patent's prosecution history, which consists of the complete record of proceedings

17   before the United States Patent and Trademark Office ("PTO") and includes the cited prior art

18   references.  The prosecution history "can often inform the meaning of the claim language by

19   demonstrating how the inventor understood the invention and whether the inventor limited the

20   invention in the course of prosecution, making the claim scope narrower than it would otherwise

21   be." *Id.* at 1317.

22       A court is also authorized to consider extrinsic evidence in construing claims, such as

23   "expert and inventor testimony, dictionaries, and learned treatises."  *Markman v. Westview*

24   *Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Expert

25   testimony may be particularly useful in "[providing] background on the technology at issue, . . .

26   explain[ing] how an invention works, . . . ensur[ing] that the court's understanding of the technical

27   aspects of the patent is consistent with that of a person of skill in the art, or . . . establish[ing] that a

28   particular term in the patent or the prior art has a particular meaning in the pertinent field."

5

*Phillips*, 415 F.3d at 1318. Although a court may consider evidence extrinsic to the patent and

prosecution history, such evidence is considered "less significant than the intrinsic record" and

"less reliable than the patent and its prosecution history in determining how to read claim terms."

*Id.* at 1317-18 (internal quotation marks and citations omitted). Thus, while extrinsic evidence

may be useful in claim construction, ultimately "it is unlikely to result in a reliable interpretation of

patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319. Any

expert testimony "that is clearly at odds with the claim construction mandated by the claims

themselves, the written description, and the prosecution history" will be significantly discounted.

*Id.* at 1318 (internal quotation marks and citation omitted). Finally, while the specification may

describe a preferred embodiment, the claims are not necessarily limited only to that embodiment.

*Id.* at 1323; *see also Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1151 (Fed. Cir.

2003) ("The general rule, of course, is that claims of a patent are not limited to the preferred

embodiment, unless by their own language.").

## III. DISCUSSION

The parties request construction of two terms of the '187 Patent and four terms of the '158

Patent. Additionally, the parties stipulate to the following constructions of two terms in the '187

Patent (Joint Statement at 2):

| Patent | Term | Agreed Construction |
|---|---|---|
| 8,461,187 | "wherein the PPI is released from the dosage form as a first and a second dose" | "wherein the PPI is released from the dosage form as a first and second amount of PPI"<br><br>The term "PPI" means "proton pump inhibitor" in each of the claims. |
| | "wherein each pulse of the PPI is sufficient to maintain plasma concentrations above the threshold concentration for at least 30 minutes" | "wherein each pulse of the PPI is sufficient independently to maintain plasma concentrations above 100 ng/ml for at least 30 minutes" |

### A. Level of Ordinary Skill in the Art

The Court first addresses the level of ordinary skill in the relevant art of the asserted

patents. *See Phillips*, 415 F.3d at 1312-13. Here, the parties have submitted expert declarations

with opinions regarding the level of ordinary skill. Takeda relies on opinions from Dr. Robert

Bellantone for the '187 Patent (*see* ECF No. 80 ("Bellantone Decl.")) and from Dr. Patrick Sinko

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

for the '158 Patent (*see* ECF No. 81 ("Sinko Decl.")). The Defendants cite the opinions of Dr. Michael Mayersohn for the '158 Patent (*see* ECF No. 88-1 ("Mayersohn Decl.")).

The parties generally agree that the relevant art for both patents would be the related fields of pharmacy or pharmaceutical drug development, pharmacokinetics, and pharmacodynamics. *See* Bellantone Decl. ¶ 32; Sinko Decl. ¶ 89; Mayersohn Decl. ¶ 36. While the '187 and '158 Patents have different priority dates (June 16, 2004 and October 12, 2007, respectively), both sides also generally agree that the person of ordinary skill in the art would have had a doctorate degree (Ph.D. or Pharm.D.) in pharmaceutical sciences or a related field and one year of relevant experience, or a Master's Degree with many years of experience.[4] *See id.* Accordingly, the Court adopts the parties' agreed positions regarding the level of ordinary skill for claim construction purposes. There is no dispute that each expert here meets or exceeds the requisite qualifications.

## B. The '187 Patent

As noted above, the '187 Patent is generally directed to formulations that contain a first and second dose of a PPI. Claims 1-5 and 10-19 recite a "dosage form," while claims 6-9 cover methods of "treating a gastrointestinal disorder" that involve administering the claimed dosage forms. Takeda asserts combinations of claims 1-2, 5-8, and 10-17 against the individual Defendants. *See* Joint Statement at 2; Defs. Br. at 4 n.3. The parties dispute two terms—one in independent claim 1, and one in dependent claim 2.

### 1. "wherein the first and second doses are released from the dosage form as discreet pulses of the PPI separated by a period of time" (claim 1)

| Defendants' Proposed Construction | Takeda's Proposed Construction |
|---|---|
| "wherein the first and second amounts of PPI are released from the dosage form as discontinuous pulses of the PPI separated by the time between completing the release of the first amount and starting the release of the second amount" | "wherein release of the second dose of PPI from the dosage form begins a period of time after release of the first dose begins" |

The first disputed phrase appears in claim 1 of the '187 Patent. Independent claim 1 recites:

1. A dosage form comprising a PPI wherein the PPI is released from the dosage form as a first and a second dose, **wherein the first and second doses are released**

---

[4]      As to the '158 Patent, Dr. Mayersohn states that "a Bachelor's or Master's Degree and a commensurately greater number of years of experience in the appropriate field" would suffice. Mayersohn Decl. ¶ 36.

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

United States District Court
For the Northern District of California

> **from the dosage form as discreet pulses of the PPI separated by a period of time,** wherein the second dose contains at least 10% more of the PPI than the first dose, and wherein each of the first and second doses comprise a sufficient amount of the PPI to raise plasma levels of the PPI to a threshold concentration of at least 100 ng/ml.

'187 Patent cl.1 (emphasis added).

Claim 1 requires release of a first and second dose of PPI "as discreet pulses" that are "separated by a period of time." The primary dispute is how the "period of time" must be measured. Takeda argues that the time period refers to the delay between the times when the two doses (or pulses) *begin* to be released. *See* Takeda Br. at 7-8. Defendants contend that the pulses must be "discontinuous," in that the time period refers to the time between when the first dose is *completely* released and when the second dose begins to be released. *See* Defs. Br. at 5-6. Therefore, under Defendants' construction, claim 1 requires that the second dose not begin releasing until 100% of the first dose is released, while Takeda's construction permits overlap between the release periods. A diagram from Dr. Bellantone's declaration (which both sides cite) illustrates the difference between the constructions:



Bellantone Decl. at 12; *see also* Defs. Br. at 6. Takeda's construction would encompass the release profiles shown in both Figures A and B above, while Defendants' construction would exclude the release profile in Figure A.

For the reasons below, the Court determines that Takeda's construction is the most consistent with the relevant intrinsic and extrinsic evidence.

### a. Claim Language

Both sides argue that the plain meaning of the claims supports their constructions. As an initial matter, the parties concur that "discreet" is a typo, and that claim 1 should read "discrete."

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

*See* Bellantone Decl. ¶ 39 ("the word "discreet" (meaning 'careful and circumspect') is misspelled and should be 'discrete' (meaning 'separate')"); Defs. Br. at 5 ("Claim 1 requires 'discre[te] pulses . . . ."). Defendants argue that the plain meaning of the claim phrase requires that "the *entire pulses*, and not just their starts, must be discontinuous and separated by a period of time—that is, they must not overlap" because "[p]ulses that overlap are by definition not 'separated by a period of time.'" Defs. Br. at 6-7. However, the claim language is not so limited. Even if "discrete" means "separate" (as the parties agree), claim 1 requires only separate pulses that are "separated by a period of time." Claim 1 does *not* state that the pulses must be "discontinuous" with absolutely no overlap. For example, under the release profile shown in Figure A above, the two pulses are distinguishable and occur over different periods—and are thus "separate"—even though they partially overlap in time. Accordingly, the plain claim language does not support importing Defendants' limitation into claim 1. *See, e.g.*, *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003) ("This additional negative limitation finds no anchor in the explicit claim language.").

In addition to plain meaning, the parties raise several arguments regarding claim differentiation and the language of other claims in the '187 Patent. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). "[T]he doctrine of claim differentiation is at its strongest" when comparing independent and dependent claims. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). First, Takeda argues that dependent claims 2-4 and 7 support its interpretation because those claims refer to specific times "wherein the second dose *begins to be released* . . . after the first dose *begins to be released*," indicating that the relevant point for measuring the "period of time" separating doses in claim 1 is the beginning of each release period. *See* Takeda Br. at 8. However, Defendants respond correctly that this language in the dependent claims is also consistent with Defendants' interpretation. *See* Defs. Br. at 7-8. While the dependent claims specify a delay between the start times of the two doses, that does not mean the release times necessarily overlap. For example, claim 2 recites a dosage form where release of the second dose begins "between 2 and 20 hours" after release of the

9

first dose begins, but does not specify how long the first dose lasts. If the first dose finishes releasing in one hour, it will not overlap with the second dose. Furthermore, claim 7 refers to a treatment method where the two doses are released "as discreet pulses of the PPI *and* the second dose begins to be released between 2 and 20 hours after the first dose begins to be released," strongly suggesting that the requirements for (1) "discre[te] pulses" and (2) a time gap between release start times are independent. Therefore, Takeda's argument is unconvincing.

Next, Takeda relies on dependent claim 9, which recites a method where the two doses "are released *continuously* such that there is a[n] *extended release* of the PPI." According to Takeda, "continuous" and "extended" release requires "no period of time separating the end of release of the first dose from the beginning of release of the second dose." Takeda Br. at 10. Claim 9 supports Takeda's position because "continuous" release implies at least some drug being released throughout the entire dosage period. This would be possible under Defendants' construction only if the second dose begins releasing at the *precise instant* that the first dose finishes releasing, with no overlap or delay, rendering claim 9 nearly impossible to satisfy. "[A] construction that renders the claimed invention inoperable should be viewed with extreme skepticism." *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002), *vacated and remanded on other grounds*, 537 U.S. 802 (2002); *see also Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (rejecting construction that excluded "essentially all guaifenesin formulations").[5]

Defendants raise another claim differentiation argument. Dependent claims 17-19 refer to the dosage form of claim 1 "wherein the period of time" is a specific range. Defendants point out that, under Takeda's construction, claims 2-4 and claims 17-19, which recite the same delay between releases, would be identical, and thus violate the presumption that different claims mean different things. For example, the comparison below shows that, under Takeda's position,

---

[5]     Defendants argue that, during prosecution, the '187 Patent applicants disclaimed "continuous" release and that claim 9 is also invalid under 35 U.S.C. § 112 ¶ 4. *See* Defs. Br. at 10-11 & n.8. However, the Court addresses—and rejects—that argument below in analyzing the prosecution history.

10

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

dependent claims 2 and 17 would both recite a delay of 2-20 hours that is measured by when each release period begins:

| Claim 2 | Claim 17 Under Takeda's Construction |
|---|---|
| "The dosage form of claim 1 wherein the second dose begins to be released between 2 and 20 hours after the first dose begins to be released." | "The dosage form of claim 1, wherein the [release of the second dose of PPI from the dosage form begins] between 2 hours and 20 hours [after release of the first dose begins]." |

*See* Defs. Br. at 8-9. This analysis also applies to claims 3 and 18, and claims 4 and 19. Takeda and Dr. Bellantone concede that these claims would be redundant under their construction, but argue that this is legally permissible. *See* Takeda Reply at 2-3; ECF No. 88-9 (Bellantone Depo.) at 20:7-13 ("They're saying the same thing.").

As Takeda observes, claim differentiation is not a rigid rule. While there is a "presumption that the difference between claims is significant," "two claims which read differently can cover the same subject matter." *Tandon*, 831 F.2d at 1023. "Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper." *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).[6] Here, the redundancy exists only between dependent claims, not between dependent and independent claims where claim differentiation "is at its strongest." *Liebel-Flarsheim*, 358 F.3d at 910. While Defendants' construction would avoid this redundancy, it would also render dependent claim 9 essentially inoperable, as explained above. Moreover, "the doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence," and "claims that are written in different words may ultimately cover substantially the same subject matter." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998). Accordingly, claim differentiation does not mandate Defendants' construction.

### b. Specification

The parties focus on the following portion of the '187 Patent's specification:

---

[6] Defendants' suggestion that redundant dependent claims would be invalid for statutory double patenting (Defs. Br. at 9, 12) is misplaced, as that doctrine prohibits only "obtaining more than one valid patent" on the same invention. *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985).

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

In cases where the PPI is delivered in pulses, the period between when the first dose *begins to be release[d]* and when the second dose *begins to be released can be separated by varying amounts of time.* Preferably, the *onset of release* of the doses are separated by between 2 hours and 20 hours, more preferably between 3 hours and 16 hours and most preferably between 4 hours and 12 hours. Of course, any of the pulses released from such a dosage form should achieve the threshold concentration and maintain plasma concentrations above such threshold for at least 30 minutes, preferably one hour to 2 hours, and more preferably between 2 hours to 8 hours.

'187 Patent col.9 ll.23-29 (emphases added). Takeda argues that the bolded portions above show that the relevant times for measuring the separation between doses are the start times for release. *See* Takeda Br. at 8. However, this argument repeats Takeda's theory above regarding claims 2-4. For the same reasons, this argument alone is unpersuasive—while the period between release start times can vary as recited in dependent claims 2-4, this does not necessarily demonstrate that the release periods overlap in time.

Other portions of the specification provide some support for Takeda's position. The Summary of the Invention states that "the first and second doses may be separated by *little or no time* delay" ('187 Patent col.1 ll.58-60 (emphasis added)), while another portion refers to "cases where there is no time separating the pulses" (*id.* col.9 ll.33-35). Thus, the inventors recognized that there could be "little" delay between the pulses, which suggests (but does not require) that the pulses may overlap in time. The specification's discussion of drug delivery in spaced pulses also refers generally to "the period between when the first dose begins to be release[d] and when the second dose begins to be released." *Id.* col. 9 ll.23-26. Otherwise, the specification provides little guidance as to whether the two PPI pulses in claim 1 may partially coincide.

Takeda argues that the specification's reference to "combined release of the first and second dose of PPI" (col.8 ll.40-46) also supports its reading. Takeda Br. at 11. This argument is misleading. The quoted sentence refers to "when a[n] *extended release* formulation is employed" (emphasis added). Elsewhere, the specification expressly distinguishes between (1) controlled or extended release and (2) pulse-based formulations: "there are two types of modified drug release. Specifically, there is controlled or extended release, and pulsed release." '187 Patent col.2 ll.57-59. Thus, the excerpt that Takeda quotes does not discuss the two-pulse system of claim 1.

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

The Court is also unpersuaded by Defendants' arguments regarding the specification's incorporation by reference of two separate patents, Nos. 5,017,381 and 6,228,398. *See id.* col.7 ll.51-60. Defendants argue that the '187 Patent must be limited to discontinuous pulses because the referenced patents disclose pulsed-release systems with discontinuous doses. *See* Defs. Br. at 11; Joint Statement Ex. 1 at 1. Even assuming that the patents are properly incorporated by reference, *see Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006), they provide only non-limiting examples of alternative dosage forms. *Cf.* U.S. Patent No. 5,017,381 col.2 ll.27-32 (describing "pulsed delivery of two drugs or drug formulations simultaneously"); U.S. Patent No. 6,228,398 col.4 ll.56-59 (describing release "in a bimodal or pulsed manner").

**c.      Prosecution History**

Defendants argue that "Applicants expressly disclaimed continuous release from the scope of 'discrete pulses' during the prosecution of the '187 patent." Defs. Br. at 10. During prosecution, the '187 Patent Examiner rejected several pending claims—including the claim that issued as claim 1—as obvious in light of a prior art reference, U.S. Patent Application Publication No. 2003/0091630 to Louie-Helm. That reference is directed to "Formulation of an Erodible, Gastric Retentive Oral Dosage Form." ECF No. 91-1 ("Louie-Helm"). In a July 27, 2012 Reply and Amendment, the '187 Patent applicants argued to the PTO that "Louie-Helm does not teach or suggest a dosage form wherein first and second doses are released from the dosage form as discreet [sic] pulses of PPI separated by a period of time." ECF No. 88-14 at 5. Defendants contend that Louie-Helm teaches "continuous release," and that by distinguishing Louie-Helm, the applicants necessarily disavowed overlapping (or "continuous") release periods under the doctrine of prosecution disclaimer.

"[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega*, 334 F.3d at 1324. Such disclaimer requires "clear and unmistakable" disavowal. *Id.* at 1325-26. Here, Defendants' theory of prosecution disclaimer does not demonstrate an unequivocal disavowal of overlapping doses.

United States District Court
For the Northern District of California

Louie-Helm discusses formulation of "a controlled release dosage form, particularly of the swellable, erodible type," based on certain disintegration test results. Louie-Helm ¶ 0006. As examples of such dosage forms, Louie-Helm discloses "a bilayer tablet" with a first and second layer (*id.* ¶ 0013) and claims a formulation where "a first fraction . . . is released . . . by diffusing" and "a second fraction . . . is released . . . by erosion" (*id.* cl.2). The '187 Patent Examiner initially found that Louie-Helm "addresses first and second dose administration." ECF No. 88-14 at 6. In response, the applicants argued that Louie-Helm "describes continuous release" and teaches away from "discrete pulses," and that "Claim 2 of Louie-Helm does not describe release in discreet pulses." *Id.* at 6-7.

However, the applicants did not clearly and unmistakably disclaim all forms of "continuous release." In their remarks, the applicants argued that Louie-Helm "does not describe a dosage form that is administered once *and releases multiple doses*." *Id.* at 6 (emphasis added). They also cited Louie-Helm ¶ 0112, which states that "the dosage forms of the present invention provide the drug by means of a continuous delivery *instead of the pulse-entry delivery* associated with conventional dosage forms." *Id.* (emphasis added). Therefore, the applicants distinguished Louie-Helm by arguing that it does not teach a single dosage form comprising discrete pulsed doses, but did not disclaim overlapping release periods.

As noted above, Louie-Helm does disclose a "bilayer tablet" and a formulation where two drug fractions begin release at the same time. Louie-Helm ¶ 0013, cl.2; *see also* Takeda Reply at 5 (agreeing that Louie-Helm teaches "two separate releases" that "occurred *at the same time*" (emphasis in original)). The '187 Patent applicants contended that these disclosures do not describe discrete pulses. Accordingly, as Takeda conceded at the June 5, 2014 hearing, the applicants clearly disclaimed a dosage form where two pulses begin release at the same time; *i.e.*, where the "period of time" separating pulses in claim 1 is zero. *Cf.* '187 Patent at col.9 ll.33-35 (referring to "cases where there is no time separating the pulses"). However, there is no indication that the applicants further disclaimed any form of overlapping doses. Accordingly, the Court rejects Defendants' prosecution disclaimer argument.

14

### d. Extrinsic Evidence

Takeda relies on the expert testimony of Dr. Bellantone, who generally repeats and supports Takeda's arguments about the claim language and specification. *See* Bellantone Decl. ¶¶ 42-49. Dr. Bellantone also elaborates on an embodiment in the '187 Patent that describes two pulses that release based on pH: "For example, polymers having different dissolution pHs are commonly used for this purpose. Hence, one population of granules can be coated with a polymer that begins dissolving at a pH of 6 and another population of granules can be coated with a polymer that begins dissolving at a pH of 6.5 to achieve a pulsed release." '187 Patent col.7 l.65-col.8 l.4. Dr. Bellantone opines that this passage indicates overlapping release periods because "The person of ordinary skill also would understand that the first population of granules may not completely finish releasing its drug before the second population of granules begins release, especially because the target pHs of the different enteric coatings in this example are close (pH 6 and pH 6.5)." Bellantone Decl. ¶ 51. Dr. Bellantone provides technical explanations for this conclusion, such as the understanding that some drug granules may pass through the gastrointestinal tract faster or slower, and that the granules' enteric coatings often contain irregularities. *Id.* ¶¶ 51-52. Defendants point out that this pH-based example in the specification does not necessarily disclose overlapping periods, but offer no contrary expert testimony. *See* Defs. Br. at 11. Accordingly, the Court finds that Dr. Bellantone's unrebutted opinions regarding the specification are persuasive and support Takeda's construction.

Both parties also cite several dictionary definitions. *E.g.*, ECF No. 88-12 (Concise Oxford American Dictionary (2006), defining "discrete" as "individually separate and distinct"); ECF No. 80-1, Ex. 6 (Merriam-Webster's Collegiate Dictionary (2000), defining "discrete" as "constituting a separate entity: individually distinct"). However, these extrinsic definitions do not help resolve the question of whether "discrete" encompasses overlapping pulses. As noted earlier, two pulses can be separate and distinguishable even if they partially overlap, as shown in Figure A in the Bellantone Declaration. Indeed, the parties generally agree that "discrete" means "separate" or "distinct," but still strongly disagree about how to construe claim 1.

15

Based on the intrinsic and extrinsic evidence analyzed above, the Court construes the term "wherein the first and second doses are released from the dosage form as discreet pulses of the PPI separated by a period of time" to mean **"wherein release of the second dose of PPI from the dosage form begins a period of time after release of the first dose begins."**

2. **"the second dose begins to be released between 2 and 20 hours after the first dose begins to be released" (claims 2 and 7)**

| Defendants' Proposed Construction | Takeda's Proposed Construction |
|---|---|
| "none of the second amount of PPI begins to be released until between 2 to 20 hours after any of the first amount of PPI begins to be released" | "release of the second dose begins between 2 hours and 20 hours after release of the first dose begins" |

Dependent claims 2 and 7 recite:

2. The dosage form of claim 1 wherein *the second dose begins to be released between 2 and 20 hours after the first dose begins to be released*.

7. The method of claim 6 wherein the first and second dose are released from the dosage form as discreet pulses of the PPI and *the second dose begins to be released between 2 and 20 hours after the first dose begins to be released*.

'187 Patent cls. 2, 7 (emphases added). The parties concur that their respective constructions of this term rise and fall with the construction of the previous term in claim 1, and offer no new additional arguments for this term. *See* Takeda Reply at 6; Defs. Br. at 12-13. Accordingly, the Court construes the term "the second dose begins to be released between 2 and 20 hours after the first dose begins to be released" to mean **"release of the second dose begins between 2 hours and 20 hours after release of the first dose begins."**

C. **The '158 Patent**

The '158 Patent is generally directed to methods of treating stomach problems with "pharmaceutical compositions" of dexlansoprazole. Takeda asserts claims 1-8 against Defendants. *See* Joint Statement at 2. The parties dispute four terms.

16

1. **"regardless of whether the patient is under fasted or fed conditions" (claim 1)**

| Defendants' Proposed Construction[7] | Takeda's Proposed Construction |
|---|---|
| "regardless of whether the patient is dosed after an overnight fast, within 5 minutes before a meal, within 30 minutes before a meal, or within 30 minutes after a meal" | "without regard to food" |

The first disputed phrase appears in claim 1 of the '158 Patent. Independent claim 1 recites:

> 1. A method of treating heartburn, acid reflux or gastroesophageal reflux disease in a patient in need of treatment thereof, the method comprising the steps of:
>
> a) obtaining a pharmaceutical composition comprising dexlansoprazole from a group of pharmaceutical compositions comprising proton pump inhibitors; and
>
> b) administering to a patient suffering from heartburn, acid reflux or gastroesophageal reflux, ***regardless of whether the patient is under fasted or fed conditions***, a therapeutically effective amount of the pharmaceutical composition obtained in step a), wherein the pharmaceutical composition comprises:
>
> (i) a first solid particle, wherein said first solid particle comprises dexlansoprazole and a first enteric coating, wherein the first enteric coating releases the proton pump inhibitor from the solid particle at a pH of about 5.0 to about 5.5; and
>
> (ii) a second solid particle, wherein said second solid particle comprises dexlansoprazole and a second enteric coating, wherein the second enteric coating releases the proton pump inhibitor from the solid particle at a pH of about 6.2 to about 6.8; wherein the first solid particle comprises from about 15% to about 50% by weight of the pharmaceutical composition and the second solid particle comprises from about 50% to about 85% by weight of the pharmaceutical composition.

'158 Patent cl.1 (emphasis added).

As their respective constructions show, the parties disagree about how the patent defines "fasted" and "fed" conditions. Defendants believe that "fasted or fed" refers to four specific food regimens identified in the specification. *See* Defs. Br. at 15-16. By contrast, Takeda argues that claim 1 encompasses all dosing without regard to food, and that Defendants' construction "would unduly narrow the scope of claim 1 to the administration of the pharmaceutical composition only under the fasted and fed conditions set forth in Table 4 of the '158 patent." *See* Takeda Reply at 7.

---

[7] In their responsive claim construction brief, Defendants changed their proposed construction from their prior position, which was "wherein the same therapeutic effect is achieved whether the patient has eaten a meal, will eat a meal, or is on an empty stomach." *Compare* Joint Statement Ex. 1 at 6 *with* Defs. Br. at 14-15.

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

This dispute also overlaps with a contested phrase in claim 4, "wherein the changes in pharmacokinetics . . . under *fasting or fed conditions* does not produce statistically significant changes in intragastric pH," which contains similar language and is discussed separately below. Here, the Court agrees with Takeda.

### a. Claim Language and Specification

The plain language of claim 1 recites only "regardless of whether the patient is under fasted or fed conditions," and does not define what "fasted" or "fed" means. As a result, both sides focus on Example 2 in the specification, which explains a research study on "The effect and timing of food on the pharmacokinetics and pharmacodynamics of TAK-390MR." '158 Patent col.23 l.35-col.27 l.17. Example 2 discusses a Phase 1 study in which the inventors administered TAK-390MR (another name for Dexilant®) to patients under different food conditions and measured plasma concentrations of dexlansoprazole and intragastric pH levels. *Id.* col.24 ll.11-38; Takeda Br. at 14. The study involved four patient food regimens shown in Table 4:

| TABLE 4 |
| --- |

| Treatment Sequences and Dosing Regimens |
| --- |

| Regimen | Timing of Dose of TAK-390MR 90 mg or Placebo |
| --- | --- |
| A | Dosed under fasting conditions |
| B | Fed State: Dosed 30 min after the start of a high-fat breakfast |
| C | Dosed 5 min before a high-fat breakfast |
| D | Dosed 30 min before a high-fat breakfast |

*Id.* Tbl.4. Based on the study, the inventors concluded: "The pH results indicate that TAK-390MR can be administered *without regard to food* or the timing of food." *Id.* col.25 ll.49-50 (emphasis added).

Defendants claim that the specification dictates that "fasting or fed conditions" are limited to the four regimens in Table IV. *See* Defs. Br. at 16; Takeda Reply at 7. The Court disagrees. As the Court understands Defendants' position, claim 1 would not literally cover—for example—dosing 35 minutes after the start of a high-fat breakfast. To the extent that Defendants' construction would restrict claim 1 to cover administration only "regardless of whether the patient

18

United States District Court
For the Northern District of California

is dosed after an overnight fast, within 5 minutes before a meal, within 30 minutes before a meal, or within 30 minutes after a meal," and no other feeding regimens, this would improperly import a limitation from the specification. *See, e.g.*, *In re Huai-Hung Kao*, 639 F.3d 1057, 1073 (Fed. Cir. 2011) (declining invitation "to import from the specification into the claim the limitation that the dosage be adjusted as a result of the informing step").

Here, the inventors claim to have solved the problem where "patients are unable to take PPIs *whenever it is convenient* for them to do so." '158 Patent col.2 ll.10-11 (emphasis added). Indeed, the specification refers repeatedly to dosing without food-based restrictions: enabling dosage "independently of the intake or consumption of food" (*id.* col.2 ll.17-19); administration "without regard to food" (*id.* col.23 ll.53-55); "wherein said pharmaceutical composition can be administered to the patient independent of the intake of food" (*id.* col.1 ll.15-17); and a drug that "can be administered to the patient independently of food or meal intake or consumption" (*id.* col.10 ll.11-13). Thus, the specification supports Takeda's position that "fasting or fed conditions" refers to the purported discovery that patients can take certain forms of dexlansoprazole without regard to food, not just under four specific conditions.

Defendants correctly state that the patent identifies only the four specific fasting or fed conditions listed in Table 4. *See also id.* Figs. 1-2 (listing Regimens A-D). However, the claims do not refer to any of those four regimens, and the inventors concluded from the Example 2 study that "TAK-390MR can be administered without regard to food." Defendants' interpretation would restrict the claims to the precise test conditions disclosed in the specification, and conversely require disclosure of test results for all possible food conditions to support Takeda's interpretation. Accordingly, the specification and claim language support Takeda's position.

**b.      Prosecution History**

Defendants argue that Takeda's construction conflicts with the '158 Patent's prosecution history because the applicants amended the claims to mean something other than "without regard to food." *See* Defs. Br. at 16-17. In an October 12, 2011 Reply during examination, the '158 Patent applicants submitted new claims to the PTO, including pending claim 31, which recited "administering . . . <u>without regard to the patient's intake of food</u>." ECF No. 81-17 at

19

1   TAKEDA009396.  Afterwards, the Examiner and the applicants held an in-person interview

2   regarding the new claims.  According to the Examiner's interview summary, the "Examiner also

3   asked to clarify the 'independent of the intake of food' approach."  *Id.* at TAKEDA006967.  On

4   December 28, 2011, the applicants filed a Supplemental Reply in which they amended pending

5   claim 31 to recite "administering . . . regardless of whether the patient is under fasted or fed

6   conditions ~~without regard to the patient's intake of food~~."  *Id.* at TAKEDA006940.  In

7   accompanying remarks, the applicants stated: "Furthermore, the Examiner asked Applicants to

8   clarify the 'independent of the intake of food' approach.  Applicants note that in order to address

9   this concern, claim 31 has been amended to recite 'under fasting or fed conditions' instead of

10  'independent of the intake of food.'"  *Id.* at TAKEDA006944.  Then, on January 13, 2012, the

11  Examiner allowed the claims, noting that the prior art of record did not teach administration

12  "regardless of fed-or-fasted state of the patient."  *Id.* at TAKEDA006876.

13          Defendants contend that the applicants changed the claim language from "without regard to

14  the patient's intake of food" to "regardless of whether the patient is under fasted or fed conditions"

15  in response to the Examiner's inquiries.  Defendants point to statements by Dr. Sinko that "without

16  regard to the patient's intake of food" means the same as "without regard to food."  Sinko Decl. at

17  30 n.5.  Thus, Defendants posit, the applicants must have meant something other than "without

18  regard to food" when they amended the claim language, otherwise the amendment would not have

19  addressed the Examiner's concerns.  *See* Defs. Br. at 16-17.

20          Defendants' theory is unavailing.  The prosecution history shows that the Examiner did not

21  reject claim 31 based on its recitation of "without regard to the patient's intake of food," but rather

22  requested clarification about the "'independent of the intake of food' approach."  The fact that the

23  applicants amended the language to "clarify" this approach does not mean that they disclaimed the

24  construction of "without regard to food."  Indeed, the Examiner's Notice of Allowability indicates

25  that the claims were allowed because the prior art did not teach dosing "regardless of fed-or-fasted

26  state."  Moreover, Dr. Sinko opined that *both* "without regard to the patient's intake of food" (the

27  original language of claim 31) and "regardless of whether the patient is under fasted or fed

28  conditions" (the issued claim language) mean "without regard to food."  Sinko Decl. at 30 n.5.  At

20

1  minimum, the applicants' statements do not rise to a "clear and unmistakable" disavowal required

2  for prosecution disclaimer.  *Omega*, 334 F.3d at 1325-26.  Indeed, Defendants do not assert that the

3  applicants expressly disclaimed Takeda's proposed construction as a matter of prosecution

4  disclaimer.  Rather, Defendants cite *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed.

5  Cir. 2004), which addressed a situation where two *separate* sets of claims employed different

6  language, which is not the situation here.  *See* Defs. Br. at 17.

7       In short, the cited prosecution history of the '158 Patent does not demonstrate any

8  disclaimer by the applicants or support Defendants' construction.

9                    **c.    Extrinsic Evidence**

10      Once again, the parties rely on opposing expert opinions, from Drs. Mayersohn

11  (Defendants) and Sinko (Takeda).  Both experts have notable credentials: Dr. Mayersohn has

12  served on committees for the FDA and U.S. Pharmacopeia (which is cited in the '158 Patent),

13  Mayersohn Decl. ¶¶ 20-21, while Dr. Sinko has worked with the National Institutes of Health,

14  Sinko Decl. ¶¶ 11-12.  Regarding this claim term, however, the experts largely parrot the parties'

15  arguments regarding the intrinsic evidence without providing independent or detailed analysis.

16  *Compare* Mayersohn Decl. ¶¶ 41-42, *with* Sinko Decl. ¶¶ 97-101.  Accordingly, the Court finds the

17  competing expert opinions of little help beyond their summaries of the intrinsic record.

18      Takeda also relies on extrinsic documentation.  First, Takeda submits the FDA's "Guidance

19  for Industry: Food-Effect Bioavailability and Fed Bioequivalence Studies," dated December 2002

20  (prior to the '158 Patent's priority date).  ECF No. 81-3 ("FDA Guidance").  These guidelines are

21  instructive because they explain how to test the effect of food on drugs, recommending a "single-

22  dose, two-treatment (fed vs. fasting)" test.  *Id.* at TAKEDA0014717.  The FDA Guidance identifies

23  only one "fed" regimen, where the subject starts a high-fat breakfast 30 minutes before

24  administration, which corresponds to Regimen B in the '158 Patent.  *Id.* at TAKEDA0014719;

25  '158 Patent Tbl.4.  Furthermore, the Guidance indicates that a comparison between this single

26  "fed" regimen and a fasting regimen can demonstrate a drug's food-independence, stating that a

27  high-fat breakfast provides "conditions that are expected to provide the *greatest effects* on GI

28  physiology so that systemic drug availability is *maximally affected*," and that a successful test

21

allows a drug maker to state that "[the drug] could be taken *without regards to meals*." FDA Guidance at TAKEDA0014718, 14720 (emphases added). Thus, these guidelines provide persuasive evidence that a person of ordinary skill would have understood that comparing one fed and one fasted condition (Regimens A and B in the '158 Patent) could support the conclusion that a drug could be dosed "without regard to food," as Takeda proposes.

By contrast, Takeda's reliance on the FDA-approved Dexilant® label is misplaced. The label states that "DEXILANT can be taken without regard to food." *See* Takeda Br. at 15-16 (citing ECF No. 81-10 at TAKEDA012767). Defendants correctly point out, however, that this label was not available until 2009—two years after the '158 Patent's asserted priority date—and therefore could not have informed the person of ordinary skill at the relevant time. *See Phillips*, 415 F.3d at 1312-13.

Overall, the Court finds that Takeda's construction aligns most closely with the totality of the intrinsic and extrinsic evidence presented. Accordingly, the Court construes the term "regardless of whether the patient is under fasted or fed conditions" to mean **"without regard to food."**

### 2. "wherein the changes in pharmacokinetics . . . under fasting or fed conditions does not produce statistically significant changes in intragastric pH" (claim 4)

| Defendants' Proposed Construction[8] | Takeda's Proposed Construction |
|---|---|
| "Wherein the changes in pharmacokinetics . . . when the patient is dosed after an overnight fast, within 5 minutes before a meal, within 30 minutes before a meal, or within 30 minutes after a meal does not produce any statistically significant differences in mean intragastric pH and percentage of time that gastric pH is greater than 4.<br><br>The term 'statistically significant' means that the P value for the pairwise comparisons of the fed and fasted regimens is less than 0.05." | "Wherein differences in pharmacokinetics . . . between fasting conditions, meaning dosing after an overnight fast, and fed conditions, meaning dosing within 30 minutes before or after a meal, do not produce statistically significant changes in mean intragastric pH over the 24-hour postdose interval.<br><br>The term 'statistically significant' means that the P value for the pairwise comparison of the fed regimen with the fasted regimen is less than 0.05." |

This disputed phrase appears in dependent claim 4, which recites:

---

[8] Defendants have revised their prior construction, which was "wherein the changes in pharmacokinetics . . . when the patient has eaten a meal, will eat a meal, or is on an empty stomach does not produce any statistically significant differences in mean intragastric pH and % time that gastric pH is greater than 4, as measured by a 0.05 P value for pairwise comparisons." *Compare* Joint Statement Ex. 1 at 15 *with* Defs. Br. at 23.

4. The method of claim 1, wherein the changes in pharmacokinetics after administration to the patient of a single dose of a therapeutically effective amount of the pharmaceutical composition comprising dexlansoprazole under fasting or fed conditions does not produce statistically significant changes in intragastric pH.

'158 Patent cl.4.  Construction of this term overlaps with the preceding term in claim 1 because claim 4 recites "fasting or fed conditions," while claim 1 contains the similar language of "fasted or fed conditions."  Both sides agree that "'statistically significant' means that the P value for the pairwise comparison[s] . . . is less than 0.05."  The parties identify two areas of disagreement: (1) the scope of "fasting or fed conditions," and (2) the relevant tests for "intragastric pH."  *See* Takeda Reply at 12.  The Court considers the intrinsic and extrinsic evidence in addressing each of these disagreements.

### a.    "under fasting or fed conditions"

Defendants argue that "fasting or fed conditions" refers to the four food regimens in Table 4, and that claim 4 requires pairwise statistical comparisons between all four regimens, including between the three "fed" regimens.  *See* Defs. Br. at 23-24.  In other words, Defendants claim that claim 4 requires comparing each fed regimen with each other fed regimen (for example, Regimens B and C in Table 4).  Defendants also point out that claim 1 uses essentially the same language of "fasted or fed conditions" and argue that this language should have the same meaning in claim 4.  *Id.* at 15.  On the other hand, Takeda contends that "fasting or fed conditions" encompass an overnight fast and "dosing within 30 minutes before or after a meal," which includes the three "fed" regimens in Table 4.  *See* Takeda Reply at 13-14.  Takeda further argues that claim 4 assesses statistical significance only between a fed regimen and a fasting regimen, not between fed regimens.  *See id.*

The Court agrees with Defendants that "fasting or fed conditions" in claim 4 should have the same meaning as "fasted or fed conditions" in claim 1.  Generally, "a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent."  *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).  "A word or phrase used consistently throughout a claim should be interpreted consistently."  *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998); *see also Phillips*, 415

23

F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."). Turning to the claim language, there is no dispute that the phrases are essentially identical in claims 1 and 4. As explained above, the specification repeatedly discusses dosing "independent of the intake of food" and "without regard to food"—which is how Takeda asked the Court to construe claim 1. Indeed, the specification shows that the inventors believed that dosing under any food conditions would not significantly affect pharmacodynamic results.

For claim 4, Takeda now argues that "fasted or fed conditions" can have an entirely different meaning. However, Takeda cannot have it both ways: reading "fasted or fed conditions" in claim 1 more broadly to encompass any dosing regimen "without regard to food," but restricting "fasting or fed conditions" in claim 4 to a much narrower range of food regimens—dosing up to 30 minutes before or after eating. Takeda argues that claim 4 provides a different "context" than claim 1 because claim 4 "refers to the test conditions for subjects participating in a food-effect study like the study disclosed in Example 2." Takeda Br. at 24. However, the claim language is not so limited and does not incorporate any studies or tests.[9] Takeda provides no convincing reason why claim 4's reference to "statistically significant changes" shows that "fasting and fed conditions" in that claim (but not claim 1) are "tied to specific clinical data." Takeda Reply at 14.

Takeda cites two cases where the Federal Circuit interpreted the same or similar terms differently in separate claims, but both cases are distinguishable. *See* Takeda Reply at 13-14. In *Aventis Pharmaceuticals, Inc. v. Amino Chemicals Ltd.*, the court construed "substantially pure" in two different ways, but did so because the term as used in the claims and specification modified two different chemicals—an intermediate and an end product. 715 F.3d 1363, 1374-75 (Fed. Cir. 2013). Here, there is no such distinction between claims 1 and 4, and no indication that "fasted and fed conditions" and "fasting and fed conditions" refer to different sets of conditions. In *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, the Federal Circuit held that

---

[9]      Unasserted dependent claims 9 and 12, which the parties did not address in briefing, also refer to a "fed state" and "fasted state." Claim 9 requires bioequivalence between dosings in a fed state and a fasted state, while claim 12 requires a specific mean intragastric pH level "regardless of whether the dexlansoprazole was administered in a fed or fasted state." At oral argument, Takeda suggested that a fed/fasted "state" may differ from a fed/fasted "condition."

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

"control code" could have different meanings based on the context of the claims at issue, but for purposes of deciding that the challenged claims were not indefinite under the former "insolubly ambiguous" standard.[10]  520 F.3d 1367, 1375-77 (Fed. Cir. 2008).  Indefiniteness is not at issue here, and again, the language of claim 4 does not provide a context that warrants an entirely different construction from claim 1.

As to extrinsic evidence, the experts' opinions again offer no definitive guidance.  For Defendants, Dr. Mayersohn opines that "fasted or fed conditions" in claim 1 and "fasting or fed conditions" in claim 4 should be "the same."  Mayersohn Decl. ¶¶ 40, 54.  However, his additional opinions on this issue are limited to whether all fed conditions must be statistically comparable, as Defendants propose.  *See id.* ¶ 55.  For Takeda, Dr. Sinko declares that, to statistically compare intragastric pH under different food conditions, "it would be necessary to perform a food-effect study like that disclosed in Example 2, in which the dosage form is administered under both fasting and fed conditions."  Sinko Decl. ¶ 156.  Dr. Sinko also opines that "in the context of claim 4, the known FDA regulations regarding testing for food effect of pharmaceutical products, the term 'under fasting or fed conditions' refers to the test conditions for subjects participating in a food-effect study like the study disclosed in Example 2," citing the FDA Guidance.  *Id.* ¶ 160.  Here, however, Dr. Sinko does not explain why these factors do not apply equally to claim 1, other than a vague reference to the "context of claim 4."  Again, claim 4 does not refer to the FDA Guidance or the additional "fed" regimens in Example 2 that are not required by the FDA Guidance.  Dr. Sinko also provides no reason why a person of ordinary skill could not evaluate statistical significance between food regimens other than the four delineated in Table 4 or the two regimens described in the FDA Guidance.

For the foregoing reasons, the Court determines that "fasting or fed conditions" should be construed consistently with "fasted or fed conditions" in claim 1.  As a result, the parties' dispute as to whether claim 4 requires comparisons between a fasting condition and each of the three "fed"

---

[10]  *Cf. Nautilus, Inc. v. Biosig Instruments, Inc.*, No. 13-369, 572 U.S. ____, 2014 WL 2440536, slip op. at 1 (June 2, 2014) (replacing "insolubly ambiguous" test with a "reasonable certainty" standard).

conditions in Table 4 is mooted. Rather, claim 4 requires that dosing without regard to food "does not produce statistically significant changes in intragastric pH."

### b. "intragastric pH"

For this term, the parties contest how intragastric pH (or stomach acidity, *see* Sinko Decl. ¶ 70) is properly measured. Defendants claim that "intragastric pH" refers to "mean intragastric pH and percentage of time that gastric pH is greater than 4." Takeda interprets this term as "mean intragastric pH over the 24-hour postdose interval." Thus, the parties agree that mean intragastric pH is an appropriate metric for "intragastric pH" as claimed. Defendants also appear to agree with Takeda that a 24-hour postdose interval is the proper measurement period, for they contend that percentage of time that gastric pH is greater than 4 is measured "for a period of 24 hours after the patient is dosed" using the same data. *See* Defs. Br. at 24 & n.12. The parties therefore disagree only about whether claim 4 also requires measurement of the percentage of time that gastric pH is greater 4.

Starting with the claims themselves, the plain language of claim 4 does not resolve this dispute. However, claim 12 (which depends from claim 1) refers to "*mean* intragastric pH." This suggests that "intragastric pH" is not limited to "mean" intragastric pH because the use of "mean" in claim 12 would otherwise be superfluous. Generally, courts construe claims "to avoid rendering any part superfluous." *Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr, Inc.*, 744 F.3d 715, 722 (Fed. Cir. 2014). Although Defendants have not argued that the rule against superfluity applies here, claim 12 demonstrates that the '158 Patent applicants knew how to specify "mean intragastric pH" and did not do so in claim 4.

Turning to the specification, the '158 Patent provides varying statements about "intragastric pH." Example 2 reflects data for both mean intragastric pH and percentage of time with pH greater than 4. As Defendants note, the inventors used "intragastric pH results" to refer to both types of pH results. '158 Patent col.25 ll.15-27. Table 7 also includes both types of data. *Id.* Tbl.7. On the other hand, the inventors also observed a statistically significant difference in percentage of time with pH greater than 4 between fed and fasting regimens, but concluded that "dosing under different fasting/fed conditions did not produce relevant differences in *intragastric pH*," suggesting

26

**United States District Court**
For the Northern District of California

1   that "intragastric pH" refers only to mean intragastric pH. *Id.* col.25 ll.23-27, ll.46-49 (emphasis

2   added). However, taken as a whole, Example 2 shows that the inventors tested and relied on both

3   mean intragastric pH and percentage of time with gastric pH greater than 4 to evaluate the food-

4   dependency of their formulation.

5       Takeda's primary argument regarding the specification is that Defendants' construction

6   would exclude a preferred embodiment—use of TAK-390MR—because that formulation resulted

7   in a statistically significant difference with respect to time with pH over 4. *See* Takeda Reply at

8   14-15. If claim 4 requires no statistically significant changes between food regimens, as

9   Defendants propose, than the formulation used in Example 2 would be excluded. Defendants

10  respond that the specification does not refer to Example 2 as a "preferred" embodiment and

11  discloses other sample formulations with varying amounts of dexlansoprazole, such that no one

12  formulation is preferred. *See* Defs. Br. at 25.

13      The Federal Circuit has warned that "[a] claim construction that excludes the preferred

14  embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support,"

15  *Adams Respiratory*, 616 F.3d at 1290 (quotation and citation omitted), but "has acknowledged that

16  a claim need not cover all embodiments," *Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328,

17  1237 (Fed. Cir. 2007). More specifically, a preferred embodiment need not be covered by all

18  claims in a given patent. In *Helmsderfer v. Bobrick Washroom Equipment, Inc.*, the patentee

19  objected to a claim construction for excluding the preferred embodiment from certain dependent

20  claims. 527 F.3d 1379, 1383 (Fed. Cir. 2008). The court rejected this argument, stating: "It is true

21  that the plain meaning of 'partially hidden from view' does not include totally hidden from view,

22  and that therefore claims 6-7 do not cover the preferred embodiment or the other illustrated

23  embodiments. However, this does not mean that these embodiments are all excluded from the

24  scope of the invention, but rather that they are excluded from the scope of these particular claims."

25  *Id.; see also August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285 (Fed. Cir. 2011) (rejecting

26  construction "where, as here, other unasserted claims in the parent patent cover the excluded

27  embodiments").

28

United States District Court
For the Northern District of California

Here, the Court concludes that TAK-390MR is a preferred embodiment and that Defendants' construction would exclude TAK-390MR from claim 4, but finds this irrelevant because other claims may cover TAK-390MR. The specification recites multiple characteristics that are "preferably" included in a pharmaceutical composition, *see* '158 Patent col.2 ll.56-67, and explains that TAK-390MR has most or all of those qualities, *id.* col.20 ll.47-56. *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003) ("[T]he use of the term 'preferably' makes clear that the language describes a preferred embodiment."). It is undisputed that Defendants' construction would exclude TAK-390MR from claim 4 due to the test results in Example 2 regarding percentage of time that gastric pH is greater than 4. However, Takeda conceded at the June 5, 2014 hearing that not all dependent claims must cover TAK-390MR, and has not argued that no other claims of the '158 Patent as properly construed would encompass that embodiment. For example, independent claim 1 lacks claim 4's limitations about the statistical significance of differences between dosing regimens. As *Helmsderfer* explains, a court need not construe dependent claims to include a preferred embodiment when other claims may encompass that embodiment.

The parties' extrinsic evidence is consistent with Defendants' position. Dr. Mayersohn expresses the view that the patent relies on both mean intragastric pH and percentage of time with pH over 4 "to determine the effect of food on intragastric pH," but largely repeats excerpts from the specification. Mayersohn Decl. ¶¶ 56-57. Dr. Sinko opines that "the plain meaning of the term 'intragastric pH' to one skilled in the art is the 'pH of the stomach'" and does not connote percentage of time where pH is above 4. Sinko Decl. ¶ 146. However, Dr. Sinko testified that both parameters are based on the same pH data and are both "measurements of intragastric pH . . . manipulated differently." ECF No. 88-15 (Sinko Depo.) at 162:10-19. This testimony is consistent with the inventors' use of both parameters to assess intragastric pH in Example 2.

Overall, the language of claims 4 and 12 strongly suggests that "intragastric pH" is not the same as "mean intragastric pH." The specification and extrinsic evidence are consistent with Defendants' construction, which does not impermissibly exclude the preferred embodiment of

United States District Court
For the Northern District of California

TAK-390MR from the scope of all claims. Therefore, the Court adopts Defendants' construction as to "intragastric pH."

For the reasons above, the Court construes the term "wherein the changes in pharmacokinetics . . . under fasting or fed conditions does not produce statistically significant changes in intragastric pH" to mean **"wherein the changes in pharmacokinetics . . . when the patient is dosed without regard to food does not produce any statistically significant differences in mean intragastric pH and percentage of time that gastric pH is greater than 4. The term 'statistically significant' means that the P value for the pairwise comparisons is less than 0.05."**

> 3. **"enteric coating releases the proton pump inhibitor from the solid particle at a pH of" "about 5.0 to about 5.5" or "about 6.2 to about 6.8" (claim 1)**

| Defendants' Proposed Construction[11] | Takeda's Proposed Construction |
|---|---|
| "enteric coating releases all of the proton pump inhibitor from the solid particle at a pH of [no less than 4.95 to a pH of no more than 5.55]/ [no less than 6.15 to a pH of no more than 6.85]" | "the target pH for dissolution of the enteric coating is approximately 5.0 to approximately 5.5 or approximately 6.2 to approximately 6.8" |

The disputed phrase appears in claim 1, which recites in relevant part:

> wherein said first solid particle comprises dexlansoprazole and a first enteric coating, wherein the first *enteric coating releases the proton pump inhibitor from the solid particle at a pH of about 5.0 to about 5.5*; and (ii) a second solid particle, wherein said second solid particle comprises dexlansoprazole and a second enteric coating, wherein the second *enteric coating releases the proton pump inhibitor from the solid particle at a pH of about 6.2 to about 6.8*;

'158 Patent cl.1 (emphases added).

The parties identify two disagreements. Defendants argue that "about" means ± 0.05 pH units, while Takeda argues that "about" means "approximately." Defendants also argue that "releases the [PPI]" means releasing *all* of the PPI at a pH of no less than the claimed value. Takeda argues that "releases the [PPI]" means that the enteric coating is designed or intended to dissolve at the specified pH. The Court adopts a modified form of Takeda's construction.

---

[11] Although Defendants' construction appears to require release "at" a particular pH, it "was intended to cover release 'at or above' a particular pH" and "the phrase 'at a pH of' in Defendants' construction should be read to mean 'at or above a pH of.'" *See* Defs. Br. at 18 n.10.

29

a.    "about 5.0 to about 5.5" and "about 6.2 to about 6.8"

i.    **Claim Language and Specification**

Takeda points to the specification to support its construction of "about" as "approximately." The specification uses the terms "about" and approximately" interchangeably when describing a pH level.  *Compare* '158 Patent col.20 ll.49-53 ("One type of granule releases drug in the proximal region of the small intestine when the pH reaches *approximately* 5.0-5.5.  The second type of granule releases drug more distally in the intestine when the pH reaches *approximately* 6.2-6.8.") (emphases added), *with id.* col.12 ll.6-9, 23-25 ("The first enteric coating surrounds the core and releases the active agent from the solid particle at a pH of *about* 5.0 to *about* 5.5. . . .The second enteric coating surrounds the core and releases the active agent from the solid particle at a pH of *about* 6.2 to *about* 6.8.") (emphases added); *see also id.* col.21 ll.7-8 (Table 1 listing "pH of release (approximate)" of different coatings).

Takeda also argues that in the context of pharmaceutical patents, if the intrinsic evidence does not support a narrower construction, courts have construed the term "about" to mean "approximately," rather than deriving a specific numerical range for the value that it modifies.  *See Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005); *see also Biopolymer Eng'g, Inc. v. Immunocorp.*, Nos. 05-536, 05-2972, 2007 WL 4562592, at *10, *12 (D. Minn. Dec. 21, 2007) ("[w]ithout evidence that would provide a basis to specify the permissible deviation from one percent, the Court gives the term 'about' its ordinary meaning of 'approximately'" and "the Court declines to arbitrarily construe 'about' through use of rounding principles. Instead, the Court gives the term 'about' its ordinary meaning of "'approximately.'""); *Unigene Labs., Inc. v. Apotex Inc.*, No. 06cv5571, 2008 WL 3992294, at *4, *9 (S.D.N.Y. Aug. 28, 2008).

Defendants do not point to any intrinsic evidence from the claims or specification, but instead argue that construing "about" as "approximately" "merely replaces one vague term for another."  Defs. Br. at 20, citing *Hynix Semiconductor Inc. v. Toshiba Corp.*, No. C-04-04708 VRW, 2006 WL 2547463, at *14 (N.D. Cal. Sept. 1, 2006) (rejecting proposed construction because it would simply "replace the present term with a more ambiguous one").  The Court does not agree that either "about" or "approximately" would be vague to one of ordinary skill in the art.

30

Defendants did not present any evidence to this effect, and similar terms of degree are frequently used in patent claims, especially in the pharmaceutical arts. *See* Manual of Patent Examining Procedure § 2173.05(b) (9th ed. Mar. 2014) (discussing "Relative Terminology," including "about"). It is for the factfinder to decide whether a specific pH value is "approximately" 5.0 to 5.5 or 6.2 to 6.8. *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("[A]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact.").

Accordingly, because the specification does not suggest any specific numerical range and uses "about" and "approximately" interchangeably, the Court determines that Defendants' restrictive numerical range is not supported by the intrinsic evidence.

### ii. Extrinsic Evidence

Defendants argue that one of ordinary skill in the art would understand that "about" means ± 0.05 based on the United States Pharmacopeia (the "USP"), which is "a book of public pharmacopeial standards." Mayersohn Decl. ¶ 50. Essentially, the USP is a widely referenced encyclopedia on drug formulation. The USP refers to dissolution pHs and describes pH measures within 0.05 units. Dr. Mayersohn thus concludes that "the USP recognizes that the pH for release of an active agent from a dosage form should be measured to an accuracy of ± 0.05, and persons of ordinary skill in the art would have agreed with this accuracy level as well." *Id.* ¶ 50.

The USP does not link its numerical range of ± 0.05 to "about" or use any words of qualification to describe its range, and therefore sheds little light on how one of ordinary skill in the art would interpret the claims. Instead, the USP teaches one of ordinary skill in the art how to test whether a drug formulation releases an active ingredient at a particular pH: create a solution with a pH within ± 0.05 of the target pH. If one of ordinary skill in the art would consider a pH of ± 0.05 accurate enough to test a drug formulation, the USP would actually seem to support a construction of "*about* 5.0 ± 0.05." Moreover, while the '158 Patent cites the USP, Defendants provide no basis for concluding that the inventors intended to incorporate the USP's pH testing standards into the claims. As a result, the Court finds that this extrinsic evidence is "less significant than the

31

intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1317-18 (internal quotation marks and citations omitted). Accordingly, the Court construes "about" to mean "approximately."

### b. "enteric coating releases the proton pump inhibitor from the solid particle at a pH of"

Defendants argue that this phrase requires that the "enteric coating releases *all* of the [PPI]" at or above a certain pH. Joint Statement Ex. 1 at 8 (emphasis added). Takeda argues that the phrase merely describes the "target pH for dissolution of the enteric coating." *Id.* While Takeda's construction accurately describes the invention as it would have been understood by one of ordinary skill in the art, the phrase "target pH" is not found in the specification. Defendants' construction, on the other hand, would essentially render the claims inoperable because it requires that all of the drug be released within a very specific pH window, and fails to account for inherent variance in the pharmaceutical arts.

One aspect of the '158 Patent's claimed invention is a method of treating a patient using a dosage form that releases a PPI at two locations: first in the proximal region of the small intestine where the pH is about 5.0 to about 5.5, and later in the distal region of the small intestine where the pH is about 6.2 to about 6.8. *See* '158 Patent col.20 ll.49-56 (Example 1), col.20 ll.1-7, col.11 l.64-col.12 l.10. The enteric coatings are responsible for regulating the release of the PPI and preventing release at undesirable pH levels. *Id.* col.12 ll.22-27.

To accomplish this, the '158 Patent discloses various enteric coatings with known dissolution pHs. *See id.* col.12 ll.9-17 (enteric polymers that dissolve at a pH of about 5.0 to about 5.5), col.12 l.36-col.13 l.2 (enteric polymers that dissolve at a pH of about 6.2 to about 6.8). For example, the specification discloses that Eudragit L 30 D-55, Eudragit L 100-55 (also known as Eudragit 100-55), HP-50, and HP-55 will release drug at a pH of about 5.0 to about 5.5. *See id.* col.12 ll.6-16. Similarly, the specification lists Eudragit L-100 and Eudragit S-100 as polymers that, "in a ratio of 4:1 to 1:4," will dissolve at a pH of about 6.2 to about 6.8. *See id.* col.12 ll.33-41. Takeda presents extensive evidence that the dissolution pH levels of the disclosed enteric polymers were well known and well characterized at the time of the '158 Patent's application, and

United States District Court
For the Northern District of California

Defendants do not argue or present any evidence to the contrary. *See* Sinko Decl. ¶¶ 106-09 (citing industry documents and scientific papers).

Defendants criticize Takeda's construction for several reasons. First, Defendants argue that Takeda's "target pH for dissolution" language is not found in the specification, and therefore cannot be correct. Defendants essentially argue that the construction must include the word "release." Defs. Br. at 18. However, the specification links the concepts of "dissolution" and drug "release." For example, the patent describes pulsed release forms:

> Particle or granule systems have also been proposed for purposes of providing a *pulsed release* of drug. Systems for the pulsed release of a drug typically use distinct populations of drug containing particles to achieve a pulsed release. The populations employ different *coating polymers*, such as those mentioned above, to *release* the drug at different points in time or location. For example, *polymers having different dissolution pHs are commonly used for this purpose*. Hence, one population of granules can be coated with a polymer that begins *dissolving* at a pH of 6 and another population of granules can be coated with a polymer that begins *dissolving* at a pH of 6.5 to achieve a pulsed *release*. In this manner, the first population of granules would *release* the drug in the upper small intestine while the second population of the granules would *release* the drug further down stream and therefore at a later time.

'158 Patent col.19 l.63-col.20 l.12 (emphases added). Reading the claims in light of the specification, one of ordinary skill in the art would recognize that dissolving the enteric coating surrounding the PPI would cause release of the PPI as claimed. Thus, Defendants' argument that "Takeda's proposed construction reads the 'release' requirement entirely out of the claims," Defs. Br. at 18, is without merit. However, the Court agrees with Defendants that "releases" is the language of the claims and therefore uses that term in the Court's construction.

Defendants next argue that Takeda's construction "only looks to see what the enteric coat is made of." *Id.* This argument misreads Takeda's construction. Takeda's construction does not read "target pH for dissolution of the enteric coating *material*," it reads "target pH for dissolution of the enteric coating." To fit within the scope of the claims, the enteric coating as a whole (not just the material) must have the specified target pH for dissolution. Thus, a dosage form made with a coating of Eudragit L 30 D-55, which material is known to dissolve at about pH 5.5, would not fall within in the claims if the coating was applied in such a manner that it would be expected to dissolve at a pH of about 4.0.

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

United States District Court
For the Northern District of California

1    Along a similar line, Defendants argue that Takeda's construction removes limits from the

2    claim because an enteric coating can be manipulated to release outside the target pH of the

3    material. Both experts agree that enteric coats may release at variable pHs due to "thickness and

4    uniformity of the enteric coating, the nature of other excipients in the enteric coat, and the testing

5    conditions." Takeda Br. at 18; Mayersohn Decl. ¶ 45 (explaining that "the release of PPIs is

6    affected by many more factors in addition to the pH, such as thickness and uniformity of the enteric

7    coating, the nature of other excipients in the enteric coat, and the testing conditions."); *see also*

8    Sinko Decl. ¶ 110. As discussed above, because the claim term is construed to require that the

9    enteric coating, not just the material used, is designed to dissolve at a specific pH, Defendants'

10    concern is obviated.

11    The parties also dispute whether the patent contemplates any release of the PPI outside of

12    the target pH, such as in the stomach, which has a much lower pH than the intestine. *See* '158

13    Patent col.9 ll.41-52. Defendants' construction requires the release of *all* of the PPI contained

14    within the enteric coating after the claimed threshold pH is reached, as modified by the word

15    "about." Thus, under Defendants' proposed construction, the PPI must not begin to release below

16    the recited threshold pH values. Defendants argue that this is necessary because "[w]ithout such a

17    requirement, the bottom-end pH values recited in the claims become entirely meaningless." Defs.

18    Br. at 19.

19    Defendants' construction—that *all* of the PPI be released at or above a specific pH—is

20    simply not practicable, and one of ordinary skill would recognize this fact. Mayersohn Decl. at

21    ¶ 45, 47; Sinko Decl. at ¶¶ 111-13 ("the target pH is not an on/off switch . . . It is well known in the

22    field of biopharmaceutics that '[t]here is not in fact a precise pH threshold above which a material

23    is soluble, rather a range of about one pH unit over which a polymer coating varies from being

24    virtually impermeable to being quite readily soluble and quick to rupture.'" (citation omitted)); *id.*

25    at ¶ 121 ("[I]n my opinion, the person of ordinary skill reviewing the specification of the '158

26    patent, who would be aware of the inherent variability in release of enteric coatings described

27    above, would have understood that the pH ranges disclosed in the specification, as well as claim 1,

28    were intended to relate to the target pHs for the initiation of dissolution of the enteric polymers

34

described in column 12, and not to the *in vitro* or *in vivo* pH levels at which enteric coatings manufactured from those polymers would begin to show some measurable release of drug.").  As Dr. Sinko points out, even using the specific enteric polymers disclosed in the patent as "releasing" at pH 5.0, "an enteric coating made of HP-50 likely will exhibit some dissolution below pH 5.0, its target pH for dissolution."  *Id.* at ¶ 113.  Defendants' construction would unduly narrow the claims so as to exclude the standard polymeric coatings that the specification expressly states are suitable for making the claimed formulations.  As noted above, a construction that excludes the patent's exemplary embodiments is "rarely, if ever, correct."  *Adams Respiratory*, 616 F.3d at 1290.

Moreover, adjusting Defendants' construction to account for this reality, by deleting the word "all," would simply copy the claim language into the construction, and would not provide additional clarification.  While Takeda's construction does allow for some drug release below the target pH, it does not read limitations out of the claims.  If the enteric coating is not designed to dissolve at or about the specific pH levels, then it does not meet the claims.  Although the Court agrees with Takeda's position, the Court believes that "designed to release" has more support in the intrinsic evidence and is more precise than "target pH for dissolution."  Indeed, Takeda's expert Dr. Sinko uses these phrases interchangeably.  *See, e.g.*, Sinko Decl. ¶¶ 50 ("These and other typical enteric coating materials are designed to dissolve (and hence release drug) . . . ."); 75 ("One type of enteric coated granule is designed so as to release drug . . . .").

Accordingly, the Court construes the term "enteric coating releases the proton pump inhibitor from the solid particle at a pH of" "about 5.0 to about 5.5" or "about 6.2 to about 6.8" to mean **"enteric coating is designed to release the proton pump inhibitor from the solid particle at a pH of" "approximately 5.0 to approximately 5.5" or "approximately 6.2 to approximately 6.8."**

### 4. "enteric coating has a pH of" "about 5.5" or "about 6.75" (claims 2 and 3)

| Defendants' Proposed Construction | Takeda's Proposed Construction |
| --- | --- |
| "enteric coating has a pH of [no less than 5.45 to no more than 5.55]/[no less than 6.70 to no more than 6.80]" | "the target pH for dissolution of the enteric coating is approximately 5.5 or approximately 6.75" |

United States District Court
For the Northern District of California

These disputed terms appear in dependent claims 2 and 3, which recite:

> 2. The method of claim 1, wherein the first enteric coating has a pH of about 5.5.
> 3. The method of claim 1, wherein the first enteric coating has a pH of about 6.75.

'158 Patent cls. 2, 3. The dispute over how to construe "about 5.5" and "about 6.75" is resolved above. The parties also dispute the construction of the phrase "enteric coating has a pH of." Defendants argue that this means the material of the coating has a specific pH, while Takeda argues that claims 2 and 3 simply restate the phrase "enteric coating releases the [PPI]." Defendants rely on claim differentiation and a plain meaning argument in support of their construction. However, when the claims are read in light of the specification, as required by *Phillips*, a modified version of Takeda's construction prevails.

Defendants correctly point out that while claim 1 requires that the enteric coating "releases the [PPI]" at a specific pH, claims 2 and 3 state that the enteric coating "has a pH." Thus, Defendants argue that Takeda's construction violates "the presumption that each claim in a patent has a different scope." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) (internal citations omitted). However, this "presumption" does not apply when the specification dictates otherwise. *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *Kraft Foods v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000).

Defendants are also correct that reading the phrase "has a pH of" outside of the context of the '158 Patent would usually be understood as claiming the pH of the material itself. Mayersohn Decl. ¶ 51. However, Defendants recognize that "the requirement that a solid compound, such as an enteric coating, 'have' a pH, is nonsensical." *Id.* Therefore, Defendants propose to measure the pH of the coating by dissolving it in water. *Id.* at ¶¶ 51-52.

Fortunately, the Court does not need to adopt a nonsensical construction of this phrase because the specification shows that the inventors used the phrase "has a pH of" to mean the same thing as "release at a pH of." In the Summary of Invention, the inventors first describe the method of claim 1 (delivering a drug with two release rates), and then refer to the first and second coatings as follows:

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

United States District Court
For the Northern District of California

Preferably, the first enteric coating *has* a pH of about 5.5 and comprises a methacrylic acid copolymer dispersion. Preferably, the second enteric coating *has* a pH of about 6.75 and comprises a mixture of a methacrylic copolymer Type B and a methacrylic copolymer Type A in a ratio of 3:1.

'158 Patent col.2 ll.63-67 (emphases added). The only other time the inventors use the phrase "has a pH of" is in claims 2 and 3. Moreover, the inventors never describe an embodiment that defines the pH of the enteric coating; the inventors only disclose coatings that dissolve at specific pH levels. Thus, the specification provides sufficient grounds for construing an otherwise nonsensical term. *See, e.g.*, *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276-77 (Fed. Cir. 2011) (construing "solid solution" to avoid "a nonsensical result").

Accordingly, because the claims are interpreted in light of the specification, *Phillips*, 415 F.3d at 1313, the Court construes "enteric coating has a pH of" "about 5.5" or "about 6.75" to mean **"enteric coating is designed to release at a pH of" "approximately 5.5" or "approximately 6.75."**

**United States District Court**
For the Northern District of California

Case No.: 13-CV-01927-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 8,461,187 AND 8,173,158

## IV.    CONCLUSION

In summary, and for the reasons stated herein, the Court construes the parties' disputed terms as follows:

| Patent | Disputed Term | Court's Construction |
|--------|---------------|----------------------|
| 8,461,187 | "wherein the first and second doses are released from the dosage form as discreet pulses of the PPI separated by a period of time" | "wherein release of the second dose of PPI from the dosage form begins a period of time after release of the first dose begins" |
| | "the second dose begins to be released between 2 and 20 hours after the first dose begins to be released" | "release of the second dose begins between 2 hours and 20 hours after release of the first dose begins" |
| 8,173,158 | "regardless of whether the patient is under fasted or fed conditions" | "without regard to food" |
| | "wherein the changes in pharmacokinetics . . . under fasting or fed conditions does not produce statistically significant changes in intragastric pH" | "wherein the changes in pharmacokinetics . . . when the patient is dosed without regard to food does not produce any statistically significant differences in mean intragastric pH and percentage of time that gastric pH is greater than 4. The term 'statistically significant' means that the P value for the pairwise comparisons is less than 0.05." |
| | "enteric coating releases the proton pump inhibitor from the solid particle at a pH of" "about 5.0 to about 5.5" or "about 6.2 to about 6.8" | "enteric coating is designed to release the proton pump inhibitor from the solid particle at a pH of" "approximately 5.0 to approximately 5.5" or "approximately 6.2 to approximately 6.8." |
| | "enteric coating has a pH of" "about 5.5" or "about 6.75" | "enteric coating is designed to release at a pH of" "approximately 5.5" or "approximately 6.75." |

**IT IS SO ORDERED.**

Dated: June 6, 2014

*Lucy H. Koh*

_____
LUCY H. KOH
United States District Judge

United States District Court
For the Northern District of California